## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| WILLIAM DECOLOGERO,<br><br>Plaintiff and Defendant in Counterclaim,<br><br>v.<br><br>HARTFORD LIFE INSURANCE COMPANY,<br><br>Defendant and Plaintiff in Counterclaim. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO:  11613 RGS |

## MOTION FOR RECONSIDERATION OF
## HARTFORD LIFE'S MOTION TO EXTEND AND FOR SANCTIONS

Hartford Life Insurance Company ("Hartford Life") hereby respectfully moves this Honorable Court to RECONSIDER the Orders issued July 6, 2007 Denying Hartford Life's Motion to Extend the discovery deadline by sixty days, and Allowing Decologero's Motion to Quash (which was filed without notice to Hartford Life's counsel, and without a Rule 7.1 Conference).  The Orders were issued the same day that counsel for Hartford Life became aware of the Motion and Opposition and came without an opportunity for counsel to respond.

As grounds therefore, Hartford Life states the following:

1.  Decologero's Opposition to Harford Life's Motion was not properly served upon counsel (it was sent to Hartford Life's counsel by the Court electronically *Thursday afternoon, July 5, 2007*, the day before the Court issued the Order denying the motion.)  *See* Affidavit of James J. Ciapciak attached hereto Exhibit "A".

1

2.    Decologero's Opposition contains *very serious* factual inaccuracies that
      require this Court's attention, which, as set forth below, ought to be addressed
      for their seriousness in nature and which materially alter the facts upon which
      the Orders that issued were based. Decologero's counsel has asserted in the
      Opposition *outright misrepresentations to the Court* that counsel for Hartford
      Life should have been able to address, yet the Opposition was sent only from
      the Court the day before the Order issued, and received the day the Order
      issued. See Exhibit "A".

3.    Decologero filed an "Emergency Motion to Quash" on July 5, 2007, *the day
      before the Order granting that "Emergency Motion" was entered.* See
      Exhibit "A", ¶5 – 10.

4.    Hartford Life's counsel was out of the office the afternoon of July 5, 2007
      when the Notice was sent by the Court, *and Decologero's counsel never
      advised or consulted with Hartford Life's counsel prior to the filing of this
      motion. See* Exhibit "A", ¶4-11.

5.    The Motion was filed *despite* correspondence by counsel for Hartford Life
      asking if a motion to quash would be filed (which Attorney Crow never
      answered), as well as attempts by Hartford Life's counsel to put over the
      scheduled depositions pending a ruling by the Court on the Motion to Extend
      (which also went unanswered.) Id.

6.    Counsel for Hartford Life learned of the Motion to Quash *at about the same
      time* as the Order Allowing that motion was entered. There was no notice to
      counsel for Hartford Life and no Local Rule 7.1 conference on Decologero's
      motion. The motion was filed by Decologero's counsel as an "Emergency
      Motion" without any notice or consultation whatsoever. Id. *Decologero never
      disclosed the existence of a twin brother before his deposition; the alleged
      letter filed by Decologero's counsel in support of the Opposition to Hartford
      Life's Motion is not signed and was never sent to Hartford Life and was
      never in Hartford Life's Claim File.* Id, ¶4-13.

7.    This unsigned letter was never sent to Hartford Life. The correspondence in
      the Claim File, as well as the Claim File notes and summary, all confirm that
      an Appeal Letter of the denial of benefits was sent October 16, 2001, not
      November 16, 2001, as represented by Attorney Crow in Decologero's
      Opposition. Id, ¶11-14. *It appears that this letter may have been entirely
      fabricated by Decologero's counsel in an attempt to misrepresent the facts to
      the Court and avoid discovery.* **This is a very serious act that must be
      addressed by this Court.**

8.    The unsigned appeal letter filed by Decologero's counsel was seen by
      Hartford Life for the first time when it was attached as an Exhibit to
      Decologero's filings submitted to the Court on July 5, 2007. Id, ¶4-13. It was

not contained in Hartford Life's Claim File, never received by Hartford Life, and all correspondence to and from Attorney Crow in 2001 (when the unsigned letter allegedly was sent) are very different from what was filed with the Court as an Exhibit to the Opposition.  Id. *None of the correspondence to or from Decologero's counsel at that time refer to this alleged letter that was filed with the Court. The entire Claim File is void of any reference to a twin brother, and this fact was never revealed to Hartford Life prior to the deposition of Decologero.*  Id.  The Claim File is completely void of any November 16, 2001 letter or any reference to a twin brother.  Id.

9.    This unsigned Appeal letter allegedly was sent by Decologero's counsel on October 16, 2001.  Id.  The letter in support of Decologero's Opposition presents  new and very different information to Hartford Life that was *disclosed for the first time at the deposition of Decologero.  That deposition was taken after the discovery deadline as a courtesy to Attorney Crow*.  There is no evidence that this phantom letter was ever sent to Hartford Life. Id., *see also*, Exhibit "A", ¶14-22.  **These facts alone warrant a hearing on this Motion for Reconsideration**.  If true, the act of filing a fabricated document is a fraud on this Court and sanctions against counsel for Decologero must issue.

10.    Counsel for Decologero is in the precarious position of having to justify her failure to file claims within the Statute of Limitations period, and clearly has been willing to do anything to justify her practice in this case.  This letter appears to be the most egregious step in a series of misrepresentations to the Court, which include representing to the Court that the Deposition of her client, William Decologero, was delayed by Hartford Life, and then representing that it was the result of Decologero's ill wife, when in reality she sent correspondence to counsel stating that she was unable to locate her client. *See* Exhibit "A", ¶14-21.

11.    Decologero's Opposition states that Decologero's counsel was unable to contact Hartford Life's counsel and that Decologero was unavailable for his scheduled deposition *due to his ill wife*.  Correspondence with counsel, attached hereto, *reveals this to be untrue*.  Counsel for Decologero in fact represented that she was unable to locate her client. *See* Exhibit "A"¶15.

12.    Hartford Life had requested for months that Decologero's counsel provide dates for Plaintiff's deposition, to which she consistently failed to respond. Finally, Hartford Life noticed the deposition and served the discovery on Decologero because Hartford Life's counsel's courtesies to counsel for Decologero were being abused and the discovery deadline sought by Hartford Life was fast approaching without any responses from Attorney Crow. *See* Exhibit "A",¶19-21.

3

13.  In Decologero's Opposition, Attorney Crow, admitted that Decologero failed to respond to the discovery of Hartford Life which was served before the discovery deadline, which will be the subject of a motion to compel by Hartford Life.

14.  Hartford Life was willing, at counsel's suggestion, to take the deposition of the Plaintiff before filing a motion to compel the discovery in order to determine exactly which responses to discovery were the most pertinent. Decologero's Opposition appears to have been a *calculated and preconceived attempt by Decologero's counsel to avoid any responses to discovery whatsoever.*

15.  Hartford Life never attempted to delay discovery in any manner as alleged by Decologero in his Opposition.  Hartford Life desired to serve discovery in November of 2006, but counsel pointed out that there was a Stay on discovery.  There was no tracking order and no Scheduling Conference set, and with the Stay, no discovery could begin.  So, Hartford Life, in November, 2006 (after Decologero's counsel failed to respond), prepared and filed a Motion to Lift the Stay and sought a Status Conference to issue a tracking Order to take this case out of limbo and move it along.  Decologero never made any efforts to lift or remove the Stay, it was Hartford Life that had to file and seek discovery.  *See* Exhibit "A", ¶19.

16.  Never had Hartford Life delayed on discovery; Hartford Life had timely served discovery and noticed depositions that were *before* the close of the discovery period.  Id., ¶20-21.  It is Decologero's counsel that has ignored, fought and failed to conduct or respond to discovery, not Hartford Life.

17.  Out of courtesy to Decologero and his attorney, who had represented that his wife was terminally ill, and who could not be found by his own counsel, Hartford Life agreed to conduct Decologero's deposition at *his* convenience beyond the discovery deadline.  Now Hartford Life is being punished for offering professional and moral courtesies to Decologero.  Id., ¶20-21.

18.  Decologero, at his deposition, the pages of which are attached hereto (*see* Exhibit "A", ¶22) *admitted* that he had never told Hartford Life about the twin brother.

**WHEREFORE**, Hartford Life Insurance Company respectfully requests a hearing on this Motion for Reconsideration, and seeks a reversal of the Orders issued a day after Decologero submitted his Opposition *and what appears to be a falsely created letter*, as well as the Order Allowing Motion to Quash (*which was issued the day after the Motion*

*to Quash was filed with the Court and <u>without</u> notice to counsel for Hartford Life as required by Local Rule 7.1*), and also will seek sanctions under Federal Rules of Civil Procedure, Rules 11 and 37, in light of the seriousness of the misrepresentations to the Court by Decologero's counsel and what may be a fraud on the Court.

## REQUEST FOR HEARING

Given the very egregious nature of the apparent serious misrepresentations to the Court, Hartford Life respectfully requests a Hearing before Judge Stearns on this matter.

**HARTFORD LIFE INSURANCE COMPANY,**

By Its Attorneys,

_/s/ James J. Ciapciak_
James J. Ciapciak, BBO #: 552328
CIAPCIAK & ASSOCIATES, P.C.
99 Access Road
Norwood, MA 02062
Tel: (781) 255-7401
Fax: (781) 255-7402

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing document was served upon Counsel of Record on Monday, July 9, 2007.

_/s/ James J. Ciapciak_
James J. Ciapciak

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| WILLIAM DECOLOGERO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CIVIL ACTION NO:  11613 REK |
| HARTFORD LIFE INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**AFFIDAVIT OF JAMES J. CIAPCIAK IN SUPPORT OF
HARTFORD LIFE'S MOTION FOR RECONSIDERATION OF
HARTFORD LIFE'S MOTION TO EXTEND AND FOR SANCTIONS**

I, James J. Ciapciak, being of full age and sound mind, state that the following is true and accurate to the best of my knowledge:

1.    I am lead counsel for Ciapciak & Associates, P.C., on the matter of *Decologero v. Hartford Life Insurance Company*, U.S.D.C. – Boston, C.A. # 11613 REK.

2.    On June 29, 2007, this firm filed a Motion to Extend the discovery deadline by 60 days on behalf of Hartford Life Insurance Company ("Hartford Life") after conferring with counsel for Plaintiff, William Decologero ("Decologero").

3.    The basis for Hartford Life's motion was that for the first time, at Plaintiff's deposition, Hartford Life learned that the Plaintiff claimed he had a twin brother. Decologero's deposition was taken after the discovery deadline at Attorney Crow's request (the deposition was noticed to take place before the discovery ended but Attorney Crow represented in correspondence that she was "unable to reach [her] client".) A copy of the correspondence, dated April 11, 2007, is attached hereto as Exhibit "A".

4.     Counsel for Decologero refused to assent to the Motion to Extend and
       represented that her "Appeal Notice" disclosed the existence of a twin brother.
       Counsel for Hartford Life reviewed the entire file, including the Notice of
       Appeal and other briefs, looking for this alleged disclosure, and found no
       mention of the twin brother. In compliance with Local Rule 7.1,
       correspondence was sent on June 29th to Attorney Crow noting that her alleged
       disclosure was not in the Notice of Appeal as she represented. The
       correspondence questioned Attorney Crow's refusal to assent to the motion
       *despite* the lack of disclosure and the past courtesies extended to her. The
       deposition of William Decologero occurred after the discovery deadline *only*
       because Attorney Crow could not find her client. *See* correspondence dated
       June 29, 2007 at 2:31 p.m. attached hereto as Exhibit "B".

5.     Decologero filed an Opposition on Thursday, July 5, 2007 without so much as
       responding to counsel for Hartford Life. Notice of the Opposition was issued
       by the Court to counsel for Hartford Life on July 5, 2007 at about noontime,
       and a Motion to Quash was also filed by Attorney Crow on July 5, 2007, and
       notice was sent by the Court at about 3:13 p.m. Counsel for Hartford Life was
       out of the office on the afternoon of July 5, 2007, and only received the
       notices on July 6, 2007. *See* Exhibit "D".

6.     Counsel for Hartford Life immediately sent to Attorney Crow correspondence
       offering to postpone the depositions in light of the Opposition, and to allow
       the Court to rule on the Motion to Extend without the necessity of filing or
       hearing of the Motion to Quash which had been filed without notice. *See*
       correspondence of July 6, 2007 at 10:46 a.m. attached hereto as Exhibit "C".

7.     Decologero's Opposition to the Harford Life's Motion was not properly filed
       as it was received from the Court electronically *Thursday afternoon, July 5,
       2007,* the day before the Court issued the Order denying the motion, without
       counsel having conferred beforehand and despite Hartford Life's counsel's
       efforts to communicate with Attorney Crow. *See* the Court Docket attached
       hereto as Exhibit "E". Given Hartford Life's counsel's willingness to put over
       the depositions pending a hearing on the Motion to Extend, there was no basis
       for filing an "Emergency" motion, especially after ignoring counsel's efforts
       to discuss the matter beforehand.

8.     Decologero's Opposition contains ***very serious*** factual inaccuracies that
       require this Court's attention, which as set forth below, ought to be addressed
       for their seriousness in nature. Decologero's counsel has asserted in the
       Opposition ***outright misrepresentations to the Court*** that counsel for Hartford
       Life should have been able to address, but the Opposition was received only
       from the Court, and only the day before the Order issued. *See* Exhibit "E".

9.     The prejudice to Hartford Life is clear: an Emergency Motion was filed and
       ruled upon without notice or consultation, as the notice of this Motion was

first viewed by counsel for Hartford Life's counsel on *July 6, 2007, the same day as the Order granting that "Emergency Motion". See* <u>Exhibit</u> *"E".*

10.   Hartford Life's counsel was out of the office at the time the notice from the Court on the Motion to Quash was received, and *Decologero's counsel never advised Hartford Life's counsel of the filing of this motion.* This occurred *despite* correspondence by counsel for Hartford Life to Decologero's counsel <u>asking</u> if a motion to quash would be filed (which went unanswered), and the attempts by Hartford Life's counsel to put over the scheduled depositions pending a ruling by the Court on the Motion to Extend (which also went unanswered). True and accurate copies of the correspondence to Attorney Crow are attached hereto as Exhibits "C" and "F".

11.   Also, because Hartford Life's counsel had no notice <u>resulting from the failure to conduct a Local Rule 7.1 conference on Decologero's motion,</u> the Court consequently issued Orders based upon misinformation. The Motion filed by Decologero's counsel as an "Emergency Motion" raises questions as to why this was curiously done *without any notice or consultation whatsoever. See* Exhibits "A" and "B". Also, why did Attorney Crow not respond to Hartford Life's counsel's efforts to discuss the issues? These facts evidence further the prejudice to Hartford Life as it was unable to formulate a response or file an Opposition revealing the misrepresentations by Decologero, and the Order issued on misinformation.

12.   <u>Decologero never disclosed the existence of a twin brother before his deposition; the alleged letter served by counsel is not signed and is not in Hartford Life's Claim File.</u> This unsigned letter was never sent to Hartford Life. The correspondence in the Claim File, as well as the Claim File notes and summary, all confirm that the Appeal Letter of the denial of benefits was sent October 15, 2001, not November 16, 2001. It appears that this letter may have been entirely fabricated by Decologero's counsel in an attempt to misrepresent the facts to the Court and avoid discovery. <u>This is a very serious act that Hartford Life suggests must be addressed by this Court.</u> None of the correspondence to or from Decologero's counsel make any mention of this alleged letter that was filed with the Court, and the entire file is void of reference to a twin brother: this fact was never revealed to Hartford Life. *See* Exhibits "A", "B", "G" and "H".

13.   This is a very serious allegation and not made lightly: It appears that this letter may have been *fabricated* by counsel to avoid a deposition of the alleged twin brother and the Plaintiff at the same time. The appeal letter filed by Decologero's counsel and all the correspondence between Plaintiff's counsel and Hartford Life are very different from what was filed with the Court as an Exhibit. The correspondence, attached hereto (*see* Exhibits "G" and "H"), is completely void of any <u>November</u> 16, 2001 letter or any reference to a twin brother. The Appeal letter was sent by Decologero's

counsel on <u>October</u> 15, 2001.  <u>Id</u>.  The phantom letter attached to attorney Crow's Opposition presents completely new information to Hartford Life that was disclosed for the first time at the deposition of Decologero.  There is no evidence that this phantom letter was ever sent to Hartford Life.  These facts alone warrant a hearing on this Motion for Reconsideration.  If true, the acts of filing a fabricated document require sanctions against counsel for Decologero.

14.    Counsel for Decologero is in the precarious position of having to justify her failure to file the claims within the Statute of Limitations period, and clearly has been willing to do anything to justify her practice in this case.  This letter appears to be a most egregious step in a series of misrepresentations to the Court, which include representing to the Court that the Deposition of Decologero was delayed by Hartford Life, and then representing that it was the result of Decologero's ill wife, while the truth is that that she was unable to locate her client (as evidenced by Attorney Crow's written correspondence to Hartford Life's counsel).  *See* Exhibit "B".

15.    Decologero's Opposition states that Decologero's counsel was unable to contact Hartford Life's counsel and that Decologero was unavailable for his scheduled deposition *due to his ill wife*.  Correspondence with counsel, attached hereto, *reveals this to be untrue*.  Counsel for Decologero in fact represented that <u>she was unable to locate her client</u>.  *See* Exhibit "B".

16.    Hartford Life had requested for months that Decologero's counsel provide dates for Plaintiff's deposition, which she consistently failed to respond to and finally Hartford Life noticed the deposition and served the discovery as Hartford Life's counsel's courtesies to counsel for Decologero were being abused.  *See* Exhibit "B".

17.    Decologero's Opposition *admits* that Decologero failed to respond to the discovery of Hartford Life, which will be the subject of a motion to compel by Hartford Life.

18.    Hartford Life was willing, at Decologero's counsel's suggestion, to take the deposition of the Plaintiff <u>before</u> filing a motion to compel to determine exactly which responses to discovery were the most pertinent, and Decologero's Opposition appears to have been a *calculated and preconceived attempt by Decologero's counsel to avoid any responses to discovery whatsoever*.

19.    Hartford Life never attempted to delay discovery in any manner as alleged by Decologero in his Opposition.  Hartford Life desired to serve discovery in November of 2006, but counsel pointed out that there was a Stay on discovery.   There was no tracking order and no Scheduling Conference set, and with the Stay, no discovery could begin.  So, Hartford Life, in November,

2006 (after Decologero's counsel failed to respond), prepared and filed a Motion to Lift the Stay and sought a Status Conference to issue a tracking Order to take this case out of limbo and move it along. *See* Exhibit I. Decologero never made any efforts to lift or remove the Stay, it was Hartford Life that had to file and seek discovery.

20.     Never had Hartford Life delayed on discovery; Hartford Life had timely served discovery and depositions notices *before* the close of the discovery period that it requested. Id.

21.     Out of courtesy to Decologero, who represented that his wife was terminally ill, and who could not be found by his own counsel, Hartford Life agreed to conduct Decologero's deposition at *his* convenience beyond the discovery deadline, and now is being punished for offering professional and moral courtesies to Decologero.

22.     Decologero, at his deposition, the pages of which are attached hereto *admitted* that he had never seen the video that was shown at his Deposition, and never told Hartford Life about the twin brother. *See* Exhibit "J" more specifically pages 106 and 107 therein.


SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 9TH DAY OF JULY, 2007:


_____          DATED: _____

James J. Ciapciak
Ciapciak & Associates, P.C.
99 Access Road
Norwood, MA 02062
(781) 255-7401

EXHIBIT A

------Original Message------
From: Cheri L. Crow, Esq.
To: Ajim Ciapciak
ReplyTo: Cheri L. Crow, Esq.
Sent: Apr 11, 2007 2:24 PM
Subject: Decologero/Hartford

Jim

This is to confirm my telephone conversation with your office today in which I informed them that since receiving the notice of deposition you issued on April 5th to take my client's deposition on April 13th, I have been unable to reach my client despite my efforts to do so. (I am assuming he is away). Therefore, I am willing to produce my client for deposition after April 13th and treat the deposition as though it took place on April 13th.

I will contact you as soon as I am able to communicate with my client with dates that work for he and I within the next few weeks.

Cheri

Law Office of Cheri L. Crow
Two Main St., Ste 300
Stoneham, MA   02180
Tel:  781-438-6400
Fax: 781-438-6411
E-Mail: chericrow@attorneycrow.org: <mailto:chericrow@attorneycrow.org>

E-MAIL CONFIDENTIALITY NOTICE
IMPORTANT:  This electronic mail message, including any attachments, is being sent by a lawyer.  It is confidential and may contain or constitute information protected by the Attorney-Client and/or Attorney work-product privileges.  If you are not the intended recipient, you are not authorized to read, retain, print, copy, disclose or disseminate any of its contents.  If you have received this communication in error, please immediately notify the sender and delete this e-mail.  Unauthorized interception of this E-Mail is a violation of federal criminal law.

Disclaimer regarding Uniform Electronic Transactions Act ("UETA"):  If this communication concerns negotiation of a contract or agreement, UETA does not apply to it.  Contract formation shall occur only with manually affixed original signatures on original documents.

Sent via BlackBerry from T-Mobile

1

# EXHIBIT B

**Femion Mezini**

| | |
|---|---|
| **From:** | Jim Ciapciak |
| **Sent:** | Friday, June 29, 2007 2:31 PM |
| **To:** | chericrow@attorneycrow.org |
| **Cc:** | Femion Mezini |
| **Subject:** | Refusal to Assent |

**Attorney Crow-**

**I received word from Yoni that you have refused to Assent to our motion to extend.  Please be advised that you will receive no future courtesies from us.  I also reviewed the file and there was no mention of a twin brother in you Notice of Appeal or in any of those related pleadings.**

**We will be filing a motion today.**

This electronic message and documents accompanying it are privileged and confidential attorney-client communications and may contain privileged work product.  Any interception or copying of this message by any person other than the addressee is improper.  If you have any questions about this warning, please contact:

James J. Ciapciak
*CIAPCIAK & ASSOCIATES, P.C.*
99 Access Road
Norwood, MA (USA) 02062
Tel:  781.255.7401
Fax: 781.255.7402
jjc@candalawyers.com
*Boston: 617.951.2727*
*Rhode Island: 401.996.7401*

# EXHIBIT C

**Femion Mezini**

| | |
|---|---|
| From: | Femion Mezini |
| Sent: | Friday, July 06, 2007 10:46 AM |
| To: | 'Cheri L. Crow, Esq.' |
| Cc: | 'Allison'; Jim Ciapciak |
| Subject: | Decologero v. Hartford Life. |

Dear Ms. Crow:

In light of your Opposition to Hartford Life's Motion to Extend the Tracking Order, we will agree to continue William DeCologero and Joseph DeCologero's Depositions until Hartford Life's Motion to Extend the Tracking Order has been ruled upon.  This will confirm that you will withdraw (without prejudice) your Motion to Quash the Deposition of Joseph DeCologero until the Court rules on Hartford Life's Motion.

Thank you,

*Femion D. Mezini, JD, MBA*

This electronic message and documents accompanying it are privileged and confidential attorney-client communications and may contain privileged work product.  Any interception or copying of this message by any person other than the addressee is improper.  If you have any questions about this warning, please contact:

*CIAPCIAK & ASSOCIATES, P.C.*
99 Access Road
Norwood, MA (USA) 02062
Tel:  781.255.7401 x 15
Fax: 781.255.7402
fm@candalawyers.com
*Boston: 617.951.2727*
*Rhode Island: 401.996.7401*

| Tracking: | Recipient | Read |
|---|---|---|
| | 'Cheri L. Crow, Esq.' | |
| | 'Allison' | |
| | Jim Ciapciak | Read: 7/6/2007 10:57 AM |
| | Alison C. Bethelmie | Read: 7/6/2007 10:47 AM |

1

# EXHIBIT D



## Jim Ciapciak

**From:** ECFnotice@mad.uscourts.gov
**Sent:** Thursday, July 05, 2007 11:39 AM
**To:** CourtCopy@mad.uscourts.gov
**Subject:** Activity in Case 1:05-cv-11613-RGS Decologero v. Hartford Life Insurance Company Opposition to Motion

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### United States District Court

### District of Massachusetts

## Notice of Electronic Filing

The following transaction was entered by Crow, Cheri on 7/5/2007 at 11:38 AM EDT and filed on 7/5/2007
**Case Name:**    Decologero v. Hartford Life Insurance Company
**Case Number:**    1:05-cv-11613
**Filer:**    William Decologero
**Document Number:** 38

**Docket Text:**
Opposition re [37] First MOTION for Extension of Time to August 31, 2007 to Extend Tracking Order (File Dispositive Motion) filed by William Decologero. (Attachments: # (1) Exhibit Letter to Hartford) (Crow, Cheri)

**1:05-cv-11613 Notice will be electronically mailed to:**

Nadine Marie Bailey    nmb@candalawyers.com

James J. Ciapciak    jjc@candalawyers.com

Cheri L. Crow    chericrow@attorneycrow.org

**1:05-cv-11613 Notice will not be electronically mailed to:**

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=7/5/2007] [FileNumber=1950197-0]
[3a47386b81f6bf12aa6dfa278f096cfd16a5c51b4fd9ecf73347e9283f6f3e3e5483

f9ee531a047bb3dc84d96741d23584d6d88cb9167ff40cac07c6d53a8f5e]]
**Document description:**Exhibit Letter to Hartford
**Original filename:**yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=7/5/2007] [FileNumber=1950197-1]
[cca809e95813fb8d10b5c21736e31d521f1fd1e3af196748c32e5b7657a899d5d45e
3bade05c71b14e0e9e3f9c6f8463a84f69b80a31e21e4b4d00872f60835d]]



**Jim Ciapciak**

---

| | |
|---|---|
| **From:** | ECFnotice@mad.uscourts.gov |
| **Sent:** | Thursday, July 05, 2007 3:13 PM |
| **To:** | CourtCopy@mad.uscourts.gov |
| **Subject:** | Activity in Case 1:05-cv-11613-RGS Decologero v. Hartford Life Insurance Company Motion to Quash |

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.

### United States District Court

### District of Massachusetts

## Notice of Electronic Filing

The following transaction was entered by Crow, Cheri on 7/5/2007 at 3:13 PM EDT and filed on 7/5/2007
**Case Name:**      Decologero v. Hartford Life Insurance Company
**Case Number:**    1:05-cv-11613
**Filer:**          William Decologero
**Document Number:** 39

**Docket Text:**
Emergency MOTION to Quash *Deposition* by William Decologero.(Crow, Cheri)

**1:05-cv-11613 Notice will be electronically mailed to:**

Nadine Marie Bailey      nmb@candalawyers.com

James J. Ciapciak      jjc@candalawyers.com

Cheri L. Crow      chericrow@attorneycrow.org

**1:05-cv-11613 Notice will not be electronically mailed to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=7/5/2007] [FileNumber=1950690-0]
[0fd8625ce0e0cea4859959e637415d5edcac7b9196627849c855b4e822da5f079b8a
bd9dd75381210d0eeeff8ae2f01e2263445cf4ff51092ee09df3af0ddab2]]

7/7/2007

# EXHIBIT E

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:05-cv-11613-RGS

Decologero v. Hartford Life Insurance Company
Assigned to: Judge Richard G. Stearns
Demand: $144,000
Case in other court: First Circuit, 06-02035
Cause: 29:1132 E.R.I.S.A.-Employee Benefits

Date Filed: 08/02/2005
Jury Demand: None
Nature of Suit: 791 Labor: E.R.I.S.A.
Jurisdiction: Federal Question

**Plaintiff**

**William Decologero**

represented by **Cheri L. Crow**
Cheri L. Crow, Esq.
Two Main Street
Suite 300
Stoneham, MA 02180
781-438-6400
Email: chericrow@attorneycrow.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Hartford Life Insurance Company**

represented by **James J. Ciapciak**
Ciapciak & Associates, PC
99 Access Road
Norwood, MA 02062
781-255-7401
Fax: 781-255-7402
Email: jjc@candalawyers.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Hartford Life Insurance Company**

represented by **James J. Ciapciak**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nadine Marie Bailey**
Ciapciak & Associates, P.C.
99 Access Road
Norwood, MA 02062
781-255-7401
Fax: 781-255-7402
Email: nmb@candalawyers.com
*ATTORNEY TO BE NOTICED*

Case 1:05-cv-11613-RGS    Document 40-3    Filed 07/09/2007    Page 13 of 42

## V.

### Counter Defendant

| William Decologero | represented by | **Cheri L. Crow**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| --- | --- | --- |

| Date Filed | # | Docket Text |
| --- | --- | --- |
| 08/02/2005 | 1 | COMPLAINT against Hartford Life Insurance Company Filing fee: $ 250, receipt number 65988, filed by William Decologero. (Attachments: # 1 Civil Cover Sheet)(Folan, Karen) (Entered: 08/04/2005) |
| 08/02/2005 | | Summons Issued as to Hartford Life Insurance Company. (Folan, Karen) (Entered: 08/04/2005) |
| 08/02/2005 | | If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Dein. (Folan, Karen) (Entered: 08/04/2005) |
| 09/28/2005 | 4 | SUMMONS Returned Executed Hartford Life Insurance Company served on 9/20/2005. (Folan, Karen) (Entered: 10/14/2005) |
| 10/12/2005 | 2 | ANSWER to Complaint by Hartford Life Insurance Company.(Folan, Karen) (Entered: 10/14/2005) |
| 10/14/2005 | 3 | NOTICE of Scheduling Conference Scheduling Conference set for 12/1/2005 02:00 PM before Judge Robert E. Keeton. (Folan, Karen) (Entered: 10/14/2005) |
| 11/29/2005 | 5 | JOINT STATEMENT re scheduling conference. (Folan, Karen) (Entered: 12/01/2005) |
| 11/30/2005 | 6 | CERTIFICATION pursuant to Local Rule 16.1 by Hartford Life Insurance Company.(Folan, Karen) (Entered: 12/01/2005) |
| 11/30/2005 | 7 | CORPORATE DISCLOSURE STATEMENT by Hartford Life Insurance Company. (Folan, Karen) (Entered: 12/01/2005) |
| 12/01/2005 | | ElectronicClerk's Notes for proceedings held before Judge Robert E. Keeton : Scheduling Conference held on 12/1/2005. Parties submitted original, signed 16b statements before conference and then in open court said that they had already submitted 16.1 statments but wanted to provide originals. Parties submitted proposed trial schedule. REK accepts the proposed schedule. Pretrial conference set for 12:00 p.m. on Wednesday, October 11, 2006 and Jury trial set for Monday October 23, 2006 at 9:00 a.m. Colloquy re: mediation. Plaintiff wants mediation but defendant is uncertain about its clients wishes right now. REK wants parties to report back in a couple of weeks about proceeding with court mediation program. (Court Reporter Cloonan.) (Folan, Karen) (Entered: 12/05/2005) |

| 12/01/2005 | 8 | CERTIFICATION pursuant to Local Rule 16.1 by William Decologero. (Folan, Karen) (Entered: 12/08/2005) |
|---|---|---|
| 12/16/2005 | 9 | MOTION to Stay discovery pending a ruling on the motion to dismiss/motion for summary judgment by Hartford Life Insurance Company.(Folan, Karen) (Entered: 12/20/2005) |
| 12/16/2005 | 10 | MOTION to Dismiss/motion for summary judgment by Hartford Life Insurance Company.(Folan, Karen) (Entered: 12/20/2005) |
| 12/16/2005 | 11 | MEMORANDUM of law in Support re 10 MOTION to Dismiss/motion for summary judgment filed by Hartford Life Insurance Company. (Folan, Karen) (Entered: 12/20/2005) |
| 12/16/2005 | 12 | STATEMENT of undisputed facts in support of 10 MOTION for summary judgment. (Folan, Karen) (Entered: 12/20/2005) |
| 12/16/2005 | 13 | AFFIDAVIT of Diane Favreau re 10 MOTION to Dismiss/motion for summary judgment. (Folan, Karen) (Entered: 12/20/2005) |
| 12/21/2005 | 14 | COUNTERCLAIM against William Decologero, filed by Hartford Life Insurance Company. (Attachments: # 1 Exhibit)(Folan, Karen) (Entered: 12/22/2005) |
| 01/10/2006 | 15 | ANSWER to Counterclaim by William Decologero.(Crow, Cheri) (Entered: 01/10/2006) |
| 01/10/2006 | 16 | AMENDED ANSWER to COUNTERCLAIM by William Decologero. (Crow, Cheri) (Entered: 01/10/2006) |
| 01/20/2006 | 17 | Opposition re 10 MOTION to Dismiss filed by William Decologero. (Crow, Cheri) (Entered: 01/20/2006) |
| 01/20/2006 | 18 | MEMORANDUM in Opposition re 10 MOTION to Dismiss filed by William Decologero. (Crow, Cheri) (Entered: 01/20/2006) |
| 01/25/2006 | 19 | MOTION for Leave to File Defendants' Reply Brief to Plaintiff's Opposition to Motion to Dismiss/Motion for Summary Judgment by Hartford Life Insurance Company.(Filo, Jennifer) (Entered: 01/31/2006) |
| 02/03/2006 | | Judge Robert E. Keeton: Electronic ORDER entered granting 19 Motion for Leave to File Reply to Opposition. Counsel using the Electronic Case Files system should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. (Filo, Jennifer) (Entered: 02/03/2006) |
| 02/08/2006 | | Judge Robert E. Keeton: Electronic ORDER entered granting 9 Motion to Stay Discovery. (Filo, Jennifer) (Entered: 02/08/2006) |
| 03/01/2006 | 21 | Letter/request (non-motion) from James Ciapciak to clerk re: deadline for reply brief to be filed. (Filo, Jennifer) (Entered: 03/09/2006) |
| 03/02/2006 | 20 | First REPLY to Response to Motion re 10 MOTION to Dismiss filed by Hartford Life Insurance Company. (Bailey, Nadine) (Entered: 03/02/2006) |

| 05/17/2006 | | Senior Judge Robert E. Keeton: Electronic ORDER entered granting 10 Motion to Dismiss/Motion for Summary Judgment. (Filo, Jennifer) (Entered: 05/17/2006) |
| 05/17/2006 | 22 | Senior Judge Robert E. Keeton: MEMORANDUM AND ORDER entered. (Filo, Jennifer) (Entered: 05/17/2006) |
| 05/17/2006 | 23 | Senior Judge Robert E. Keeton: FINAL JUDGMENT in favor of Defendant against Plaintiff.(Filo, Jennifer) (Entered: 05/17/2006) |
| 06/12/2006 | 24 | NOTICE of Change of Address by Cheri L. Crow (Crow, Cheri) (Entered: 06/12/2006) |
| 06/15/2006 | 25 | NOTICE OF APPEAL as to 22 Memorandum & ORDER, 23 Judgment by William Decologero. $ 455 NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov/clerks/transcript.htm MUST be completed and submitted to the Court of Appeals. Appeal Record due by 7/5/2006. (Crow, Cheri) (Entered: 06/15/2006) |
| 07/06/2006 | 26 | Certified and Transmitted Record on Appeal to US Court of Appeals re 25 Notice of Appeal, (Attachments: # 1)(Ramos, Jeanette) (Entered: 07/06/2006) |
| 07/11/2006 | 27 | USCA Case Number 06-2035 for 25 Notice of Appeal, filed by William Decologero,. (Ramos, Jeanette) (Entered: 07/11/2006) |
| 07/21/2006 | | Case Reopened. Case closed in error on 5/17/06. Counterclaims still pending. (Folan, Karen) (Entered: 07/21/2006) |
| 07/25/2006 | | Filing fee: $ 455.0, receipt number 73406 for 25 Notice of Appeal, (Folan, Karen) (Entered: 07/25/2006) |
| 08/29/2006 | 28 | MOTION to Stay *Motion to Lift Stay* by Hartford Life Insurance Company.(Bailey, Nadine) (Entered: 08/29/2006) |
| 08/31/2006 | | ELECTRONIC NOTICE of Reassignment. Judge Richard G. Stearns added. Judge Robert E. Keeton no longer assigned to case. (Folan, Karen) (Entered: 08/31/2006) |
| 08/31/2006 | 29 | Opposition to MOTION to Stay *Opposition to Motion to LIft Stay* by William Decologero.(Crow, Cheri) Modified on 9/5/2006 (Flaherty, Elaine). (Entered: 08/31/2006) |
| 09/05/2006 | | Judge Richard G. Stearns : Electronic ORDER entered finding as moot 29 Motion to Stay (no action needed, pleading is an OPPOSITION to motion not a MOTION) (Flaherty, Elaine) (Entered: 09/05/2006) |
| 09/05/2006 | | Notice of correction to docket made by Court staff. Correction: opposition to motion to stay (#29) corrected because: document was docketed as a motion by counsel, instead of an opposition to motion (Flaherty, Elaine) (Entered: 09/05/2006) |
| 09/06/2006 | | Judge Richard G. Stearns : Electronic ORDER entered denying 28 |

|  |  |  |
|---|---|---|
|  |  | Motion to Stay "Denied without prejudice. The court lacks jurisdiction in light of the notice of appeal." (Flaherty, Elaine) (Entered: 09/06/2006) |
| 10/25/2006 | 30 | USCA Judgment as to 25 Notice of Appeal, filed by William Decologero. Because not all claims against all parties have been adjudicated, and because the district court did not purpot to render the interlocutory order immediately appealable under Fed. R. Civ. P. 54(b), this appeal is dismissed for lack of jurisdiction. DISMISSED. (Ramos, Jeanette) (Entered: 10/25/2006) |
| 10/25/2006 | 31 | MANDATE of USCA as to 25 Notice of Appeal, filed by William Decologero, (Ramos, Jeanette) (Entered: 10/25/2006) |
| 11/02/2006 | 32 | MOTION to Lift Stay *(Renewed Motion) on Discovery and for a New Scheduling Order* by Hartford Life Insurance Company.(Bailey, Nadine) Modified on 11/2/2006 (Flaherty, Elaine). (Entered: 11/02/2006) |
| 11/10/2006 | 33 | MOTION for Entry of Judgment under Rule 54(b) by William Decologero.(Crow, Cheri) (Entered: 11/10/2006) |
| 11/10/2006 | 34 | Opposition re 32 MOTION to LIFT Stay *(Renewed Motion) on Discovery and for a New Scheduling Order* filed by William Decologero. (Crow, Cheri) (Entered: 11/10/2006) |
| 11/13/2006 | 35 | Opposition re 33 MOTION for Entry of Judgment under Rule 54(b) filed by Hartford Life Insurance Company. (Ciapciak, James) (Entered: 11/13/2006) |
| 11/17/2006 |  | Judge Richard G. Stearns : Electronic ORDER entered granting 32 the Motion to lift the stay and for new scheduling order and denying 33 Motion for Entry of Judgment under Rule 54(b). The parties shall file within fourteen days from the date of this Order a jointly proposed scheduling order. (Hamilton, Maria Raia) (Entered: 11/17/2006) |
| 11/22/2006 |  | Appeal Record Returned: 25 Notice of Appeal, (Ramos, Jeanette) (Entered: 11/22/2006) |
| 12/01/2006 | 36 | JOINT STATEMENT of counsel *PURSUANT TO F.R.C.P. 16(B) AND LOCAL RULE 16.1(D)*. (Ciapciak, James) (Entered: 12/01/2006) |
| 12/11/2006 |  | Judge Richard G. Stearns : Electronic ORDER entered. The following SCHEDULING ORDER is hereby entered in the instant case: "1. motions to add parties, add claims or move to dismiss claims to be filed by 1-8-07; 2. all discovery to be completed by 4-16-07; 3. dispositive motions to be filed by 7-1-07; 4. oppositions to be filed by 8-1-07. Counsel will be notifed by the Court if a hearing on motions is to be scheduled. SO ORDERED." (Johnson, Mary) Modified on 12/11/2006 (Johnson, Mary). (Entered: 12/11/2006) |
| 06/29/2007 | 37 | First MOTION for Extension of Time to August 31, 2007 to Extend Tracking Order (File Dispositive Motion) by Hartford Life Insurance Company.(Ciapciak, James) (Entered: 06/29/2007) |
| 07/05/2007 | 38 | Opposition re 37 First MOTION for Extension of Time to August 31, |

| | | |
|---|---|---|
| | | 2007 to Extend Tracking Order (File Dispositive Motion) filed by William Decologero. (Attachments: # 1 Exhibit Letter to Hartford)(Crow, Cheri) (Entered: 07/05/2007) |
| 07/05/2007 | 39 | Emergency MOTION to Quash *Deposition* by William Decologero. (Crow, Cheri) (Entered: 07/05/2007) |
| 07/06/2007 | | Judge Richard G. Stearns : Electronic ORDER entered granting 39 Motion to Quash having examined the November 16, 2001 letter from Attorney Crow to Hartford Insurance Co. (Zierk, Marsha) (Entered: 07/06/2007) |
| 07/06/2007 | | Judge Richard G. Stearns : Electronic ORDER entered denying 37 Motion for Extension of Time (Zierk, Marsha) (Entered: 07/06/2007) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/09/2007 10:11:39 | | |
| **PACER Login:** | ci0562 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:05-cv-11613-RGS |
| **Billable Pages:** | 3 | **Cost:** | 0.24 |

# EXHIBIT F

CIAPCIAK
&
ASSOCIATES, P. C.

ATTORNEYS AT LAW

99 Access Road
Norwood, MA 02062
Tel (781) 255-7401
Fax (781) 255-7402

BOSTON, MA OFFICE
(617) 951-2727

RHODE ISLAND OFFICE
(401) 996-7401

July 5, 2007

*VIA FACSIMILE*

Cheri L. Crow, Esquire
Two Main Street
Suite 300
Stoneham, MA 02180

**Re:** **Decologero v. Hartford Life Insurance Company – Defendant**
**USDC C. A. No.:  05-11613 REK**

Dear Ms. Crow:

In light of the fact that you had not disclosed the twin brother (we checked our file), will you be filing a motion to quash the deposition of Joseph DeCologero that scheduled for Tuesday?

Very truly yours,

James J. Ciapciak

JJC/acb

# CIAPCIAK

## &

# ASSOCIATES, P. C.

99 Access Road
Norwood, MA 02062
Tel: (781) 255-7401
Fax: (781) 255-7402

**BOSTON, MA**
Suite 1900
101 Federal Street
Boston, MA 02110
(617) 951-2727

**COVENTRY, RI**
113 Tiouge Avenue
Coventry, RI 02816
(401) 996-7401

**TO:**          **Cheri L. Crow, Esquire**

**FROM:**          **James J. Ciapciak**

**YOUR FAX #:**     **(781) 438-6411**          **C&A CASE #:**

**RE:**          **Decologero**

**DATE:**          **July 5, 2007**     **NO. OF PAGES (incl. cover):  2**

**REMARKS:**

Please call sender at the above telephone number if there is trouble in the transmission or if you do not receive all pages.

***Confidentiality Note***

THIS TELECOPY IS SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE AND CONTAINS CONFIDENTIAL INFORMATION FOR THE PERSON(S) NAMED ABOVE.  ANY DISTRIBUTION, COPYING OR DISCLOSURE IS STRICTLY PROHIBITED.  IF YOU HAVE RECEIVED THIS TELECOPY IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY BY TELEPHONE AT THE ABOVE TELEPHONE NUMBER.

TX Report

P   1
07/05/2007 13:19
Serial No.  331112999
TC:   104710

| Destination | Start Time | Time | Prints | Result | Note |
|---|---|---|---|---|---|
| 17814386411#### | 07-05 13:18 | 00:00 56 | 002/002 | OK | L1 |

Note    L1: Main Circuit, L2: Sub Circuit, TMR: Timer, POL: Poll, ORG: Original,
        FME: Frame Erase TX, MIX: Mixed Original, CALL: Manual Communication,
        CSRC: CSRC, FWD: Forward, PC: PC-FAX, BND: Bind, SP: Special Original,
        FCODE: F-Code, RTX: Re-Tx, RLY: Relay, MBX: Secure, BUL: Bulletin

Result  OK: TX OK, S-OK: Stop Communication, PW-OFF: Power Switch OFF, TEL: RX from TEL,
        NG: Other Error, Cont: Continue, No Ans: No Answer, Refuse: Receipt Refused,
        Busy: Busy, M-Full:Memory Full.

## CIAPCIAK

&

## ASSOCIATES, P. C.

99 Access Road
Norwood, MA 02062
Tel: (781) 255-7401
Fax: (781) 255-7402

**BOSTON, MA**
Suite 1900
101 Federal Street
Boston, MA 02110
(617) 951-2727

**COVENTRY, RI**
113 Tiouge Avenue
Coventry, RI 02816
(401) 996-7401

TO:          Cheri L. Crow, Esquire

FROM:        James J. Ciapciak

YOUR FAX #:  (781) 438-6411          C&A CASE #:

RE:          Decologero

DATE:        July 5, 2007          NO. OF PAGES (incl. cover): 2

REMARKS:

Please call sender at the above telephone number if there is trouble in the transmission or if you do not receive all pages.

***Confidentiality Note***
THIS TELECOPY IS SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE AND CONTAINS CONFIDENTIAL INFORMATION FOR THE PERSON(S) NAMED ABOVE. ANY DISTRIBUTION, COPYING OR DISCLOSURE IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS TELECOPY IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY BY TELEPHONE AT THE ABOVE TELEPHONE NUMBER.

EXHIBIT G

October 23, 2001


Cheri L. Crow, Esq.
23 Walkers Brook Drive
Suite 40
Reading, MA 01867

Policyholder: Trustees Of The Educational Profession Of America Group Ins
Policy No.:    83AGP005062
Insured:       William Decologero
SSN:           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

Dear Attorney Crow:

We have received the appeal that you submitted in connection with the above-referenced claim for Disability benefits on October 15, 2001.

The claim has been referred to a Claim Specialist who will conduct a complete review based upon the statements submitted and the documents contained in the claim file. Upon completion of this review, we will advise you of our determination.

Enclosed are the copies of the pertinent documents upon which we based our determination:

1.  Initial Claim for Total Disability Benefits completed by you and signed on 05/30/00.
2.  Verification of coverage by Seabury and Smith (formerly Albert H. Wohler & Co.) dated 06/20/00.
3.  Attending Physician Statement completed by Dr. Paul Weinstein on 06/26/00.
4.  Medical records from Dr. Paul Weinstein dating from 05/22/00 through 01/23/01.
5.  Copy of medical records from Dr. Onaly Kapasi dating from 01/31/01 through 05/02/01.
6.  Copy of Independent Medical Examination (IME) report done 10/27/00 and received from Atlantic Charter Insurance Company on 07/17/01.
7.  Copy of a job description for a Restaurant Manager from the Dictionary of Occupational Titles.
8.  Claimant questionnaire and Other Income Questionnaire completed and signed by you on 04/13/01.
9.  A copy of your Detailed Earnings Report from Social Security Administration.
10. Employment verification and payroll information from J.L. Marshall & Sons, Inc dated 06/07/01.
11. Corporate Documents for Two Essex Street Inc. signed by you on 10/27/99 and listing you as Treasurer0.21 and Director of the corporation.
12. Interview with Hartford Life Insurance's Investigator William Moryto conducted 08/10/01 and a statement signed by you.
13. Surveillance report and video from our representative surveillance vendor Factfinder Investigations on 06/29/01 and 06/30/01.

Also enclosed is a copy of the applicable policy.

All other documents and internal notes are considered proprietary and confidential and will not be forwarded.

If you have any questions, please feel free to contact our office at Toll Free (888) 232-5340, x33892.  Our office hours are 8:00 AM to 4:00 PM EST, Monday through Friday.

Sincerely,


Diane Favreau
Hartford Life Insurance Company

00040

# EXHIBIT H

November 28, 2001

Cheri L. Crow, Esq.
23 Walkers Brook Drive
Suite 40
Reading, MA 01867

Policyholder:  Trustees Of The Educational Profession Of America Group Ins
Policy No.:      83AGP005062
Insured:          William Decologero
SSN:               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

Dear Attorney Crow:

We have received the appeal that you submitted in connection with the above-referenced claim for
Long Term Disability (LTD) benefits on October 15, 2001 along with material contained therein.
The material included tax forms W-2 for the year 2000 from J. L. Marshall, Great Eastern Masonry,
Two Essex St. Inc., Form 1040A, the year 1999 Form 1040, W-2's from Spud's Restaurant and your
spouse's W-2's from LGH Health Enterprises Inc and Merrimack Valley Nephrology.  Your letter
dated October 15, 2001 requested a copy of Mr. Decologero's claim file.  The pertinent documents
upon which we based our decision were submitted to you on October 23, 2001.  You requested an
enlargement of time through November 20, 2001 to provide written submission supporting Mr.
Decologero's appeal.

Upon completion of a comprehensive review of the information in Mr. Decologero's claim file, it is
our opinion that the claim termination outlined in Kim Gabrielsen's, Senior Investigative Analyst,
letter of August 20, 2001 (copy attached) should be upheld.  The August 20,2001 letter listed the
evidence contained in Mr. Decologero's claim file.  Our decision to uphold the denial of his claim
for LTD benefits is based upon that evidence and our full and fair review.

Total Disability is defined on page 20 as:

**Total Disability**:

With respect to Plans with a Maximum Benefit Period of two or more years, Total Disability
means disability which:

a) during the Waiting Period and the first 24 months during which Total Disability Benefits are
   payable, wholly and continuously prevents an Insured Person from performing the substantial
   and material duties of his or her usual occupation; and
b) thereafter wholly and continuously prevents an Insured Person from engaging in any and every
   occupation or employment for which he or she is reasonably suited by training, education or

experience.

Maximum Payment Period is defined on page 4 as:

**Maximum Payment Period:**
For Total Disability that commences
a) before Age 60, we pay benefits up to the Maximum Benefit Period for selected Plan;
b) on or after Age 60, but before Age 64, we pay benefits up to the Maximum Benefit Period for the selected Plan or to Age 65, whichever occurs first; or
c) on or after Age 64, we pay benefits for up to 12 months.

We will not pay Total Disability benefits beyond the date the Insured Person ceases to be Totally Disabled.

As stated in Ms. Gabrielsen's letter to Mr. DeCologero, Dr. Weinstein first treated your client on 05/22/00 at which time his impression was that Mr. DeCologero sustained a cervical strain, thoracic strain, lumbar strain, strain/contusion left shoulder and a strain/contusion left knee. Dr. Weinstein referred Mr. DeCologero for a MRI on 10/12/00 which resulted in findings consistent with a partial tear of the supraspinatus tendon without demonstration of a complete tear. Dr. Weinstein then referred your client to Dr. Onaly Kapasi who recommended Mr. DeCologero for arthroscopic shoulder evaluation and Neer Achromioplasty with repair of the Rotator Cuff. Dr. Kapasi advised Mr. DeCologero that this was considered "elective surgery" that would require pre-approval from the insurance company. Mr. DeCologero did not elect to have this recommended surgery on his left shoulder or on his left knee. An Independent Medical Evaluation (IME) performed on Mr. DeCologero by Dr. Mordecai Berkowitz on 6/27/00 revealed your client could return to full time work in a modified capacity (lifting up to 5 pounds frequently and 10 – 15 pounds on occasion) within 2 weeks from that evaluation. A follow-up exam by Dr. Berkowitz on 10/27/00 revealed that Mr. DeCologero had sufficient time to recover and should be working at his regular occupation (Restaurant Manger) without restrictions. The Dictionary of Occupational Titles provided by the U. S. Department of Labor suggests the occupation of Restaurant Manger defined the occupation to be within Mr. DeCologero's physical capacity (light occupation).

Mr. DeCologero worked for J. L. Marshall & Sons from 09/21/00 through 10/06/00 as a laborer; considered a heavy occupation with frequent lifting of up to 50 lbs. This return to work is confirmed by Form W-2 indicating wages of $1851.00. The Form W-2 from Great Eastern Masonry for wages in the amount of $516 further confirms that Mr. DeCologero worked during the period of time he was receiving LTD benefits.

Mr. DeCologero's initial claim form signed on 5/30/00 indicated he was earning $1200 per week as of his last day worked (05/17/00). The W-2 form showing wages of $19,200 would suggest that Mr. DeCologero earned 16 weeks of wages from Two Essex St. Inc. for the year 2000 (16 x $1200 = $19,200). Since Mr. DeCologero did not indicate wages earned from any other employer on his initial claim form, it appears the $516 from Great Eastern Masonry was earned after Mr. Decologero's last day worked (05/17/00).

Our determination that your client no longer met the Policy definition of Totally Disabled beyond 09/20/01 is supported by Mr. DeCologero's return to work.   The Maximum Benefit Period (referenced above) clearly states that "We will not pay Total Disability benefits beyond the date the Insured Person ceases to be Totally Disabled" (09/21/00).

Review of the surveillance videos performed on 06/29/01 and 06/30/01 revealed that Mr. DeCologero was able to drive, open and close the van door with his left hand and arm, turn his upper body and neck, walking without any assistive device or observed difficulty, bending, lifting chairs using both hands and arms above the shoulders without any observed outward pain or limitation.  Mr. DeCologero's functionality is contradictory to his subjective complaints regarding his physical abilities.

The file documentation and the surveillance video reviewed as well as Mr. DeCologero's return to work indicates Mr. DeCologero was not wholly and continuously prevented from performing the substantial and material duties of his light work occupation as a Restaurant Manger as of 09/21/00.

In conclusion, the information, which was reviewed, is not sufficient to change our prior claim determination.  Based upon our file documentation, the termination of LTD benefits was appropriate, and Mr. DeCologero's claim remains closed.

We reserve all rights and defenses available to us in making this determination as well as recovering the overpayment in the amount of $31,000.

If you have any questions, please feel free to contact our office at Toll Free (888) 232-5340, x33892.  Our office hours are 8:00 AM to 4:00 PM EST, Monday through Friday.


Sincerely,


Diane Favreau, Specialist
Hartford Life Insurance Company

# EXHIBIT I

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WILLIAM DECOLOGERO, )<br><br>Plaintiff, )<br><br>v. )<br><br>HARTFORD LIFE INSURANCE COMPANY, )<br><br>Defendant. ) | CIVIL ACTION NO: 11613 REK |

## RENEWED MOTION TO LIFT THE STAY ON DISCOVERY AND FOR A NEW SCHEDULING ORDER

Defendant Hartford Life Insurance Company (hereinafter the "Hartford") filed a Motion to Dismiss/Motion for Summary Judgment based upon the statute of limitations, which was allowed by the Court. At the time the dispositive motion was filed, the Hartford also moved to stay all discovery (and initial disclosures) pending a ruling on the motion to dismiss/motion for summary judgment, which was Granted by the Court. There remains in this case the Hartford's counter claims for $31,000.00, which will require some discovery.

On August 29, 2006 the Hartford filed a Motion to Lift the Stay on Discovery. On August 30, 2006 Defendant filed a Petition for Permission to Appeal. On October 3, 2006, the United States Court of Appeals for the First Circuit Dismissed Defendant's appeal.

As grounds for this renewed Motion, Hartford further states that the old Scheduling Order no longer applies, and new deadlines must be set.

WHEREFORE, the Hartford respectfully requests that the Stay on discovery that was entered by the Court be lifted, and that the Court issue a new Scheduling Order with respect to the remaining claims.

Respectfully submitted by,

HARTFORD LIFE INSURANCE COMPANY,
By Its Attorneys,


_____/s/ Nadine M. Bailey_____
Nadine M. Bailey, BBO # 644493
James J. Ciapciak, BBO #: 552328
CIAPCIAK & ASSOCIATES, P.C.
99 Access Road
Norwood, MA  02062
Tel:  (781) 255-7401
Fax:  (781) 255-7401


## LOCAL RULE 7.1(A)(2) CERTIFICATION

I hereby certify that on November 2, 2006, I contacted Plaintiff's counsel and we conferred and attempted in good faith to resolve or narrow the issues pursuant to L.R. 7.1(A)(2).

_____/s/ Nadine M. Bailey_____
Nadine M. Bailey, BBO # 644493

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing document was served upon Counsel of Record on November 2, 2006.

_____/s/ Nadine M. Bailey_____
Nadine M. Bailey, BBO # 644493

# EXHIBIT J

1

1              UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF MASSACHUSETTS

3                           C.A. No. 11613-REK

4

5

   WILLIAM DeCOLOGERO,
6            Plaintiff/Defendant-in-Counterclaim,

7   vs.

8

   HARTFORD LIFE INSURANCE COMPANY,
9            Defendant/Plaintiff-in-Counterclaim.

10

11                    * * * * * * * * *

12

13           DEPOSITION OF WILLIAM DeCOLOGERO, a

14   witness called on behalf of the Defendant, taken

15   pursuant to the applicable provisions of the

16   Massachusetts Rules of Civil Procedure at the offices

17   of Ciapciak & Associates, 99 Access Road, Norwood,

18   Massachusetts on June 5, 2007, commencing at 1:05 p.m.

19                      * * * * * * * *

20

21              Reporter: Joyce E. Romanow
        Professional Court Reporter and Notary Public
22             Copley Court Reporting, Inc.
        58 Batterymarch St, Suite 317, Boston, MA 02110
23                  (617) 423-5841
               www.copleycourt.com            ORIGINAL
24

DISK ENCLOSED

89

1  work." How is that statement not true?

2      A.    Regarding my policy, um.

3      Q.    What that sentence is saying is that you

4  represented to Hartford Life that you had never

5  resumed work. And you're saying that's not true?

6      A.    I called them and told them I resumed work,

7  to Eric Green, the claims manager, that I had gone to

8  work for 13 days.

9      Q.    When did you call him?

10     A.    I called him, I don't recall what day, but

11 I recall what he said. As long as I didn't void the

12 30 days of disability in my contract policy that I

13 wouldn't lose my benefits.

14     Q.    I don't get it.

15     A.    Well, I only worked 13 days, I informed

16 him. And he said there was no problem as long as I

17 didn't work beyond 30 days, that's when they would

18 have just cancelled my whole policy. I tried working

19 and I couldn't, and I got paid.

20     Q.    Did you represent in writing to Hartford

21 Life that you had never resumed work?

22     A.    No, I never did. I told them I worked.

23     Q.    Did you -- do you recall representing to

24 Met Life that you had never resumed work since the

90

1  accident?

2      A.    I never told them I never resumed work.

3      Q.    So it's your recollection that you didn't

4  put in writing that you never resumed to work?

5      A.    No, I told -- I informed them when I did

6  work.

7      Q.    And it's not your recollection that you

8  informed them you went back to work after they already

9  found out about it?

10     A.    I told them before that.

11     Q.    Okay. The next thing that's starred in

12 this letter is a couple paragraphs down. It begins on

13 8-10-01. You met with and provided a signed statement

14 to Frank Barre. Do you see that one?

15          MS. CROW: I'm sorry. There's another

16 asterisk before that. The second sentence of the

17 second paragraph.

18     Q.    Okay.

19     A.    What's the --

20     Q.    Do you disagree that the position of a

21 laborer is considered heavy occupation requiring

22 frequent lifting?

23          MS. CROW: Of up to 50 pounds.

24     A.    I disagree with that, yeah. All laborers

91

1  don't lift 50 pounds all day long, no.

2      Q.    The next asterisk, what part do you

3  disagree with there?

4      A.    (Looks.) On 50 pounds and then --

5          MS. CROW: He's moving down.

6      Q.    What is that asterisk relating to?

7      A.    (Reads.) That's not me in the video.

8      Q.    It's your twin brother?

9      A.    Twin brother, completely.

10     Q.    You didn't say to Frank Barre that, yeah,

11 that's you on the video?

12     A.    I hadn't even seen the video. I never was

13 informed there was a video.

14     Q.    Did you discuss with Frank Barre that you

15 were throwing chairs in the back of a pickup?

16     A.    No. Who is Frank Barre?

17     Q.    The investigator.

18     A.    Oh, the one that was standing in the house

19 and that didn't want to leave when my wife was laying

20 there dying. That guy, yeah. I didn't discuss

21 anything with him. I didn't know what -- he never

22 even mentioned anything about, I didn't even know he

23 was an investigator. He was just -- I didn't know.

24 He was sitting there. He just took information, the

92

1  questions I gave him -- he gave me, I answered them.

2  Nothing about surveillance.

3      Q.    You didn't do a statement with him?

4      A.    I did a statement with him, but I have the

5  statement. I never said something about throwing

6  chairs in the back of a pickup truck on the statement.

7      Q.    I asked if you gave him a statement.

8      A.    Never, no.

9      Q.    You never gave him a statement?

10     A.    On throwing chairs in the back of a pickup

11 truck?

12     Q.    I said nothing about chairs in the back --

13     A.    You just did.

14     Q.    They're separate questions. Let me take a

15 step back.

16     A.    Go ahead.

17     Q.    Did you give him a statement?

18     A.    I give him a statement, yes.

19     Q.    Okay. You said I had no idea who he was.

20     A.    I didn't even know his name. I'm sorry.

21     Q.    Okay.

22          MS. CROW: If it's not clear yet, he's

23 not good on names.

24     Q.    Believe me. The guy who came into your

93

1 house that you've mentioned, you didn't know he was
2 from the insurance company?
3    A.    I did.
4    Q.    You did?
5    A.    Yes, I did.
6    Q.    So he told you, I'm from the insurance
7 company.
8    A.    Right.
9    Q.    And he took a statement from you?
10    A.    Right.
11    Q.    My next question is regarding the video.
12    A.    Okay.
13    Q.    Did you tell him about your acts in the
14 video, that that was you?
15    A.    No, whatsoever.
16    Q.    All right. That's fine. Okay. The
17 statement that's listed on this letter, does that
18 sound familiar?
19    A.    Regarding what, sir?
20    Q.    The statement you gave. Did you give --
21 when you gave a statement to the guy?
22    A.    The statement isn't on this letter, sir,
23 right?
24    Q.    Okay. It looks like it isn't, it being

94

1 quotes here.
2    A.    What's being quoted here. Explain to me.
3 I described my disability. Which part are you going
4 to right now?
5    Q.    The part where it says, "In your statement
6 you're quoted in part, you relayed the following
7 information." You did relay that to him, right?
8    A.    Yes.
9        MS. CROW: We think it would be better
10 to go from the actual statement. We're not agreeing
11 that it's been accurately transcribed here.
12        MR. CIAPCIAK: It says in part. It was
13 anything --
14        MS. CROW: I don't know. We have no way
15 of knowing if it's been --
16        MR. CIAPCIAK: Is anything -- well, I
17 asked him to star anything he thought was inaccurate.
18        MS. CROW: Wait a minute. I said we're
19 not saying that we're agreeing that this is what his
20 statement was. With regard to the specific facts
21 within those statements?
22        MR. CIAPCIAK: Yes.
23        MS. CROW: Yes. So until he gets to an
24 asterisk, he agrees with those.

95

1        MR. CIAPCIAK: Let's go to the
2 asterisks.
3        MS. CROW: Well, he doesn't disagree
4 with them.
5    Q.    Okay. The next asterisk it says, My
6 sitting is okay. I am comfortable when sitting." I
7 presume what you're trying to say there is you're
8 uncomfortable when you're sitting?
9    A.    Uncomfortable, yes.
10    Q.    The next asterisk I have is down the
11 bottom. Well, hang on. About half a through the
12 page. "I have been asked if I worked including
13 volunteer work or self-employment activities at any
14 time since I reported becoming disabled. I have not
15 worked at all since becoming disabled."
16    A.    I have.
17    Q.    Okay. You know you have.
18    A.    Right.
19    Q.    But I'm wondering, was that not in your
20 statement when you made it or was that untrue when you
21 made it? I'm trying to figure out what the asterisk
22 is for then.
23    A.    I'm saying I knew I worked for 13 days with
24 the company there. That's in my statement. It's not

96

1 true. I don't recall that at all. I did work and I
2 did expose that way before he even took my statement,
3 the gentleman.
4    Q.    The next thing you've got starred is
5 "Social Security disability. I received about 220 --
6        MS. CROW: It's the "My left hand"
7 sentence.
8        MR. CIAPCIAK: Okay.
9    Q.    The next thing you have starred is, "My
10 left hand was severely injured at my restaurant."
11    A.    It's not my restaurant. It was Friendly's.
12    Q.    Okay. So if that was in your statement, it
13 would be untrue?
14    A.    Untrue.
15    A.    It's not true anyway.
16    A.    Not true.
17    Q.    The next thing you have starred is Tony D's
18 closed in June of 2000. Is that you or --
19        MS. CROW: That is an asterisk.
20    A.    Because I don't recall saying it was
21 closed.
22    Q.    Okay.
23    A.    I don't recall at all. It kept -- it was
24 open, so.

97

1    Q.    Okay.  The next thing you've got starred,
2  if I have it right, on the next page that's circled,
3  that entire paragraph?
4    A.    Yeah.
5    Q.    And I presume that the star and the circle
6  is that you're claiming now that this was your
7  brother?
8    A.    It totally is.
9    Q.    Okay.  Your identical twin?
10    A.    Yeah.
11    Q.    You have an identical twin called Joe and
12  that's who it is?
13    A.    Yeah, I guess so.
14    Q.    No.  Don't guess.
15    A.    I have a twin, I do.  Completely
16  identical.  You won't even tell us apart.
17    Q.    So if we subpoena him at trial, there's
18  going to be two of you guys sitting there, right?
19    A.    Dressed alike.  You could call me or him
20  Bill.
21    Q.    Okay.  The next thing you've got asterisked
22  and kind of circled there is that you returned to work
23  for another employer performing a job as a general
24  laborer.  Didn't we already establish you did that?

98

1    A.    Yeah.  That's why I —
2          MS. CROW:  Let me — general laborer as
3  defined as the heavy duty occupation.  He's told you
4  what his duties are supposed to be.
5    Q.    The part you have a problem with is the
6  general laborer part of that.  You were just driving
7  around in a go-cart or whatever.  All right.
8    A.    Yeah.  On a laborer's union.  Yeah.
9    Q.    Gotcha.  The next thing you've got starred
10  is, "It appears that you had, and continue to have the
11  functional ability to perform the material and
12  substantial duties of your usual occupation," which I
13  would expect you to star.
14    A.    Yes.
15    Q.    Now, you started the explanation of your
16  overpayment.
17    A.    They didn't overpay me.  That was my money.
18    Q.    Are you — do you understand the fact that
19  if you're found to be not disabled, then that money is
20  due back to the insurance company?
21    A.    That's what you're finding — that's that
22  you're here for.  I understand that, yes.  But the
23  reason why I did that, I'm —
24    Q.    You're disputing that?

99

1    A.    Of course.  It's my money.
2    Q.    We wouldn't be here if you were not
3  disputing.
4    A.    You want me to say, yeah, it's your money
5  and I took it by accident?
6    Q.    No.  What I'm asking you is that, do you
7  understand?
8    A.    Yes, I do.
9    Q.    That the policy states that if you were
10  found to be not disabled at the time, back then —
11    A.    I understand.
12    Q.    The money comes back?
13          MS. CROW:  That's what the policy —
14  that's what you say the policy says.
15          MR. CIAPCIAK:  Okay.  All right.
16    Q.    Whether your counsel disagrees or not.
17          MS. CROW:  I don't admit anything about
18  anything being owed for any reason.
19    Q.    Did we cover all the stars or did I miss
20  any?
21    A.    I was just wondering — can I ask a
22  question?
23          MS. CROW:  No.  No.  No.  No.
24          MR. CIAPCIAK:  You can keep that one.

100

1  I'm going to take that one.
2          (Off the record discussion.)
3          MR. CIAPCIAK:  Back on the record.
4    Q.    Now with this letter they sent you a bunch
5  of documents.  Do you recall that?
6    A.    I don't recall, no.  I recall letters,
7  that's it.
8    Q.    I'll show you this.  Do you recall getting
9  that with the letter?  The letter talks about how it's
10  attached, too.
11          MS. CROW:  No attachments.  It doesn't
12  say there's any attachments.
13    Q.    Did you — do you recall getting anything
14  with this letter?
15    A.    No.
16    Q.    Have you ever seen this?
17    A.    No.
18    Q.    Okay.  Did you work for Great Eastern
19  Masonry?
20    A.    Is that the same as the laborers?
21    Q.    Separate from the laborers.  It's a
22  separate W-2 that was filed.
23    A.    That's the laborer's union.
24    Q.    Do you recall getting — did you have a

101

1  separate job there other than the driving around?

2      A.    No.  They were connected to the laborer's

3  union, masonry group.

4      Q.    Any reason why you got two separate W-2s?

5      A.    They probably, that's how they do it in the

6  laborer's union.  The company hires, the union hires.

7      Q.    So you got one W-2 for $1,851 and another

8  one for $516?

9      A.    Yeah.  Yeah.

10     Q.    Okay.  And that work was after your

11  incident, right, after your accident?

12     A.    Yes.

13     Q.    Okay.

14           MR. CIAPCIAK:  Why don't you fire up the

15  video.

16           (Video is being played.)

17     Q.    Let me ask you a couple of questions.  When

18  you filed your claim form, it asked you about other

19  prior injuries.  Do you remember that?

20     A.    I don't recall.

21     Q.    Okay.  In there you didn't disclose your

22  1993 left-hand injury.  Any reason why you didn't

23  write that down?

24     A.    I disclosed my Social Security disability.

102

1      Q.    Okay.  Was your left-hand injury bothering

2  you at that time?

3      A.    At what time?

4      Q.    Up to and including the day of your

5  accident about which we're here today.

6      A.    Off and on.

7           (Video playing.)

8      Q.    Is that your van -- or truck, I mean?

9      A.    That's not my truck.  That's my brother's.

10     Q.    That's Joe's truck?

11     A.    That's Joe.  And David's here.

12     Q.    Joe.  And David who?

13     A.    My brother David, yeah.

14     Q.    Whose is that?

15     A.    That's my wife's.

16     Q.    So that's your brother?

17     A.    That's my brother.

18     Q.    Okay.  Well, he's certainly not disabled,

19  huh?

20     A.    No.  He's a painter, a carpenter.

21     Q.    And that's his truck, the plate on that and

22  everything is registered to him?

23     A.    Him and my brother David went halves in the

24  truck.  He's a painter, contractor.  He just built a

103

1  new house for my brother and at the time he got the

2  truck, so they both split it.

3      Q.    Okay.  How can you tell that's him and not

4  you?

5      A.    Because of his shorts.  Look at his

6  shorts.  I don't wear his stuff.

7      Q.    You don't wear orange shorts?

8      A.    No.

9           MS. CROW:  And you can't lift those

10  chairs like that.

11     Q.    Okay.

12     A.    He's painting the house.  Joe was painting

13  the trim for Elaine.

14     Q.    Is that you there?

15     A.    Where?

16     Q.    Start from the beginning.  Is that you in

17  that car?

18     A.    I don't know.

19     Q.    Is that your car?

20     A.    That's Elaine's, my wife's.

21     Q.    Okay.

22           MS. CROW:  Can you see that well?

23     A.    Yeah, I can see it.

24     Q.    Is that your wife or you?

104

1           MS. CROW:  Or someone else.

2      A.    I can't see.  I can see somebody in there

3  in a white shirt.  That's me in the orange.

4      Q.    That's you in the orange shirt.  Okay.

5      A.    Yeah.  I think it's me.

6      Q.    Are you pushing a carriage?

7      A.    You can hardly see.

8      Q.    Just tell me if you think it's you.

9           MS. CROW:  Didn't we just see the green

10  car pull out while he was standing there?  That's what

11  I saw.  What did you see?

12           MR. CIAPCIAK:  I'm asking him, not you.

13     A.    Joe was painting the house for Elaine.  He

14  stayed for three weeks with us.  He was staying over

15  with us.  She's got cancer.

16     Q.    I'm just trying to figure out if this is

17  you.

18     A.    I don't see nothing.

19     Q.    It takes a while.  We're going to go

20  through it.  That's your wife's van, though, right?

21  Is it registered to you or your wife?

22     A.    I think it's registered to Elaine.  It's

23  her van.  I think so.

24     Q.    Is that Mass. Ave. Auto.  Does that ring a

105

1  bell, would that have been you or her?

2      A.    Mass Ave. Auto. That's not Elaine. She's

3  not driving, she's sick.

4      Q.    Okay. So -- it's not your wife, who else

5  could it be?

6      A.    It could be Joe.

7      Q.    Joe who?

8      A.    My brother.

9      Q.    Your brother. Okay. That's you in the

10 orange shirt, though, right?

11     A.    I believe so. 100 percent so, yeah.

12           MS. CROW: So let's be clear. You're

13 asking who that person is there?

14     Q.    Now I'm --

15           MS. CROW: Never mind.

16           MR. CIAPCIAK: My depo.

17           MS. CROW: You're right.

18     Q.    The guy under the hood there, see him?

19     A.    Yeah.

20     Q.    Is that you?

21     A.    Not it's not me.

22     Q.    It doesn't look like you at all?

23     A.    Yeah, that's Joe.

24     Q.    That's Joe, is it?

106

1      A.    Yeah. He looks -- that's Joe.

2      Q.    Okay.

3      A.    What would I go underneath the hood for? I

4  don't know about cars.

5           MR. CIAPCIAK: We'll just play another

6  minute or two.

7           MS. CROW: Um-hum.

8      Q.    When did you first become aware of the

9  video?

10     A.    Now. I just -- I didn't -- there was a

11 video after the fact, after it was sent to the

12 lawyers. I never saw the video, nothing.

13     Q.    Did you ever tell anybody that that wasn't

14 you or --

15     A.    Actually.

16     Q.    That was your twin brother?

17     A.    As soon he told me -- as soon as I heard

18 about a pickup truck, I said, Well, I don't own a

19 pickup truck. It's Joe. And I knew exactly what he

20 was doing. He was painting the house and he stayed

21 with us.

22     Q.    Okay. Did you ever tell anybody from

23 Hartford Life it wasn't you?

24     A.    Of course. No, I'm sorry. I never told

107

1  anybody from Hartford Life it wasn't me because I was

2  instructed from my lawyer.

3           MS. CROW: We won't talk about that.

4      Q.    Still looks like your identical twin up

5  there?

6      A.    Yeah. It's -- sometimes I can't tell.

7  That's how close we are. What would I be over there

8  for? I don't go to Mass. Auto.

9      Q.    I'm just asking.

10     A.    I know. Joe is a tinker. He knows

11 everything.

12     Q.    Is he a mechanic or?

13     A.    He's everything, but he's a contractor. He

14 does completely the opposite I do. I don't do -- I'm

15 not good with my hands or anything like that. 30

16 years he's been a contractor, you know.

17     Q.    What's he doing now?

18     A.    He works for J. Brown. He's doing all

19 these good contractor, painter.

20     Q.    Painting houses?

21     A.    Not inside, marblizing. He does

22 specialized painting. This Old House, he's been on

23 there.

24     Q.    Good. Let me know if you see you anywhere

108

1  in there, okay?

2      A.    I don't know if it's Joe or me.

3      Q.    I can't tell.

4      A.    All right.

5      Q.    That's why I'm asking you.

6      A.    I can't tell you.

7      Q.    We're going to play it through, so just let

8  me know if you show up anywhere in there, if you can

9  tell.

10     A.    (Watches video.)

11     Q.    There must be some. Does Joe live on

12 Lexington Street?

13     A.    Washington Ave. in Woburn. He sold it.

14     Q.    What's your date of birth again?

15     A.    4-26-57.

16     Q.    Still Joe there?

17     A.    What's that?

18     Q.    Still Joe?

19     A.    Joe. Why would I be there? They're not

20 even my auto guys.

21     Q.    Does Joe go to Mass. Ave. Auto a lot?

22     A.    It looks like he's looking at a car maybe.

23 He wants to buy it. I don't know. That's what Mass.

24 Ave. Auto is.

109

1    Q.    By the way, what is your Social Security
2  number?
3    A.    Mine?
4    Q.    Yeah.
5    A.    You have it there, right?
6    Q.    Yeah, I'm asking you.
7    A.    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.
8    Q.    Do you know your brother's?
9    A.    Do you want my birthday?
10   Q.    I already asked you your birthday.
11   A.    I know my brother's birthday.
12   Q.    Who is that?  Do you know that other guy
13  there?
14   A.    What other guy?
15   Q.    Are you paying attention?
16   A.    Yeah.  I don't see no other guy.
17   Q.    Dark T-shirt.
18   A.    I don't know.  That's a used car lot.
19   Q.    I'm just asking if you know the guy.
20   A.    No, I don't know.
21   Q.    It could be your other twin brother?
22   A.    That's Joey.  He looks healthy.  He'll go
23  down the road and stop at anything.
24         They put the truck --

110

1         MS. CROW:  Would you just watch.  And if
2  you see somebody that's you, tell them.
3    Q.    Feel free to just --
4    A.    I'm just telling you --
5         MS. CROW:  I don't want you to do that,
6  to chit chat.
7    A.    (Watches video.)
8    Q.    If he's got his own truck, why is he
9  driving your wife's car there?
10   A.    Because they brought the truck up to him.
11   Q.    They brought the truck up to him?
12   A.    Yeah.  He parked the truck for him.  My
13  brother David was in Reading.  He has two cars or
14  three cars.  The truck is just for business.
15   Q.    This is your wife's.
16   A.    Right.  He's using that.  He's running
17  around for her.  I remember that.  Didn't see the
18  truck in the driveway, did you?
19   Q.    I didn't look.
20         (Watching video.)
21   Q.    Is Joe in the white T-shirt?
22   A.    Yeah.
23   Q.    Here we go.  Same guy, Joe, walking around
24  the van?

111

1    A.    Yeah.  See the shorts?  Like them?  There's
2  Joe.  Those are his shorts.  That's Joey.  I knew he
3  was Joey, especially with shorts like those.  That's
4  Joey.
5    Q.    The truck is in the driveway, though.
6    A.    That's the next day.
7    Q.    But he's still driving the van though,
8  huh?
9    A.    He's driving the van.
10   Q.    And who have we got there?
11   A.    That's Joe.
12        MS. CROW:  See the shorts?
13   Q.    Nice shorts.  Nice shorts.
14        That's my car, too, right?
15        MS. CROW:  Don't say that.  Even though
16  you're being sarcastic, it comes across different on
17  the deposition transcript.  Stop.
18   A.    All right.  This is a second day, right?
19  Is this a different day?
20   Q.    Same shorts?
21   A.    Yeah,  he stayed with us.  He's not living
22  -- he's not home.  So in other words, I didn't change
23  mine either?  Is that what you're trying to imply?  If
24  he didn't change them, I didn't change them, right?

112

1    Q.    So the only one of you in there was the
2  orange shirt that you saw?
3    A.    Yeah.  That was me.  I mean, I still didn't
4  understand it.
5    Q.    Okay.
6         MS. CROW:  Are we done with this?
7         MR. CIAPCIAK:  Yeah, it's done.
8         MS. CROW:  Thank you.  Are you going to
9  make that an exhibit since it was played for the
10  deposition?
11        MR. CIAPCIAK:  Since it was what?  I
12  don't know how we can do that.  You can't put a
13  sticker on there, you'll ruin it.  I can make a copy
14  for you.
15        MS. CROW:  Put a sticker on the sleeve.
16        MR. CIAPCIAK:  Okay.  Do you want me to
17  make a copy for you or hang onto it?  How do you want
18  to handle it?
19        MS. CROW:  I have a copy.
20        MR. CIAPCIAK:  So what do you want me to
21  do?
22        MS. CROW:  Make it an exhibit.  Mark the
23  sleeve.
24        MR. CIAPCIAK:  Mark the cover and then

113

1  do what?
2          MS. CROW:  Do you want to seal it?
3          MR. CIAPCIAK:  No, then we can't use
4  it.
5          MS. CROW:  You don't have another one?
6          MR. CIAPCIAK:  No, that's it.
7          MS. CROW:  Well, how do we know what he
8  was shown?
9          MR. CIAPCIAK:  All right.  Put a sticker
10  on it.  Exhibit 3.
11          (Exhibit 3 marked.)
12          MR. CIAPCIAK:  We'll hold onto the
13  exhibits and give you copies before you leave.
14      Q.   Do you remember a Dr. Berkowitz?  It
15  doesn't ring a bell?
16      A.   I don't recall his name at the moment.  It
17  doesn't ring a bell, no.
18      Q.   All right.  But you do recall an IME?
19      A.   Yes.
20      Q.   Do you recall seeing his report as to what
21  he found?
22      A.   No.
23      Q.   Okay.
24          (Brief recess.)

114

1      Q.   All right.  So the letter you got from --
2  that was marked as Exhibit 2, this letter here that
3  you got, you put the asterisks on, you remember
4  getting that, right?  At least that's what you said
5  earlier, I believe.
6      A.   Yes, I recall getting something like that.
7      Q.   When you got that and it talked about you
8  having a pickup truck and putting stuff in the back,
9  how come you didn't call and say, Hey, that's my
10  brother Joey?
11      A.   Never mentioned a pickup truck to me at
12  all.  If I recall.  A pickup truck for surveillance?
13      Q.   (Looks.)
14      A.   Of course I would say that.
15      Q.   Surveillance -- it's Number 13 on Page 2 in
16  the letter, "Surveillance report and video from our
17  representative surveillance vendor Factfinder
18  Investigations on 6-29-01 and 6-30-01."
19      A.   So what was discussed?  Nothing was
20  discussed about a pickup truck.
21      Q.   Okay.
22      A.   That I know of.
23      Q.   The part you circled here?
24      A.   Yeah.

115

1      Q.   Why didn't you call and say, Hey, that was
2  my brother, Joey?
3          MS. CROW:  Objection.  Calls for
4  attorney/client privilege.  Instruct the witness not
5  to answer.
6          MR. CIAPCIAK:  How is that
7  attorney/client?  I'm asking him a question why he
8  didn't.  He said he wasn't represented by counsel when
9  he got this letter.  How is it attorney/client
10  privilege?
11          MS. CROW:  Okay.
12      A.   I gave it to my counselor.
13      Q.   No.  You said -- I already asked you.  You
14  already told me you had no attorney when you got this
15  letter.
16      A.   Right.  But you say why didn't I call them.
17      Q.   Yeah.  And say, Hey, it's not me, it's my
18  brother Joe.
19      A.   I called my lawyer, of course I called him
20  and said it wasn't me.  I never knew that -- you're
21  talking about the surveillance investigating reporter
22  that came to my house.
23      Q.   No.  It tells you about the videotape.
24      A.   Right now, it does, after the fact, after

116

1  the guy left.  I know what you're talking about.
2      Q.   When you got this letter --
3      A.   Right.
4      Q.   Why didn't you call and say, Hey, that
5  wasn't me, that's my brother.
6      A.   Of course, I did.  Of course, I did.
7      Q.   So you called Hartford and said, That's my
8  brother Joey?
9      A.   Of course, I did.  I thought you meant
10  during the report of the gentleman sitting in front of
11  me mentioning this to me.
12      Q.   Okay.  So your testimony here today as you
13  sit here today, you called the Hartford and said, Hey,
14  that's not me, that's my brother Joey?
15      A.   Of course, I did.  100 percent.
16      Q.   Okay.
17      A.   I was just confused with the different
18  reports.
19      Q.   Okay.  So you didn't own a pickup truck?
20      A.   Of course not.
21      Q.   A Ford F150 pickup.  Didn't you own a '97
22  Corvette, a 1990 Caddie DeVille?
23      A.   Is that a pickup.
24      Q.   A 1996 Dodge Intrepid, a 1998 Ford F150

117

1 pickup, a 1989 Mercedes Benz 560 SL?

2  A.   Yeah.

3  Q.   And a 24-foot fiberglass boat?

4  A.   Yes.

5  Q.   Earlier you said you didn't ever own a

6 pickup?

7  A.   I never said I never owned a pickup. I

8 said that wasn't the pickup in the video.

9  Q.   We'll see what the transcript says. So you

10 did own a pickup there?

11  A.   Back in 1987, '97, before the

12 investigation?

13  Q.   Did you own a pickup?

14       MS. CROW: When?

15  A.   When?

16  Q.   Ever.

17  A.   You didn't say "ever." You said, did I own

18 a pickup.

19  Q.   I'm asking you, did you own a pickup?

20  A.   Of course I owned a pickup.

21  Q.   When?

22  A.   I had one in '86, '88, and '97 say. Why

23 don't you go back. I had five pickups, but what does

24 that relevant to the last --

118

1       MS. CROW: Don't ask him a question,

2 just answer his.

3  A.   I know. But you asked if I ever owned a

4 pickup, sir.

5  Q.   I disagree.

6  A.   You disagree? Okay.

7       MS. CROW: All right.

8  Q.   Did you get a Workers' Comp. settlement

9 from Atlantic Charter Insurance Company in 2001, lump

10 sum settlement.

11  A.   I did.

12  Q.   $23,000 approximately?

13  A.   I recall it, yes.

14  Q.   Do you recall signing a statement denying

15 that you were working while on disability?

16  A.   Do I recall signing a statement --

17       MS. CROW: Objection. Are you talking

18 about in connection with the Worker Comp. claim or are

19 you talking about something else now?

20       MR. CIAPCIAK: This case. I'm asking if

21 he recalls signing a statement.

22       MS. CROW: Okay. I want to make sure

23 we're talking about this claim.

24  A.   I don't recall.

119

1  Q.   Do you recall signing a statement on this

2 case ever?

3  A.   On this case?

4  Q.   Yes.

5  A.   Regarding a statement I made?

6       MS. CROW: Did you ever sign a

7 statement, do you recall?

8  A.   I don't recall.

9  Q.   You don't recall ever signing a statement?

10  A.   No.

11  Q.   Do you recall ever signing claim forms?

12  A.   Yes. Yes.

13  Q.   Separate from a statement?

14  A.   Yes.

15  Q.   Disability claim forms?

16  A.   Yes.

17  Q.   When did you first retain Cheri Crow?

18       MS. CROW: Objection.

19       MR. CIAPCIAK: I can ask when he first

20 retained you. What's wrong with that?

21       MS. CROW: You think so?

22       MR. CIAPCIAK: I know it.

23       MS. CROW: Have you got something to

24 cite for me?

120

1       MR. CIAPCIAK: You won't allow him to

2 answer the question?

3       MS. CROW: No.

4       MR. CIAPCIAK: I'll suspend.

5       MS. CROW: No, we won't suspend.

6       MR. CIAPCIAK: It's my deposition.

7       MS. CROW: Well, I'll let him answer.

8       MR. CIAPCIAK: Good.

9  Q.   When did you first retain Cheri Crow?

10  A.   When I first recall, um, when I first --

11 regarding my, like the first letter, recognition of

12 not getting my disability no more, that's when I

13 obtained a lawyer, Ms. Crow.

14  Q.   Approximately October 15, 2001?

15  A.   I don't recall what date. I don't recall.

16  Q.   Month? Year?

17  A.   No, no. I don't know the year, no.

18  Q.   You don't even know what year?

19  A.   What year? No. I said within the time

20 period after I got discontinued.

21  Q.   About the time of that letter?

22  A.   Could be.

23  Q.   Does that ring a bell?

24  A.   Could be. I just don't know dates when I

190

1        COMMONWEALTH OF MASSACHUSETTS

2          COUNTY OF MIDDLESEX

3

4        I, Joyce E. Romanow, a Professional

5   Shorthand Reporter and Notary Public in and for the

6   Commonwealth of Massachusetts, do hereby certify that

7   William DeCologero, the witness whose deposition is

8   herein set forth, was identified and duly sworn by me

9   and that such deposition is a true record of the

10  testimony given by the witness on June 5, 2007 to the

11  best of my skill and ability.

12

13        I further certify that I am neither

14  related to nor employed by any of the parties in or

15  counsel to this action, nor am I financially

16  interested in the outcome of this action.

17

18        In witness whereof, I have hereunto set

19  my hand and seal this 25th day of June, 2007.

20

21

22  _____

23  Joyce E. Romanow, Notary Public

24  My Commission Expires:   July 6, 2012