UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.
05-11613

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
                                                    \*
WILLIAM DECOLOGERO,                  \*
        Plaintiff/Defendant in Counterclaim  \*
                                                    \*
v.                                                 \*
                                                    \*
HARTFORD LIFE INSURANCE          \*
        COMPANY,                                \*
        Defendant/Plaintiff in Counterclaim  \*
                                                    \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


WILLIAM DECOLOGERO'S OPPOSITION TO HARTFORD
LIFE'S MOTION FOR RECONSIDERATION OF ITS MOTION TO EXTEND
AND FOR SANCTIONS


Plaintiff/Defendant in Counterclaim William Decologero (hereinafter "Mr. Decologero") hereby states his opposition to Defendant/Plaintiff in Counterclaim Hartford Life Insurance Company's Motion for Reconsideration of its Motion to Extend and for Sanctions ("Hartford Motion for Reconsideration") in the above matter. As grounds for its opposition, Decologero submits the Affidavit of Cheri L. Crow, Esq. ("Crow Affidavit") with its attached exhibits and states the following.

Hartford Life Insurance Company ("the Hartford") asserts that the Court should reconsider its denial of the Hartford's Motion to Extend the Tracking Order ("Hartford Motion to Extend") for several reasons. First and foremost, it bases its motion for reconsideration and for sanctions on serious assertions about the alleged actions of counsel for Mr. Decologero. The Hartford, through Attorney Ciapciak, claims that Mr.

Decologero's counsel made "outright misrepresentations to the Court." Affidavit of James Ciapciak ("Ciapciak Affidavit") ¶ 2. He claims that counsel's November 16, 2001 letter to the Hartford was never sent. Ciapciak Affidavit ¶¶ 6, 7. He asserts that counsel fabricated the letter which revealed the existence of Mr. Decologero's identical twin brother, Joseph Decologero, as an attempt to misrepresent the facts to the Court and to avoid discovery and to commit fraud on this Court. Ciapciak Affidavit ¶¶ 7, 9. [1]

First and foremost, the fabrication of a document for submission to the Court is wrong and is not conduct in which Mr. Decologero's counsel would engage in for any reason and counsel vehemently denies having done so. Crow Affidavit ¶¶ 6, 31. [2]

The Hartford's counsel relies on the fact that the copy of the November 16, 2001 letter filed with the Court as an exhibit did not have the actual signature of Mr. Decologero on it to support his assertion that the document was fabricated later. Ciapciak Affidavit ¶ 12. The original letter sent to the Hartford was signed by counsel. Crow Affidavit ¶ 6. Almost all of the file copies of documents sent out by Mr.

---

[1]   While I am personally angry, upset and outraged by the allegations made about me by Mr. Ciapciak, I believe that it is in my client's best interest for me to address these allegations as factually and dispassionately as possible at this time in this forum. I will review my personal options regarding these allegations separately.

[2]   While counsel would never engage in fabrication of documents and misrepresentation to the Court, counsel is aware that not everyone always acts as they should. In this situation, the facts of the case also support counsel's position that there was no fabrication. The Hartford's counterclaim seeks the return of thirty-one thousand dollars ($31,000.00) in disability benefits previously paid to Mr. Decologero. The existence of an identical twin brother present on a surveillance video is very helpful to Mr. Decologero's defense of this matter. This is not a situation where the document that was allegedly fabricated is hiding or explaining something that is hurtful to the party's case. There is no reason for the existence of a twin brother to have been hidden and nothing to fear with regard to the Hartford knowing it. Mr. Decologero has nothing to gain by the fabrication of such a letter. Mr. Decologero's counsel has nothing to personally gain and everything to lose (her license, reputation, livelihood) by fabricating such a letter. This is NOT the type of situation in which even an unethical and unscrupulous person would engage in the type of conduct asserted by Mr. Ciapciak.

Decologero's counsel do not have signatures on them.  Rather, the original and copies are often printed out at the same time, the original is signed and sent and the distribution copies and file copies are unsigned.  That is what was done here.  This is a standard practice among many lawyers especially those who compose and distribute their own documents as I do.

The Hartford's counsel next points to the Hartford's claim that the November 16, 2001 letter is not in the Hartford's claim file.[3]  Mr. Decologero's counsel does not know what happened to the letter except that it was sent to the Hartford on November 16, 2001 and that it was never returned to her by the U.S. Post Office.  Crow Affidavit ¶ 6, 34.  It is just as reasonable an explanation that the Hartford lost, misplaced or mishandled the letter as that it never received it.

Many of the assertions made by the Hartford's counsel in its Motion to Reconsider and for Sanctions appear to be the result of misunderstandings by counsel for the Hartford.

The Hartford contends that Mr. Decologero testified at his deposition that he had never seen the video before and he never told the Hartford about his twin brother.  See Ciapciak Affidavit ¶ 22.  Mr. Decologero did NOT state that he had NEVER seen the video before.  Mr. Decologero had been asked about the investigator, Frank Barre, who apparently took his statement around the time of the video surveillance.  The Hartford's counsel asked if Mr. Decologero told Mr. Barre that it was not him in the video and Mr.

---

[3]  The Hartford's counsel states that the Appeal letter was sent on October 16, 2001, not November 16, 2001 and appears to claim that Mr. Decologero's counsel is trying to replace the October letter with the November letter after the fact.  Mr. Ciapciak has his facts totally confused.  An initial appeal letter was sent to the Hartford on October **15**, 2001, not October 16th.  Crow Affidavit, Exhibit A.  That letter asked for more time up to and including November 20, 2001 to submit information and materials.  The November 16, 2001 letter was that follow-up submission on behalf of Mr. Decologero.  Crow Affidavit, Exhibit C.

Decologero stated that Mr. Barre did not tell him there was a video.    See Crow Affidavit Exhibit H, Deposition of William Decologero on June 5, 2007 ("Decologero Deposition") at page 90 line 13 through page 93 line 15.  Mr. Decologero stated the first time he was aware of a video was after it was sent to his lawyer.  Crow Affidavit, Exhibit H, Decologero Deposition at page 106 lines 8-12.

While it is true that Mr. Decologero stated that he personally never told the Hartford about his twin brother, the reason was that he had engaged counsel at the point and his counsel was the one communicating directly with the Hartford, which she did on November 16, 2001.  In fact at his deposition, Mr. Decologero referred to the picture of he and his twin that was sent to the Hartford by his counsel.  Crow Affidavit, Exhibit H, Decologero Deposition at page 31 lines 3-12.  Mr. Decologero stated he did not inform the Hartford directly because he had a lawyer.  Crow Affidavit, Exhibit H, Decologero Deposition at pages 106 line 8 – page 107 line 2.

In addition to the assertions by the Hartford regarding the November 16, 2001 letter and its knowledge of the existence of Mr. Decologero's twin brother, the Hartford seeks reconsideration of its motion to extend the tracking order based on its assertion that it was not properly served with Mr. Decologero's opposition to its original motion to extend.  See Hartford Motion for Reconsideration ¶ 1.  The argument is unclear.  It appears that Mr. Ciapciak has a problem with being served with Mr. Decologero's opposition to Hartford's Motion to Extend on the day BEFORE the Court ruled on that motion.  (It was not served AFTER the Court's decision which would at least serve as a basis for an argument).

On Friday, June 29, 2007 at 3:30 p.m., Mr. Decologero's counsel received an NEF from the Court that The Hartford had filed its Motion to Extend the Tracking Order. Crow Affidavit ¶ 23. Mr. Decologero's Opposition to this Motion was prepared and filed on Thursday, July 5, 2007 at 11:38 a.m., the third business day after receiving the Hartford's motion. Crow Affidavit ¶ 24. A copy was sent electronically by the court to myself and to the Hartford's counsel at that time. *Id.* Service was made upon the Hartford's counsel in accordance with Section E(3) of the Electronic Case Filing Administrative Procedures of January 1, 2006 of the United States District Court for the District of Massachusetts whereby transmission of pleadings filed through the Court's transmission facilities constitutes service of the filed documents upon all registered ECF users. Mr. Ciapciak is a registered ECF user. Mr. Ciapciak admits that his office received service of Mr. Decologero's opposition on July 5, 2007. Ciapciak Affidavit ¶ 5.

The only electronic submission of the Hartford's motions and other pleadings filed with the court by the Hartford that I have received over the past several months has been from the Court's NEF, including the Hartford's Motion to Reconsider which is being addressed by this memorandum. Crow Affidavit ¶ 29. I have not received direct e-mail submissions from the Hartford's counsel of its filings with the Court. *Id.*

The Hartford next contends that Mr. Decologero's counsel filed his Emergency Motion to Quash without consulting with the Hartford's counsel as required. This is accurate to some extent. At 1:18 p.m. on July 5, 2007, less than two (2) hours after filing the opposition discussed above, Mr. Decologero's counsel received a facsimile from the Hartford's counsel asking if she would be filing a motion to quash the subpoena to take Joseph Decologero's deposition on July 10, 2007. Crow Affidavit ¶ 25. Mr.

Decologero's counsel believed that this facsimile was in response to the earlier filed opposition and that the Hartford was taking the position that the deposition would proceed unless the subpoena was quashed. *Id.*

Based on the contents of this facsimile, Mr. Decologero's counsel filed an Emergency Motion to Quash the Subpoena with the Court on Thursday, July 5, 2007 at 3:13 p.m. Crow Affidavit ¶ 26. The motion was filed in a hurry due to the fact that it was almost the end of the day and counsel was leaving on a four day vacation trip out of state and would not be returning until Tuesday, July 10, 2007, the day the deposition was scheduled to take place. *Id.* While not an excuse for not making the extra effort to ensure compliance with the rule, it should be noted that the Hartford was in violation of this Court's Scheduling Order in issuing the notice of deposition and subpoena in the first place since the date for the completion of discovery had already passed. It should also be noted that the Hartford's counsel also did not confer with Mr. Decologero's counsel before filing its Motion to Reconsider. In addition, the reality is that any attempt to resolve the matter would not have been possible prior to filing the emergency motion in any event since the Hartford's counsel states in his affidavit that he was out of the office that afternoon. Ciapciak Affidavit ¶ 5.

The Hartford's counsel did send an email to Mr. Decologero's counsel on Friday, July 6, 2007 agreeing to continue the deposition until the Court's ruling if she would withdraw the motion to quash but counsel was not in the office to receive it prior to the Court's rulings on the motions. Crow Affidavit ¶ 27 and Exhibit G.

The Hartford repeats its arguments that the Court should extend the discovery deadline so it can conduct additional discovery because it did not learn of the existence of

Mr. Decologero's twin brother until it took Mr. Decologero's deposition. Since the Hartford contends that it never received the November 16, 2007 letter, for the sake of this argument it will be assumed that the Hartford did first learn of the twin brother at Mr. Decologero's deposition. The Hartford's request to extend the discovery deadline should still be denied.

The Hartford's counsel claims that Mr. Decologero's counsel misrepresented to this Court that the deposition of Mr. Decologero was delayed by the Hartford. Ciapciak Affidavit ¶ 14. No such misrepresentation was ever made. Mr. Decologero's counsel did and still does assert that the Hartford did not conduct any discovery between November 17, 2007 and April 5, 2007 when it faxed a notice of deposition for Mr. Decologero on April 13, 2007 to counsel, a "delay" of over four (4) months and just eleven (11) days before the discovery completion deadline. It is quite clear from the original Opposition to the Hartford's Motion to Extend that this was the only "delay" assigned to the Hartford.

The deposition did not take place on April 13, 2007 because counsel could not reach the deponent and this was confirmed in the email to the Hartford's counsel sent at that time. Crow Affidavit ¶ 20 and Exhibit E. Mr. Decologero's wife's illness, an inoperable terminal brain tumor, was raised as an issue to be worked around in rescheduling the deposition along with both counsel's schedules. A date of June 5, 2007 was agreed upon.

For the sake of these motions the Court should treat the deposition as having taken place on April 13, 2007 as originally scheduled. Even then, the Hartford's motion should be denied. Hartford's claim that it could not depose Decologero's twin brother

due to the postponement of Decologero's deposition until after the discovery completion date is disingenuous and totally inaccurate. Even if Hartford had taken Decologero's deposition on its originally scheduled date, April 13, 2007, the discovery completion date was April 16, 2007. Hartford could not have subpoenaed Decologero's twin brother and taken his deposition between Friday, April 13, 2007 and Monday, April 16, 2007.

At no time prior to Mr. Decologero's deposition in the course of this litigation did the Hartford engage in any communications, discovery or pleadings in which it would be expected that the existence of Mr. Decologero's twin brother would have or should have been disclosed. The first and only discovery engaged in by the Hartford to be completed within the discovery deadline was Mr. Decologero's deposition scheduled for April 13, 2007.[4] The Hartford could have scheduled Mr. Decologero's deposition at any time between November 17, 2007 and April 16, 2007.[5] Since the Hartford chose not to engage in discovery until just a few days before the discovery completion date that the Hartford itself proposed to the Court, the Court should not extend the discovery deadline.

---

[4]     The Hartford also alleges that Mr. Decologero failed to respond to discovery requests for which it will file a motion to compel. Ciapciak Affidavit.¶ 17. These discovery requests were received on April 9, 2007, just one week before the discovery **completion** deadline. The Hartford's counsel seems to be confused between a deadline by which all discovery must be served and a discovery completion deadline. It is Mr. Decologero's position that since the discovery served could not be completed within the deadline set by the Court as submitted to it by both parties, the discovery was outside the discovery deadline and no responses were required.

It also appears as though the Hartford is arguing its need to depose Mr. Decologero's twin brother (for which the only pertinent testimony will be that he is the person on the surveillance videotape) to extend discovery so it can force Mr. Decologero to respond to all of the discovery requests (interrogatories, requests for documents and requests for admissions) it sent out on April 6, 2007. Thus, even if the Court is inclined to allow the Hartford to take Joseph Decologero's deposition (which as argued above, it should not do), the Court should not just extend the discovery deadline but should limit the Hartford to this one deposition.

[5]     It is ridiculous that the Hartford blames Mr. Decologero's counsel for not providing deposition dates. The Hartford was totally in control of its ability to notice the deposition if available dates were not provided to it as it claims.

CONCLUSION

For all of the above reasons, the Hartford's Motion to Reconsider and for

Sanctions should be denied.

/s/  *Cheri L. Crow*

_____
Cheri L. Crow, Esq. BBO#106830
Law Office of Cheri L. Crow
Two Main Street, Suite 300
Stoneham, MA   02180
(781) 438-6400
chericrow@attorneycrow.org

CERTIFICATE OF SERVICE

I, Cheri L. Crow, Esq., counsel for Plaintiff/Defendant in Counterclaim William
Decologero, hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing
(NEF) and paper copies will be sent to those indicated as non registered participants on
July 18, 2007.

James Ciapciak, Esq.
Ciapciak & Associates, P.C.
99 Access Road
Norwood, MA   02062

/s/  *Cheri L. Crow*

_____
Cheri L. Crow, Esq.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.
05-11613

*************************************
*
WILLIAM DECOLOGERO,                  *
      Plaintiff/Defendant in Counterclaim  *
                                     *
v.                                   *
                                     *
HARTFORD LIFE INSURANCE              *
      COMPANY,                        *
      Defendant/Plaintiff in Counterclaim  *
                                     *
*************************************


AFFIDAVIT OF CHERI L. CROW, ESQ.


       I, Cheri L. Crow, do hereby state that the following is true and accurate to the best of my knowledge:

1.      I am counsel for Plaintiff/Defendant in Counterclaim William Decologero in this matter.

2.      Paragraphs 3 through 29 contain the timeline of pertinent events in this action.

3.      Mr. Decologero received a notice from Hartford Life Insurance Company ("the Hartford") dated August 20, 2001 that his disability benefits were being terminated retroactively to September 21, 2000.

4.      On October 15, 2001, I spoke to the Hartford and sent a letter stating that I was representing Mr. Decologero and requested an enlargement of time to appeal the termination of his disability benefits up to and including November 20, 2001.  A true and accurate copy of this letter with its enclosures is attached hereto as Exhibit A.

5.      On October 23, 2001, the Hartford sent me a letter which I received stating that it had received the appeal and the claim was being reviewed and enclosed documents comprising their claim file.  A copy of this letter is attached hereto as Exhibit B.

6.      On November 16, 2001, I sent a signed detailed appeal letter to the Hartford. A true and accurate copy of this letter with its enclosure but without signature is attached as Exhibit C.

7.      On November 28, 2001, the Hartford sent me a letter which I received denying Mr. Decologero's appeal. A copy of this letter is attached hereto as Exhibit D.

8.      Since the Hartford's November 28, 2001 letter did not refer to my November 16, 2001 letter and the Hartford's October 23, 2001 letter had not stated that it would enlarge the time to appeal, I believed that the Hartford had essentially denied my request for an enlargment of time to appeal and that it had refused to consider the contents of the November 28, 2001 letter as a "late" submission.

9.      There were no other communications from myself to the Hartford prior to the filing of the complaint in this matter on August 2, 2005.

10.     On December 16, 2005, after the scheduling conference in this case, the Hartford moved for summary judgment and filed a motion to stay discovery pending a ruling on its motion.

11.     On December 21, 2005, the Hartford filed a counterclaim against Mr. Decologero.

12.     On February 8, 2006, the Court granted Hartford's Motion to Stay Discovery.

13.     On May 17, 2006, the Court (Senior Judge Keeton) granted the Hartford's Motion for Summary Judgment on Mr. Decologero's complaint.

14.     Final judgment was entered (erroneously) by the Court while the Hartford's counterclaim was still pending and I filed an appeal with the First Circuit Court of Appeals. Ultimately, the appeal was dismissed on October 3, 2006 by the First Circuit Court of Appeals since the final judgment was corrected. This decision was entered into this Court's docket on October 25, 2006.

15.     On November 2, 2006 the Hartford moved to lift the stay on discovery. On November 10, 2006, I opposed and moved for entry of final judgment on the Court's dismissal of Mr. Decologero's complaint.

16.     On November 17, 2006, the Court denied the Motion for Entry of Final Judgment and granted the Hartford's Motion to Lift the Stay on Discovery. The Court also ordered the parties to file a joint proposed scheduling order within fourteen (14) days.

17.     The parties filed a Joint Statement including a Pre-Trial Schedule on December 1, 2006 in which **both** parties set the **completion** of discovery deadline as April 16, 2007.

18.     On December 11, 2007, the Court entered the Scheduling Order that all discovery be completed by April 16, 2007.

19.     The Hartford did not engage in **any** discovery until it sent a Notice of Deposition for Decologero on April 5, 2007 scheduling the deposition for Friday, April 13, 2007, just three (3) days before the discovery completion deadline. The notice was barely within the minimun time allowed to notice a party's deposition.

20.     On April 11, 2007 I telephoned the Hartford's counsel and spoke to an associate stating that I had been unable to contact my client regarding the deposition scheduled for April 13th. I did not state in connection with this conversation that my client was unavailable due to his wife's illness. I stated that I was willing to produce Mr. Decologero for deposition after April 13, 2007 and treat it as though it had been taken within the discovery completion deadline. I confirmed this conversation by email, a true and accurate copy of which is attached as Exhibit E.

21.     I specifically refused to extend the discovery completion deadline except as set forth above because on April 9, 2007, I received additional discovery requests from Hartford (interrogatories, requests for documents and requests for admissions) which could not be completed by the discovery completion deadline and thus I considered them untimely under the Court's Discovery Order.

22.     On May 8, 2007, after comparing all pertinent schedules (which did involve issues regardng the terminal illness of Mr. Decologero's wife), Mr. Decologero's deposition was scheduled for Tuesday, June 5, 2007 at 1:00 p.m. and took place on that date.

23.     On Friday, June 29, 2007 at 3:30 p.m., I received an NEF from the Court that The Hartford filed a Motion to Extend the Tracking Order.

24.     I prepared and filed an Opposition to this Motion on Thursday, July 5, 2007 at 11:38 a.m., on the third business day after receiving the Hartford's motion. A copy was sent electronically by the court to myself and to the Hartford's counsel at that time.

25.     At 1:18 p.m. on July 5, 2007, less than two (2) hours after I had filed the opposition, I received a facsimile from the Hartford's counsel asking if I would be filing a motion to quash the subpoena to take the twin brother's, Joseph Decologero, deposition on July 10, 2007. I believed that this facsimile was in response to my opposition and that the Hartford was taking the position that the deposition would proceed unless the subpoena was quashed. A copy of the Hartford's July 5, 2007 facsimile is attached hereto as Exhibit F.

26.     Based on the contents of this fax, I filed an Emergency Motion to Quash the Subpoena with the Court on Thursday, July 5, 2007 at 3:13 p.m. I felt forced to act immediately because it was near the end of the day and I was leaving that

afternoon on a four day vacation trip out of state and would not be returning until Tuesday, July 10, 2007, the day the deposition was scheduled to take place.

27.    The Hartford's counsel did send me an email agreeing to continue the deposition until the Court's ruling if I would withdraw the motion to quash.   This email was sent on Friday, July 6, 2007 after I had already left on my trip.  A copy of this email is attached as Exhibit G.  I did not know about this email until Tuesday, July 10, 2007 when I returned to my office and the Court had already ruled on the pending motions.

28.    It was and is my understanding and belief that, in accordance with Section E(3) of the Electronic Case Filing Administrative Procedures of January 1, 2006 of the United States District Court for the District of Massachusetts, transmission of my pleadings filed through the Court's transmission facilities constitutes service of the filed documents upon the Hartford's counsel since he is a registered ECF user.

29.    The only electronic submission of the Hartford's motions and other pleadings filed with the court by the Hartford that I have received over the past several months has been from the Court's NEF.  I have not received direct e-mail submissions from the Hartford's counsel of its filings with the Court.

30.    The Hartford's counsel did not confer with me before filing its Motion to Reconsider that is presently before the Court.

31.    A true and accurate copy of pertinent pages of the minuscript from Mr. Decologero's June 5, 2007 deposition referred to in the Opposition are attached hereto as Exhibit H.

32.    I did not fabricate my November 16, 2001 letter after the fact as alleged by the Hartford's counsel.

33.    I was surprised at the deposition of Mr. Decologero on June 5, 2007 when it appeared that the Hartford's counsel was unaware that Mr. Decologero had an identical twin brother since that information had been disclosed to the Hartford in my November 16, 2001 letter.  I surmised that the Hartford might have failed to provide it to counsel since it did not consider it timely submitted and that it had been separated from other parts of the claim file.

34.    I have no explanation as to why my November 16, 2001 letter is not in the Hartford's claim file.  The letter was never returned to me and my previous letter sent to the same address was received by the Hartford.

35.    I have been practicing law as a litigator for over 25 years.  I have never had any complaints brought against me or any disciplinary actions taken against me.

36.    I believe that I have a reputation as a respected member of the Bar with a high degree of ethics.


Signed under the pains and penalties of perjury this 18th day of July 2007.

/s/  *Cheri L. Crow*

_____
Cheri L. Crow, Esq. BBO#106830
Law Office of Cheri L. Crow
Two Main Street, Suite 300
Stoneham, MA   02180
(781) 438-6400
chericrow@attorneycrow.org


CERTIFICATE OF SERVICE

I, Cheri L. Crow, Esq., counsel for Plaintiff/Defendant in Counterclaim William Decologero, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on July 18, 2007.

James Ciapciak, Esq.
Ciapciak & Associates, P.C.
99 Access Road
Norwood, MA   02062

/s/  *Cheri L. Crow*

_____
Cheri L. Crow, Esq.

EXHIBIT A

# CHERI L. CROW, ESQ.

23 Walkers Brook Drive, Suite 40
Reading, Massachusetts 01867
(781) 944-8470
FAX (781) 944-8495

October 15, 2001

By Facsimile and Regular Mail

Veronica Carpenter
Investigative Analyst
Special Investigations Unit-Group Benefits Division
Hartford Life Insurance Company
P.O. Box 2999
Hartford, CT 06104-2999

RE:     Claimant:          William Decologero
        Policy Holder:     Trustees of the Educational Profession of America
                           Group Insurance Trust
        SSN:               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
        Policy Number:     AGP 5062 Plan I

Dear Ms. Carpenter:

Per our telephone conversation of today, I am writing to inform you that I represent Mr. Decologero. Enclosed is a Letter of Representation as well as an Authorization signed by Mr. Decologero for your records.

Mr. Decologero intends to appeal the termination of his benefits and the demand for repayment of monies previously paid to him. I request an enlargement of time to provide the written submission supporting his appeal up to and including November 20, 2001. This enlargement of time is needed because Mr. Decologero has just retained me and his wife has been diagnosed with ovarian cancer and he has been focused on her medical situation.

I also request a copy of the applicable policy and any and all documents from Mr. Decologero's claim file, including notes made by Hartford employees.

Thank you in advance for your anticipated cooperation.

Sincerely,

Cheri L. Crow, Esq.

From : To Decologero

Date: 10/15/01 Time: 2:11.44 PM

Page 3 of 3

## AUTHORIZATION

I, William Decologero, hereby authorize the Hartford Life Insurance Companies or any agent or employee thereof to communicate with:

Cheri L. Crow, Esq.
23 Walkers Brook Drive
Reading, MA 01867
(781) 944-8470
FAX (781) 944-8495

regarding my medical situation, my claim for disability benefits and or the termination of such benefits and my appeal of such termination, and any other related matters.

I, William Decologero, hereby authorize the Hartford Life Insurance Companies or any agent or employee thereof to release to Cheri L. Crow, Esq. a copy of any and all documents concerning my medical situation, my claim for disability benefits and or the termination of such benefits and my appeal of such termination, and any other related matters including but not limited to the Hartford's claim file, investigative file, and medical records.

I hereby release from any restriction of professional confidences any and all mental health providers, physicians, surgeons, technicians, psychologists, therapists and medical records librarians.

Policy Holder:      Trustees of the Educational Profession of America
                    Group Insurance Trust

SSN:                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

Policy Number:      AGP 5062 Plan 1

Date: 10/15/01                SIGNED: _____
                              WILLIAM DECOLOGERO
                              26 Chapin Street
                              North Andover, Massachusetts 01845
                              (978) 689-2393

cc:     Cheri L. Crow, Esq.

From: * To: Decologero

Date: 10/15/01 Time 2:11:44 PM

# WILLIAM DECOLOGERO

26 Chapin Street
North Andover, Massachusetts 01845
(978) 689-2393

October 15, 2001

Veronica Carpenter
Investigative Analyst
Special Investigations Unit-Group Benefits Division
Hartford Life Insurance Company
P.O. Box 2999
Hartford, CT 06104-2999

RE:      Termination of Total Disability Benefits
        Policy Holder:     Trustees of the Educational Profession of America
                         Group Insurance Trust
        SSN:            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
        Policy Number:   AGP 5062 Plan I

Dear Ms. Carpenter:

I am writing this letter to inform you and the Hartford Life Insurance Company that I have retained Cheri L. Crow, Esq. of 23 Walkers Brook Drive, Reading, Massachusetts 01867, Telephone 781-944-8470 to represent me with regard to my claim for disability benefits, the termination of my benefits and my appeal of the termination of such benefits.

All communications should be directed to Attorney Crow regarding my situation.

Sincerely,

William Decologero

cc:     Cheri L. Crow, Esq.

# EXHIBIT B

October 23, 2001

**Hartford Life**

Cheri L. Crow, Esq.
23 Walkers Brook Drive
Suite 40
Reading, MA 01867

Policyholder: Trustees Of The Educational Profession Of America Group Ins
Policy No.:    83AGP005062
Insured:       William Decologero
SSN:           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

Dear Attorney Crow:

We have received the appeal that you submitted in connection with the above-referenced claim for Disability benefits on October 15, 2001.

The claim has been referred to a Claim Specialist who will conduct a complete review based upon the statements submitted and the documents contained in the claim file. Upon completion of this review, we will advise you of our determination.

Enclosed are the copies of the pertinent documents upon which we based our determination:

1.  Initial Claim for Total Disability Benefits completed by you and signed on 05/30/00.
2.  Verification of coverage by Seabury and Smith (formerly Albert H. Wohler & Co.) dated 06/20/00.
3.  Attending Physician Statement completed by Dr. Paul Weinstein on 06/26/00.
4.  Medical records from Dr. Paul Weinstein dating from 05/22/00 through 01/23/01.
5.  Copy of medical records from Dr. Onaly Kapasi dating from 01/31/01 through 05/02/01.
6.  Copy of Independent Medical Examination (IME) report done 10/27/00 and received from Atlantic Charter Insurance Company on 07/17/01.
7.  Copy of a job description for a Restaurant Manager from the Dictionary of Occupational Titles.
8.  Claimant questionnaire and Other Income Questionnaire completed and signed by you on 04/13/01.
9.  A copy of your Detailed Earnings Report from Social Security Administration.
10. Employment verification and payroll information from J.L. Marshall & Sons, Inc dated 06/07/01.
11. Corporate Documents for Two Essex Street Inc. signed by you on 10/27/99 and listing you as Treasurer0.21 and Director of the corporation.
12. Interview with Hartford Life Insurance's Investigator William Moryto conducted 08/10/01 and a statement signed by you.
13. Surveillance report and video from our representative surveillance vendor Factfinder Investigations on 06/29/01 and 06/30/01.

Hartford Life Simsbury Disability
Claims Office
200 Great Pond Dr.
Windsor, CT 06095
Toll Free 888 232 5340
Facsimile 860 843 5997

Mailing Address: P.O. Box 2993
Hartford, CT 06104-2993

Also enclosed is a copy of the applicable policy.

All other documents and internal notes are considered proprietary and confidential and will not be forwarded.

If you have any questions, please feel free to contact our office at Toll Free (888) 232-5340, x33892. Our office hours are 8:00 AM to 4:00 PM EST, Monday through Friday.

Sincerely,

Diane Favreau
Hartford Life Insurance Company

# EXHIBIT C

# CHERI L. CROW, ESQ.

23 Walkers Brook Drive, Suite 40
Reading, Massachusetts 01867
(781) 944-8470
FAX (781) 944-8495

November 16, 2001

Veronica Carpenter
Investigative Analyst
Special Investigations Unit-Group Benefits Division
Hartford Life Insurance Company
P.O. Box 2999
Hartford, CT  06104-2999

| | | |
|---|---|---|
| RE: | Claimant: | William Decologero |
| | Policy Holder: | Trustees of the Educational Profession of America Group Insurance Trust |
| | SSN: | 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 |
| | Policy Number: | AGP 5062 Plan I |

Dear Ms. Carpenter:

This letter constitutes Mr. Decologero's appeal of the termination of his benefits and the demand for repayment of monies previously paid to him by The Hartford.

The Hartford observes that Mr. Decologero has not had the recommended surgery on this left shoulder. Mr. Decologero has been attempting to get approval from the worker's compensation insurer for the shoulder surgery but has not been successful to date. Mr. Decologero cannot afford to pay for the surgery by himself and cannot get a doctor to perform the operation until he can do so.

Mr. Decologero disputes the conclusions reached by Dr. Berkowitz who was hired by the worker's compensation insurer. Both of his treating physicians, who are more familiar with the injuries, the symptoms, the treatment and Mr. Decologero as an individual, have found Mr. Decologero to be injured and disabled. Mr. Decologero's October MRI also showed objective demonstrable evidence of a physical injury which Dr. Kapasi has stated requires surgery. Mr. Decologero is willing to undergo an IME with a specialist in this area hired by The Hartford.

The job description that you have relied upon does not accurately describe Mr. Decologero's job duties. He not only "managed" the restaurant but he, as is typically the case in the restaurant business and most small businesses, did everything that needed to be done. In

Veronica Carpenter
Hartford Life Insurance Company
November 16, 2001
Page 2

addition to those duties listed as a Restaurant Manager's duties, Mr. Decologero's job duties included cooking, cleaning, lifting, carrying food, liquor, dishes and other items, delivering heavy items, loading and unloading, lots of walking and running around and generally helping anywhere and everywhere as needed. Most restaurants do not have the luxury of having someone who performs only those duties contained in the job description you rely on. Mr. Decologero would be unable to get a job as a restaurant manager if he told them he was restricted in his ability to lift, carry, bend and walk and/or stand for long periods of time. It is also very telling that his injury occurred when he fell off the dumpster because he was clearing off trash that had been placed on top of the dumpster. Mr. Decologero needs to be able to be on his feet, walking, lifting, carrying, bending, etc. in order to do the job of managing a restaurant. He cannot do so.

Further, The Hartford itself states that a "light occupation" is defined as the ability to lift 20 pounds maximum with frequent lifting and/or carrying of objects weighing up to 10 pounds. Mr. Decologero cannot do frequent lifting. He cannot lift 20 pounds. He cannot carry objects weighing up to 10 pounds. Thus, he cannot perform this "light occupation."

With regard to the wages The Hartford claims shows that Mr. Decologero was working when he should not have been, the wages Mr. Decologero received from Two Essex Street Inc. in 2000 were for Mr. Decologero's work at the restaurant, Tony D's Italian Steakhouse ("Tony D's"), prior to his injury on May 17, 2000. Two Essex Street Inc. owns Tony D's restaurant and was Mr. Decologero's employer.

With regard to his position at Two Essex Street Inc., Mr. Decologero was not a shareholder and received no income from the corporation except in his capacity as an employee of Tony D's as discussed above. Two Essex Street Inc. was owned by his brother Joseph and Ray Doane. Mr. Decologero was to be an owner but could not afford to invest in the corporation. While corporate documents list Mr. Decologero as the Treasurer and a Director, he did not know he continued in those capacities after the initial filing. He was told and he believed that he had been removed as an officer and director after he did not invest. Therefore, he believed that he did not hold those positions when he stated that he did not. He does not have the corporate documents you seek regarding Two Essex Street Inc. and he does not have the authority to obtain them. The owners' information is as follows: Raymond Doane, 47 Cragie Street, Somerville, MA  02143 and Joseph Decologero, 253 Lexington Street, Woburn, MA 01801. Mr. Decologero will try to assist The Hartford in obtaining any additional information about Two Essex Street, Inc. that he can provide. Please let me know what more, if anything, The Hartford would like him to do in this regard.

Veronica Carpenter
Hartford Life Insurance Company
November 16, 2001
Page 3


Regarding Mr. Decologero's working for J.L. Marshall & Sons, Inc., Mr. Decologero had been out of work all summer due to his injuries and he wanted to try to return to work. Tony D's was closed at that time while work was being done on the building and the lease was being renegotiated. (In fact, Tony D's closed and as far as Mr. Decologero knows, Two Essex Street Inc. was not involved in anything else.) Mr. Decologero had a good friend who worked at J.L. Marshall & Sons, Inc. who said Mr. Decologero could try to work. Mr. Decologero told them he could not lift but they said they had light work involving driving a pickup truck around the site. After Mr. Decologero started, the duties assigned to him changed and he could not do the work so he had to stop. Mr. Decologero's attempt to return to work ended because there was no work at the construction site that he could do. There was not a general lack of work. J.L. Marshall & Sons, Inc. was involved in a major construction project that continued for a long period of time after Mr. Decologero's time there. This is a big company and the term "lack of work" is a catchall used by them. If Mr. Decologero could have performed duties that involved lifting, carrying, bending, etc., he could have remained employed at J.L. Marsh & Sons, Inc.

After his return to work failed, Mr. Decologero called The Hartford and spoke with Derek Breen, his contact there. He told Mr. Breen about this failed attempt to work and Mr. Breen told him that so long as he had not worked thirty (30) days or more, his benefits would not be affected. Thus, Mr. Decologero was under the impression that this failed attempt to return to work did not constitute "working." He did not disclose it after that because he did not even think about it.

The Hartford also claims that Mr. Decologero was under surveillance on June 29 and 30, 2001 and on videotape during that time. The Hartford contends that Mr. Decologero was observed engaging in motions and actions that were inconsistent with his claim of injuries/disability. Mr. Decologero disputes that the person who was under surveillance and videotaped was him. Mr. Decologero has an identical twin brother. His brother owns a Ford pickup truck. His brother was often at Mr. Decologero's house and would sometimes drive the van to run errands. It is Mr. Decologero's position that the person who was driving, walking, lifting and bending while under surveillance and on videotape must be his twin brother. Enclosed is a copy of a photograph taken of Mr. Decologero and his brother taken on October 20, 2001 which shows that they look the same.

The Hartford has requested Mr. Decologero's personal tax records for 1997 and 1998 well before his May 2000 injury. I do not believe that these are relevant and we will not provide them unless and until you can provide me with information as to why they are relevant.

Veronica Carpenter
Hartford Life Insurance Company
November 16, 2001
Page 4


     Mr. Decologero does not have any additional medical information to submit at this time and relies upon this submissions by his doctors, Dr. Weinstein and Dr. Kapasi, and his MRI that is objective evidence of his shoulder injury.

     Mr. Decologero has been injured and is disabled under the term so his policy.  He cannot work and has not worked other than his failed attempt to return to work (for which he should be commended).  His MRI provides substantiation of his injury and his inability to work.  The information the Hartford has relied on to terminate his benefits is inaccurate and faulty with regard to the surveillance, the videotape, his involvement with Two Essex Street Inc. and the assertion that he "worked" since his injury occurred.

     For all of the above reasons, The Hartford should reverse its decision to terminate Mr. Decologero's benefits.


                    Sincerely,



                    Cheri L. Crow, Esq.


Enc.



OCT 20 2001

# EXHIBIT D

November 28, 2001



Cheri L. Crow, Esq.
23 Walkers Brook Drive
Suite 40
Reading, MA  01867

**Hartford Life**

Policyholder:  Trustees Of The Educational Profession Of America Group Ins
Policy No.:    83AGP005062
Insured:       William Decologero
SSN:           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

Dear Attorney Crow:

We have received the appeal that you submitted in connection with the above-referenced claim for Long Term Disability (LTD) benefits on October 15, 2001 along with material contained therein. The material included tax forms W-2 for the year 2000 from J. L. Marshall, Great Eastern Masonry, Two Essex St. Inc., Form 1040A, the year 1999 Form 1040, W-2's from Spud's Restaurant and your spouse's W-2's from LGH Health Enterprises Inc and Merrimack Valley Nephrology. Your letter dated October 15, 2001 requested a copy of Mr. Decologero's claim file. The pertinent documents upon which we based our decision were submitted to you on October 23, 2001. You requested an enlargement of time through November 20, 2001 to provide written submission supporting Mr. Decologero's appeal.

Upon completion of a comprehensive review of the information in Mr. Decologero's claim file, it is our opinion that the claim termination outlined in Kim Gabrielsen's, Senior Investigative Analyst, letter of August 20, 2001 (copy attached) should be upheld. The August 20,2001 letter listed the evidence contained in Mr. Decologero's claim file. Our decision to uphold the denial of his claim for LTD benefits is based upon that evidence and our full and fair review.

Total Disability is defined on page 20 as:

**Total Disability:**

With respect to Plans with a Maximum Benefit Period of two or more years, Total Disability means disability which:

a) during the Waiting Period and the first 24 months during which Total Disability Benefits are payable, wholly and continuously prevents an Insured Person from performing the substantial and material duties of his or her usual occupation; and
b) thereafter wholly and continuously prevents an Insured Person from engaging in any and every occupation or employment for which he or she is reasonably suited by training, education or

Hartford Life Simsbury Disability
Claims Office
200 Great Pond Dr.
Windsor, CT 06095
Toll Free 888 232 5340
Facsimile 860 843 5997

Mailing Address: P.O. Box 2993
Hartford, CT 06104-2993

experience.

Maximum Payment Period is defined on page 4 as:

**Maximum Payment Period:**
For Total Disability that commences
a) before Age 60, we pay benefits up to the Maximum Benefit Period for selected Plan;
b) on or after Age 60, but before Age 64, we pay benefits up to the Maximum Benefit Period for the selected Plan or to Age 65, whichever occurs first; or
c) on or after Age 64, we pay benefits for up to 12 months.

We will not pay Total Disability benefits beyond the date the Insured Person ceases to be Totally Disabled.

As stated in Ms. Gabrielsen's letter to Mr. DeCologero, Dr. Weinstein first treated your client on 05/22/00 at which time his impression was that Mr. DeCologero sustained a cervical strain, thoracic strain, lumbar strain, strain/contusion left shoulder and a strain/contusion left knee. Dr. Weinstein referred Mr. DeCologero for a MRI on 10/12/00 which resulted in findings consistent with a partial tear of the supraspinatus tendon without demonstration of a complete tear. Dr. Weinstein then referred your client to Dr. Onaly Kapasi who recommended Mr. DeCologero for arthroscopic shoulder evaluation and Neer Achromioplasty with repair of the Rotator Cuff. Dr. Kapasi advised Mr. DeCologero that this was considered "elective surgery" that would require pre-approval from the insurance company. Mr. DeCologero did not elect to have this recommended surgery on his left shoulder or on his left knee. An Independent Medical Evaluation (IME) performed on Mr. DeCologero by Dr. Mordecai Berkowitz on 6/27/00 revealed your client could return to full time work in a modified capacity (lifting up to 5 pounds frequently and 10 – 15 pounds on occasion) within 2 weeks from that evaluation. A follow-up exam by Dr. Berkowitz on 10/27/00 revealed that Mr. DeCologero had sufficient time to recover and should be working at his regular occupation (Restaurant Manger) without restrictions.  The Dictionary of Occupational Titles provided by the U. S. Department of Labor suggests the occupation of Restaurant Manger defined the occupation to be within Mr. DeCologero's physical capacity (light occupation).

Mr. DeCologero worked for J. L. Marshall & Sons from 09/21/00 through 10/06/00 as a laborer; considered a heavy occupation with frequent lifting of up to 50 lbs.  This return to work is confirmed by Form W-2 indicating wages of $1851.00.  The Form W-2 from Great Eastern Masonry for wages in the amount of $516 further confirms that Mr. DeCologero worked during the period of time he was receiving LTD benefits.

Mr. DeCologero's initial claim form signed on 5/30/00 indicated he was earning $1200 per week as of his last day worked (05/17/00). The W-2 form showing wages of $19,200 would suggest that Mr. DeCologero earned 16 weeks of wages from Two Essex St. Inc. for the year 2000 (16 x $1200 = $19,200). Since Mr. DeCologero did not indicate wages earned from any other employer on his initial claim form, it appears the $516 from Great Eastern Masonry was earned after Mr. Decologero's last day worked (05/17/00).

Our determination that your client no longer met the Policy definition of Totally Disabled beyond 09/20/01 is supported by Mr. DeCologero's return to work.   The Maximum Benefit Period (referenced above) clearly states that "We will not pay Total Disability benefits beyond the date the Insured Person ceases to be Totally Disabled" (09/21/00).

Review of the surveillance videos performed on 06/29/01 and 06/30/01 revealed that Mr. DeCologero was able to drive, open and close the van door with his left hand and arm, turn his upper body and neck, walking without any assistive device or observed difficulty, bending, lifting chairs using both hands and arms above the shoulders without any observed outward pain or limitation. Mr. DeCologero's functionality is contradictory to his subjective complaints regarding his physical abilities.

The file documentation and the surveillance video reviewed as well as Mr. DeCologero's return to work indicates Mr. DeCologero was not wholly and continuously prevented from performing the substantial and material duties of his light work occupation as a Restaurant Manger as of 09/21/00.

In conclusion, the information, which was reviewed, is not sufficient to change our prior claim determination.  Based upon our file documentation, the termination of LTD benefits was appropriate, and Mr. DeCologero's claim remains closed.

We reserve all rights and defenses available to us in making this determination as well as recovering the overpayment in the amount of $31,000.

If you have any questions, please feel free to contact our office at Toll Free (888) 232-5340, x33892.  Our office hours are 8:00 AM to 4:00 PM EST, Monday through Friday.


Sincerely,

Diane Favreau, Specialist
Hartford Life Insurance Company

EXHIBIT E

## Cheri L. Crow, Esq.

**From:**    *"Cheri L. Crow, Esq." <chericrow@attorneycrow.org>*
**To:**      *"Ciapciak, James" <jjc@candalawyers.com>*
**Sent:**    *Wednesday, April 11, 2007 2:24 PM*
**Subject:** *Decologero/Hartford*

Jim

This is to confirm my telephone conversation with your office today in which I informed them that since receiving the notice of deposition you issued on April 5th to take my client's deposition on April 13th, I have been unable to reach my client despite my efforts to do so. (I am assuming he is away). Therefore, I am willing to produce my client for deposition after April 13th and treat the deposition as though it took place on April 13th.

I will contact you as soon as I am able to communicate with my client with dates that work for he and I within the next few weeks.

Cheri

Law Office of Cheri L. Crow
Two Main St., Ste 300
Stoneham, MA  02180
Tel: 781-438-6400
Fax: 781-438-6411
E-Mail: chericrow@attorneycrow.org

E-MAIL CONFIDENTIALITY NOTICE
IMPORTANT: This electronic mail message, including any attachments, is being sent by a lawyer. It is confidential and may contain or constitute information protected by the Attorney-Client and/or Attorney work-product privileges. If you are not the intended recipient, you are not authorized to read, retain, print, copy, disclose or disseminate any of its contents. If you have received this communication in error, please immediately notify the sender and delete this e-mail. Unauthorized interception of this E-Mail is a violation of federal criminal law.

Disclaimer regarding Uniform Electronic Transactions Act ("UETA"): If this communication concerns negotiation of a contract or agreement, UETA does not apply to it. Contract formation shall occur only with manually affixed original signatures on original documents.

# EXHIBIT F

# CIAPCIAK

## &

## ASSOCIATES, P. C.

99 Access Road
Norwood, MA 02062
Tel: (781) 255-7401
Fax: (781) 255-7402

**BOSTON, MA**
Suite 1900
101 Federal Street
Boston, MA 02110
(617) 951-2727

**COVENTRY, RI**
113 Tiouge Avenue
Coventry, RI 02816
(401) 996-7401

**TO:**          Cheri L. Crow, Esquire

**FROM:**        James J. Ciapciak

**YOUR FAX #:**  (781) 438-6411          **C&A CASE #:**

**RE:**          Decologero

**DATE:**        July 5, 2007          **NO. OF PAGES (incl. cover): 2**

**REMARKS:**

Please call sender at the above telephone number if there is trouble in the transmission or if you do not receive all pages.

### ***Confidentiality Note***

THIS TELECOPY IS SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE AND CONTAINS CONFIDENTIAL INFORMATION FOR THE PERSON(S) NAMED ABOVE. ANY DISTRIBUTION, COPYING OR DISCLOSURE IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS TELECOPY IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY BY TELEPHONE AT THE ABOVE TELEPHONE NUMBER.

CIAPCIAK
&
ASSOCIATES, P.C.
ATTORNEYS AT LAW

99 Access Road
Norwood, MA 02062
Tel (781) 255-7401
Fax (781) 255-7402

BOSTON, MA OFFICE
(617) 951-2727

RHODE ISLAND OFFICE
(401) 996-7401

July 5, 2007

*VIA FACSIMILE*

Cheri L. Crow, Esquire
Two Main Street
Suite 300
Stoneham, MA 02180

Re:   **Decologero v. Hartford Life Insurance Company – Defendant**
      **USDC C. A. No.:  05-11613 REK**

Dear Ms. Crow:

        In light of the fact that you had not disclosed the twin brother (we checked our file), will you be filing a motion to quash the deposition of Joseph DeCologero that scheduled for Tuesday?

                        Very truly yours,

                        James J. Ciapciak

JJC/acb

# EXHIBIT G

**Cheri L. Crow, Esq.**

| | |
|---|---|
| **From:** | "Femion Mezini" <fm@candalawyers.com> |
| **To:** | "Cheri L. Crow, Esq." <chericrow@attorneycrow.org> |
| **Cc:** | "Allison" <acb@candalawyers.com>; "Jim Ciapciak" <jjc@candalawyers.com> |
| **Sent:** | Friday, July 06, 2007 10:45 AM |
| **Subject:** | Decologero v. Hartford Life. |

Dear Ms. Crow:

In light of your Opposition to Hartford Life's Motion to Extend the Tracking Order, we will agree to continue William DeCologero and Joseph DeCologero's Depositions until Hartford Life's Motion to Extend the Tracking Order has been ruled upon. This will confirm that you will withdraw (without prejudice) your Motion to Quash the Deposition of Joseph DeCologero until the Court rules on Hartford Life's Motion.

Thank you,


Femion D. Mezini, JD, MBA

This electronic message and documents accompanying it are privileged and confidential attorney-client communications and may contain privileged work product. Any interception or copying of this message by any person other than the addressee is improper. If you have any questions about this warning, please contact:

**CIAPCIAK & ASSOCIATES, P.C.**
99 Access Road
Norwood, MA (USA) 02062
Tel: 781.255.7401 x 15
Fax: 781.255.7402
fm@candalawyers.com
Boston: 617.951.2727
Rhode Island: 401.996.7401

# EXHIBIT H

**1**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MASSACHUSETTS

C.A. No. 11613-REK

WILLIAM DeCOLOGERO,
    Plaintiff/Defendant-in-Counterclaim,

vs.

HARTFORD LIFE INSURANCE COMPANY,
    Defendant/Plaintiff-in-Counterclaim.

**••••••••••**

DEPOSITION OF WILLIAM DeCOLOGERO, a witness called on behalf of the Defendant, taken pursuant to the applicable provisions of the Massachusetts Rules of Civil Procedure at the offices of Ciapciak & Associates, 99 Access Road, Norwood, Massachusetts on June 5, 2007, commencing at 1:05 p.m.

**••••••••**

Reporter: Joyce E. Romanow
Professional Court Reporter and Notary Public
Copley Court Reporting, Inc.
58 Batterymarch St, Suite 317, Boston, MA 02110
(617) 423-5841
www.copleycourt.com

---

**2**

**APPEARANCES**

CHERI L. CROW, ESQ.
    Law Office of Cheri L. Crow
    Two Main Street
    Suite 300
    Stoneham, Massachusetts 02180
    (781)438-6400
    For Plaintiff

JAMES J. CIAPCIAK, ESQ.
    Ciapciak & Associates, P.C.
    99 Access Road
    Norwood, Massachusetts 02062
    (781)255-7401
    For Defendant

---

**3**

**I N D E X**

DEPOSITION OF    WILLIAM DeCOLOGERO

EXAMINATION BY MR. CIAPCIAK .................. 4

**E X H I B I T S**

| No. | Description | Page |
|-----|-------------|------|
| 1 | Notice | 71 |
| 2 | Letter Dated 8-20-01 | 71 |
| 3 | DVD | 113 |
| 4 | Letter Dated 10-15-01 | 125 |
| 5 | Letter Dated 10-15-01 | 125 |
| 6 | Claim for Disability Benefits Form | 125 |
| 7 | Long-Term Disability Claim Form | 136 |
| 8 | Initial Injury Reports | 140 |
| 9 | Occupational Description | 165 |
| 10 | Claimant Questionnaire | 170 |
| 11 | Letter Dated 6-7-01 | 170 |
| 12 | Articles of Incorporation | 181 |

---

**4**

**P R O C E E D I N G S**

(Begins 1:05 p.m.)

(WILLIAM DeCOLOGERO, sworn.)

EXAMINATION BY MR. CIAPCIAK:

Q.    Good afternoon. My name is Jim Ciapciak. I represent the Hartford Life Insurance Company. And we're here to take your deposition today with respect to a claim for long-term disability benefits.

Could you please state your full name and address for the record.

A.    My name is William DeCologero, 26 Chapin Road, North Andover.

Q.    And your date of birth?

A.    4-26-57.

Q.    Have you been deposed or given trial testimony today or both?

MS. CROW: Before today?

MR. CIAPCIAK: Yes. Before today.

MS. CROW: You forgot the "before."

Q.    Before today.

MR. CIAPCIAK: Have you ever been, I thought I said.

A.    No.

29

1    A.    Yes, I did.

2    Q.    Was it a Workers' Comp. matter?

3    A.    Yes.

4    Q.    Was that after or before your surgeries?  I

5  presume it was after.

6    A.    I couldn't recall now, but I had three

7  surgeries, I know that.

8    Q.    Did you reach an end result with it?

9    A.    No.  I still totally -- it's still

10  completely numbed and --

11    Q.    Does it affect your ability, your hand,

12  gripping or anything?

13    A.    It does, yes.  I have a problem with it.

14    Q.    What about as you sit here today.  Does it

15  affect anything?

16    A.    It does still hurt.  It's constantly, I'm

17  used to it, just --

18    Q.    I'm just trying to --

19    A.    I couldn't explain it to you.  It's just a

20  pain and it's going to stay there.

21    Q.    Just kind of a dull pain and you're used to

22  it?

23    A.    Yeah.  In other words, if it snows out or

24  rains out, I'll be really hurting like a toothache.

30

1  But right now it's calmed down.  If it rains, boom,

2  I'm gone.  It's like -- I can't sleep.

3    Q.    I see.

4    A.    Like I said, it's open medical, they take

5  care of it for me.

6    Q.    You do have that, good.

7    A.    Yeah.

8    Q.    Wonderful.  Do you --

9    A.    New England Neurological Center in North

10  Andover.  Dr. Rossman is a doctor and a surgeon.

11    Q.    If you can, do you know whether it affects

12  your strength or gripping ability still to this date,

13  or is that only when it rains or the weather?

14    A.    It depends how I handle something.  I try

15  not to handle something I can't -- if it's too heavy

16  or too --

17    Q.    Okay.

18    A.    Regarding with my shoulder, I can't, now

19  it's really connected.

20    Q.    I gotcha.  Okay.  So back to the '90s.  You

21  got rid of Perrault in the '90s.  This was after your

22  hand accident.  What other businesses or real estate

23  or restaurants did you own?

24    A.    Well, I was getting involved with Two Essex

31

1  Street, Inc.  I was involved with my brother Joseph

2  and Mr. Ray Doane.

3    Q.    That's the Joe?

4    A.    That's my twin brother, Joseph.

5    Q.    Oh, really.  You have a twin brother.

6  Identical or paternal?

7    A.    Identical.

8    Q.    Oh, really.  Oh, good.

9    A.    You got the pictures.  You saw him.

10    Q.    I don't have pictures.  You have an

11  identical twin?

12    A.    Yes.

13    Q.    Any other siblings?

14    A.    I have two other brothers and two sisters,

15  six of us.

16    Q.    Okay.  So Two Essex?

17    A.    Inc., yeah.

18    Q.    Was owned by your brother?

19    A.    We filed a corporation in September of '99.

20    Q.    Okay.

21    A.    We were going to buy -- we bought -- we

22  were going to open the place January 1 on New Years'.

23    Q.    Um-hum.

24    A.    But we went for our liquor license.  With

32

1  my record, criminal record, they wanted me off the

2  corporation right away.  And we did.  We had a lawyer

3  who took me off.  But I stayed on as a general manager

4  worker, not an owner and liquor license holder.

5    Q.    Did you buy into it at all or do any of the

6  capitalization of the corporation?

7    A.    No.  I was buying into it until --

8    Q.    Until then?

9    A.    Until then, yeah.

10    Q.    What was the criminal record?

11    A.    The DOUI.

12    Q.    Is that it?

13    A.    That was it.  Two of them in the past 10

14  years.

15    Q.    That would be a problem with a liquor

16  license.

17    A.    Yeah.

18    Q.    All right.  Do you have any other criminal

19  record?

20    A.    I have assault and battery.

21    Q.    Back when?

22    A.    Back when?  I don't know.

23    Q.    '60s, '70s, '80s, '90s?

24    A.    I'd say '90s.  Used car salesman.  It

89

1  work." How is that statement not true?

2  A.    Regarding my policy, um.

3  Q.    What that sentence is saying is that you

4  represented to Hartford Life that you had never

5  resumed work. And you're saying that's not true?

6  A.    I called them and told them I resumed work,

7  to Eric Green, the claims manager, that I had gone to

8  work for 13 days.

9  Q.    When did you call him?

10  A.    I called him, I don't recall what day, but

11  I recall what he said. As long as I didn't void the

12  30 days of disability in my contract policy that I

13  wouldn't lose my benefits.

14  Q.    I don't get it.

15  A.    Well, I only worked 13 days, I informed

16  him. And he said there was no problem as long as I

17  didn't work beyond 30 days, that's when they would

18  have just cancelled my whole policy. I tried working

19  and I couldn't, and I got paid.

20  Q.    Did you represent in writing to Hartford

21  Life that you had never resumed work?

22  A.    No, I never did. I told them I worked.

23  Q.    Did you -- do you recall representing to

24  Met Life that you had never resumed work since the

90

1  accident?

2  A.    I never told them I never resumed work.

3  Q.    So it's your recollection that you didn't

4  put in writing that you never resumed to work?

5  A.    No, I told -- I informed them when I did

6  work.

7  Q.    And it's not your recollection that you

8  informed them you went back to work after they already

9  found out about it?

10  A.    I told them before that.

11  Q.    Okay. The next thing that's starred in

12  this letter is a couple paragraphs down. It begins on

13  8-10-01. You met with and provided a signed statement

14  to Frank Barre. Do you see that one?

15  MS. CROW: I'm sorry. There's another

16  asterisk before that. The second sentence of the

17  second paragraph.

18  Q.    Okay.

19  A.    What's the --

20  Q.    Do you disagree that the position of a

21  laborer is considered heavy occupation requiring

22  frequent lifting?

23  MS. CROW: Of up to 50 pounds.

24  A.    I disagree with that, yeah. All laborers

91

1  don't lift 50 pounds all day long, no.

2  Q.    The next asterisk, what part do you

3  disagree with there?

4  A.    (Looks.) On 50 pounds and then --

5  MS. CROW: He's moving down.

6  Q.    What is that asterisk relating to?

7  A.    (Reads.) That's not me in the video.

8  Q.    It's your twin brother?

9  A.    Twin brother, completely.

10  Q.    You didn't say to Frank Barre that, yeah,

11  that's you on the video?

12  A.    I hadn't even seen the video. I never was

13  informed there was a video.

14  Q.    Did you discuss with Frank Barre that you

15  were throwing chairs in the back of a pickup?

16  A.    No. Who is Frank Barre?

17  Q.    The investigator.

18  A.    Oh, the one that was standing in the house

19  and that didn't want to leave when my wife was laying

20  there dying. That guy, yeah. I didn't discuss

21  anything with him. I didn't know what -- he never

22  even mentioned anything about, I didn't even know he

23  was an investigator. He was just -- I didn't know.

24  He was sitting there. He just took information, the

92

1  questions I gave him -- he gave me, I answered them.

2  Nothing about surveillance.

3  Q.    You didn't do a statement with him?

4  A.    I did a statement with him, but I have the

5  statement. I never said something about throwing

6  chairs in the back of a pickup truck on the statement.

7  Q.    I asked if you gave him a statement.

8  A.    Never, no.

9  Q.    You never gave him a statement?

10  A.    On throwing chairs in the back of a pickup

11  truck?

12  Q.    I said nothing about chairs in the back --

13  A.    You just did.

14  Q.    They're separate questions. Let me take a

15  step back.

16  A.    Go ahead.

17  Q.    Did you give him a statement?

18  A.    I give him a statement, yes.

19  Q.    Okay. You said I had no idea who he was.

20  A.    I didn't even know his name. I'm sorry.

21  Q.    Okay.

22  MS. CROW: If it's not clear yet, he's

23  not good on names.

24  Q.    Believe me. The guy who came into your

93

1  house that you've mentioned, you didn't know he was
2  from the insurance company?
3      A.    I did.
4      Q.    You did?
5      A.    Yes, I did.
6      Q.    So he told you, I'm from the insurance
7  company.
8      A.    Right.
9      Q.    And he took a statement from you?
10     A.    Right.
11     Q.    My next question is regarding the video.
12     A.    Okay.
13     Q.    Did you tell him about your acts in the
14  video, that that was you?
15     A.    No, whatsoever.
16     Q.    All right. That's fine. Okay. The
17  statement that's listed on this letter, does that
18  sound familiar?
19     A.    Regarding what, sir?
20     Q.    The statement you gave. Did you give --
21  when you gave a statement to the guy?
22     A.    The statement isn't on this letter, sir,
23  right?
24     Q.    Okay. It looks like it isn't, it being

94

1  quotes here.
2      A.    What's being quoted here. Explain to me.
3  I described my disability. Which part are you going
4  to right now?
5      Q.    The part where it says, "In your statement
6  you're quoted in part, you relayed the following
7  information." You did relay that to him, right?
8      A.    Yes.
9              MS. CROW: We think it would be better
10  to go from the actual statement. We're not agreeing
11  that it's been accurately transcribed here.
12              MR. CIAPCIAK: It says in part. It was
13  anything --
14              MS. CROW: I don't know. We have no way
15  of knowing if it's been --
16              MR. CIAPCIAK: Is anything -- well, I
17  asked him to star anything he thought was inaccurate.
18              MS. CROW: Wait a minute. I said we're
19  not saying that we're agreeing that this is what his
20  statement was. With regard to the specific facts
21  within those statements?
22              MR. CIAPCIAK: Yes.
23              MS. CROW: Yes. So until he gets to an
24  asterisk, he agrees with those.

95

1              MR. CIAPCIAK: Let's go to the
2  asterisks.
3              MS. CROW: Well, he doesn't disagree
4  with them.
5      Q.    Okay. The next asterisk it says, My
6  sitting is okay. I am comfortable when sitting." I
7  presume what you're trying to say there is you're
8  uncomfortable when you're sitting?
9      A.    Uncomfortable, yes.
10     Q.    The next asterisk I have is down the
11  bottom. Well, hang on. About half a through the
12  page. "I have been asked if I worked including
13  volunteer work or self-employment activities at any
14  time since I reported becoming disabled. I have not
15  worked at all since becoming disabled."
16     A.    I have.
17     Q.    Okay. You know you have.
18     A.    Right.
19     Q.    But I'm wondering, was that not in your
20  statement when you made it or was that untrue when you
21  made it? I'm trying to figure out what the asterisk
22  is for then.
23     A.    I'm saying I knew I worked for 13 days with
24  the company there. That's in my statement. It's not

96

1  true. I don't recall that at all. I did work and I
2  did expose that way before he even took my statement,
3  the gentleman.
4      Q.    The next thing you've got starred is
5  "Social Security disability. I received about 220 --
6              MS. CROW: It's the "My left hand"
7  sentence.
8              MR. CIAPCIAK: Okay.
9      Q.    The next thing you have starred is, "My
10  left hand was severely injured at my restaurant."
11     A.    It's not my restaurant. It was Friendly's.
12     Q.    Okay. So if that was in your statement, it
13  would be untrue?
14     A.    Untrue.
15     Q.    It's not true anyway.
16     A.    Not true.
17     Q.    The next thing you have starred is Tony D's
18  closed in June of 2000. Is that you or --
19              MS. CROW: That is an asterisk.
20     A.    Because I don't recall saying it was
21  closed.
22     Q.    Okay.
23     A.    I don't recall at all. It kept -- it was
24  open, so.

---

**105**

1  bell, would that have been you or her?
2     A.   Mass Ave. Auto. That's not Elaine. She's
3  not driving, she's sick.
4     Q.   Okay. So -- it's not your wife, who else
5  could it be?
6     A.   It could be Joe.
7     Q.   Joe who?
8     A.   My brother.
9     Q.   Your brother. Okay. That's you in the
10 orange shirt, though, right?
11    A.   I believe so. 100 percent so, yeah.
12       MS. CROW: So let's be clear. You're
13 asking who that person is there?
14    Q.   Now I'm --
15       MS. CROW: Never mind.
16       MR. CIAPCIAK: My depo.
17       MS. CROW: You're right.
18    Q.   The guy under the hood there, see him?
19    A.   Yeah.
20    Q.   Is that you?
21    A.   Not it's not me.
22    Q.   It doesn't look like you at all?
23    A.   Yeah, that's Joe.
24    Q.   That's Joe, is it?

---

**106**

1     A.   Yeah. He looks -- that's Joe.
2     Q.   Okay.
3     A.   What would I go underneath the hood for? I
4  don't know about cars.
5        MR. CIAPCIAK: We'll just play another
6  minute or two.
7        MS. CROW: Um-hum.
8     Q.   When did you first become aware of the
9  video?
10    A.   Now. I just -- I didn't -- there was a
11 video after the fact, after it was sent to the
12 lawyers. I never saw the video, nothing.
13    Q.   Did you ever tell anybody that that wasn't
14 you or --
15    A.   Actually.
16    Q.   That was your twin brother?
17    A.   As soon he told me -- as soon as I heard
18 about a pickup truck, I said, Well, I don't own a
19 pickup truck. It's Joe. And I knew exactly what he
20 was doing. He was painting the house and he stayed
21 with us.
22    Q.   Okay. Did you ever tell anybody from
23 Hartford Life it wasn't you?
24    A.   Of course. No, I'm sorry. I never told

---

**107**

1  anybody from Hartford Life it wasn't me because I was
2  instructed from my lawyer.
3        MS. CROW: We won't talk about that.
4     Q.   Still looks like your identical twin up
5  there?
6     A.   Yeah. It's -- sometimes I can't tell.
7  That's how close we are. What would I be over there
8  for? I don't go to Mass. Auto.
9     Q.   I'm just asking.
10    A.   I know. Joe is a tinker. He knows
11 everything.
12    Q.   Is he a mechanic or?
13    A.   He's everything, but he's a contractor. He
14 does completely the opposite I do. I don't do -- I'm
15 not good with my hands or anything like that. 30
16 years he's been a contractor, you know.
17    Q.   What's he doing now?
18    A.   He works for J. Brown. He's doing all
19 these good contractor, painter.
20    Q.   Painting houses?
21    A.   Not inside, marblizing. He does
22 specialized painting. This Old House, he's been on
23 there.
24    Q.   Good. Let me know if you see you anywhere

---

**108**

1  in there, okay?
2     A.   I don't know if it's Joe or me.
3     Q.   I can't tell.
4     A.   All right.
5     Q.   That's why I'm asking you.
6     A.   I can't tell you.
7     Q.   We're going to play it through, so just let
8  me know if you show up anywhere in there, if you can
9  tell.
10    A.   (Watches video.)
11    Q.   There must be some. Does Joe live on
12 Lexington Street?
13    A.   Washington Ave. in Woburn. He sold it.
14    Q.   What's your date of birth again?
15    A.   4-26-57.
16    Q.   Still Joe there?
17    A.   What's that?
18    Q.   Still Joe?
19    A.   Joe. Why would I be there? They're not
20 even my auto guys.
21    Q.   Does Joe go to Mass. Ave. Auto a lot?
22    A.   It looks like he's looking at a car maybe.
23 He wants to buy it. I don't know. That's what Mass.
24 Ave. Auto is.