# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **WILLIAM DECOLOGERO,** ) | |
| ) | |
| **Plaintiff/Defendant-in-Counterclaim,** ) | |
| ) | |
| **v.** ) | |
| ) | **C.A. NO:05-11613 REK** |
| **HARTFORD LIFE INSURANCE** ) | |
| **COMPANY,** ) | |
| ) | |
| **Defendant/Plaintiff-in-Counterclaim.** ) | |

## HARTFORD LIFE INSURANCE COMPANY'S
## MOTION FOR SUMMARY JUDGMENT

Defendant/Plaintiff-in-Counterclaim, Hartford Life Insurance Company (hereinafter the "Hartford Life"), moves for summary judgment pursuant to Fed.R.Civ. P. 56 and local Rule 56.1.

As grounds for its motion, Hartford Life states (as more fully set forth in the attached Memorandum of Law In Support of this motion) that Mr. Decologero has admitted that he worked during his alleged disability and, therefore, there is no dispute that he must reimburse Hartford Life $31,000.00 in disability payments as he did not meet the Policy's definition of Total Disability on or after September 21, 2000.

WHEREFORE, Defendant/Plaintiff-in-Counterclaim, Hartford Life Insurance Company,

respectfully requests that its Motion for Summary Judgment on its Counterclaim be allowed.

Respectfully submitted by,
HARTFORD LIFE INSURANCE
COMPANY,
By Its Attorney,


   /s/ James J. Ciapciak
James J. Ciapciak, BBO #: 552328
CIAPCIAK & ASSOCIATES, P.C.
99 Access Road
Norwood, MA  02062
Tel:  (781) 255-7401
Fax:  (781) 255-7401


## CERTIFICATE OF SERVICE

I, James J. Ciapciak, hereby certify that this document filed through the ECF system will be sent electronically on this 25th day of February 2008 to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants:

Cheri L. Crow, Esquire
Two Main Street
Suite 300
Stoneham, MA 02180


   /s/ James J. Ciapciak
James J. Ciapciak

F://JJC/DeCologero/Pleadings/MotionSJ-Counterclaim.doc

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| WILLIAM DECOLOGERO, | ) | |
| | ) | |
| **Plaintiff/Defendant-in-Counterclaim,** | ) | |
| | ) | |
| v. | ) | |
| | ) | **C.A. NO:05-11613 REK** |
| HARTFORD LIFE INSURANCE COMPANY, | ) | |
| | ) | |
| **Defendant/Plaintiff-in-Counterclaim.** | ) | |
| | ) | |

**HARTFORD LIFE INSURANCE COMPANY'S MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## I.      INTRODUCTION

Defendant/Plaintiff-in-Counterclaim Hartford Life Insurance Company (hereinafter

"Hartford Life"), hereby moves for Summary Judgment based on Plaintiff/Defendant-in-

Counterclaim's Admissions, that he worked during his alleged disability and, therefore, there is

no dispute that he must reimburse Hartford Life $31,000.00 in disability payments as he did not

meet the Policy's definition of Total Disability on or after September 21, 2000.

## II.      PROCEDURAL HISTORY

On August 1, 2005, Plaintiff/Defendant-in-Counterclaim, William DeCologero ("Mr.

DeCologero") filed suit against Hartford Life alleging violations of the Employee Retirement

Security Act ("ERISA"), 29 U.S.C. §§1001 *et. seq.*  On December 20, 2005, Hartford Life filed a

Counterclaim alleging counts of Breach of Contract, Conversion and Unjust Enrichment against

Mr. DeCologero.  On December 14, 2005, Hartford Life filed a Motion for Summary Judgment

seeking to dismiss the claims brought against it by Mr. DeCologero.  On May 17, 2006, this Honorable Court allowed Hartford Life's Motion for Summary Judgment.  The only remaining claim is Hartford Life's Counterclaim against Mr. DeCologero.


### III.    CONCISE STATEMENT OF MATERIAL FACTS OF RECORD AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

1.    Hartford Life issued a disability policy of insurance to the Trustees of the Educational Profession of America Group Insurance Trust under Policy number 83AGP005062, subject to Forms and Riders, including, but not limited to Form SRP-1311 J (5062).  The policy period was from December 1, 1999 to the anniversary date of December 1st of each year beginning in the year 2000.  [See Hartford Life Insurance Company Policy Number 83AGP005062, (hereinafter the "Policy"), a copy of which is attached hereto and marked as "Exhibit 1"].

2.    Mr. DeCologero alleges in his Complaint that during the Policy effective dates, Tony D Italian Steak House was a holder of the Policy as a member of the Trustees of the Educational Profession of America Group Insurance Trust.  [See Plaintiff's Complaint, ¶¶8 and 9, a copy of which is attached hereto and marked as "Exhibit 2"].

3.    Mr. DeCologero alleges in his Complaint that he was employed with Tony D Italian Steak House during the Policy effective dates and, therefore, claims he was an "Eligible Person [for disability benefits] as defined by the Policy."  [Exhibit 1].

4.    The Policy issued by Hartford Life was subject to Form SRP-1311 J (5062),

**"ACCIDENT AND SICKNESS TOTAL DISABILITY BENEFIT**," which states, in relevant part, as follows:


**Total Disability:**

With respect to Plans with a Maximum Benefit Period of one year, Total Disability means disability which wholly and continuously prevents an Insured Person from performing the substantial and material duties of his or her usual Occupation.

With respect to Plans with a Maximum Benefit Period of two or more years, Total Disability means disability which:

a)    during the Waiting Period and the first 24 months during which Total Disability Benefits are payable, wholly and continuously prevents an Insured Person from performing the substantial and material duties of his or her usual occupation; and

b)    thereafter wholly and continuously prevents an Insured Person from engaging in any and every occupation or employment for which he or she is reasonably suited by training, education or experience.

[See Exhibit 1, **ACCIDENT AND SICKNESS TOTAL DISABILITY BENEFIT,** Form SRP-1311 J (5062), p. 20]

5.    On or about May 17, 2000, Mr. DeCologero claims he injured himself while performing his duties as an employee of Tony D Italian Steak House.  [Exhibit 1; See also Claim for Total Disability Benefits, Statement of Insured, signed by Mr. DeCologero, a copy of which is attached hereto and marked as "Exhibit 3"].

6.    On May 30, 2000, Mr. DeCologero submitted to Hartford Life an Initial Claim for Total Disability Benefits. [See Exhibit 2, ¶10; Exhibit 3].

7.    On June 26, 2000, the treating physician for Mr. DeCologero's May 17, 2000 injury, Dr. Weinstein, submitted an initial proof of loss on behalf of Mr. DeCologero.  [See Long Term Disability Claim, Attending Physician's Statement of Disability, a copy of which is attached hereto and marked as "Exhibit 4"].

8.    Mr. DeCologero's Complaint alleges that on August 16, 2000, he was notified by Hartford Life that his claim for disability benefits was approved.  [Exhibit 2, ¶14].

9.      On August 20, 2001, Hartford Life forwarded correspondence to Mr. DeCologero wherein it stated, in relevant part, that his claim for disability benefits was terminated effective September 21, 2000.  [Exhibit 1, ¶15; See also August 20, 2001 correspondence from Kim Gabrielsen, Senior Investigative Analyst, Special Investigations Unit – Group Benefits Division, Hartford Life Insurance Company, a copy of which is attached hereto and marked as "Exhibit 5"].

10.     Hartford Life indicated in the August 20, 2001 correspondence, that because benefits were paid after September 21, 2000, an overpayment occurred in the amount of $31,000.00. [Exhibit 5].

11.     In the August 20, 2001 correspondence, Hartford Life stated it based its "decision to terminate benefits upon Policy language and all documents contained in [Mr. DeCologero's] file, viewed as a whole", including, but not limited to: "10) Employment verification and payroll information from J.L. Marshall & Sons, Inc. dated 06/07/01."  [Exhibit 5, p. 2].

12.     On April 5, 2007, counsel for Hartford Life propounded Requests for Admissions upon Mr. DeCologero.  [See Hartford Life's Requests for Admissions, a copy of which is attached hereto and marked as "Exhibit 6"].

13.     Mr. DeCologero never replied to Hartford Life's Requests for Admissions.

14.     Pursuant to F.R.C.P. 36, Hartford Life's Requests for Admissions are Deemed Admitted.

15.     Mr. DeCologero has made the following Admissions:

        a.      Page 20 of the Policy insuring Mr. DeCologero contains the following
                definition of Total Disability:

                **Total Disability:**

                With respect to Plans with a Maximum Benefit Period of one year,
                Total Disability means disability which wholly and continuously
                Prevents an Insured Person from performing the substantial and

Material duties of his or her usual occupation.

With respect to Plans with a Maximum Benefit Period of two or More years, Total Disability means disability which:

a)     during the Waiting Period and the first 24 months during which Total Disability Benefits are payable, wholly and continuously prevents an Insured Person from performing the substantial and material duties of his or her usual occupation; and

b)     thereafter wholly and continuously prevents an Insured Person from engaging in any and every occupation or employment for which he or she is reasonably suited by training, education or experience.

[Exhibit 6, Request No. 1].

b.     Mr. DeCologero has read and understands the definition of Total Disability as set forth in Request No. 1.  [Exhibit 6, Request No. 2].

c.     On or about May 17, 2000, at the time Mr. DeCologero allegedly became disabled he was working as a Restaurant Manager at Tony D's Italian Restaurant.  [Exhibit 6, Request No. 3].

d.     From September 21, 2000 until October 6, 2000, Mr. DeCologero was employed by J.L. Marshall & Sons as a laborer.  [Exhibit 6, Request No. 4].

e.     On October 6, 2000, Mr. DeCologero was laid-off by J.L. Marshall & Sons Inc. due to lack of work.  [Exhibit 6, Request No. 5].

f.     Mr. DeCologero did not notify but rather concealed his employment with J.L. Marshall & Sons Inc. from Hartford Life.  [Exhibit 6, Request No. 6].

g.     Mr. DeCologero received disability insurance benefits from Hartford Life for the time period of September 21, 2000 until July 31, 2001 in the amount of $31,000.00.  [Exhibit 6, Request No. 7].

h.     Despite Hartford Life's written demand, Mr. DeCologero refused and continues to refuse to reimburse Hartford Life the $31,000.00, (plus applicable interest) which he received for the time period of September 21, 2000 until July 31, 2001.  [Exhibit 6, Request No. 8].

16.    Mr. DeCologero's deposition was taken on June 5, 2007.  [See portions of Deposition

Transcript of William DeCologero, a copy of which is attached hereto and marked as

"Exhibit 7"].

17.    During his testimony, Mr. DeCologero admitted that he worked for J.L. Marshall & Sons

as a laborer from September 21, 2000 through October 6, 2000.  [Exhibit 7, pp. 86-87, ll.

2-1; pp. 157-158. ll. 17-11].

18.    During the time he worked for J.L. Marshall & Sons, Mr. DeCologero admitted he made

$1,850.00.  [Exhibit 7, p. 86, ll. 16-21].

## IV.    **ARGUMENT**

### A.    **Summary Judgment Is Appropriate As There Are No Genuine Issues of Material Fact and, Therefore, The Hartford Is Entitled To Judgment As A Matter of Law**

Summary Judgment is appropriate when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue of material fact and that the moving party is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(C).  Summary judgment is not "a disfavored procedural shortcut";

rather, it is an integral part of the judicial process "designed 'to secure the just, speedy and

inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327

(1986)(quoting Fed. F. Civ. P. 1); See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242

(1986).

Mr. DeCologero admitted in his deposition that he worked for J.L. Marshall & Sons as a

laborer from September 21, 2000 through October 6, 2000.  [Exhibit 7, pp. 86-87, ll. 2-1; pp.

157-158. ll. 17-11].  J.L. Marshall & Sons paid Mr. DeCologero for his services.  [Exhibit 7, p.

86, ll. 16-21].

In addition, Mr. DeCologero admitted that he concealed his employment with J.L. Marshall & Sons Inc. from Hartford Life and that he received disability insurance benefits from Hartford Life for the time period of September 21, 2000 until July 31, 2001 in the amount of $31,000.00.  .  [Exhibit 6, Request Nos. 7 and 8].

As a result of Mr. DeCologero's admissions that he did engage in employment from September 21, 2000 until October 6, 2000, there is no dispute that he did not meet the Policy's definition of Total Disability on or after September 21, 2000.  Therefore, Hartford Life is entitled to recoup at least the $31,000.00 it paid to Mr. DeCologero after he no longer met the Policy's definition of Total Disability.

When, as in the present case, there is no genuine issue of material fact, summary judgment should be granted to Hartford Life, as the moving party, to promote judicial economy. Here, the facts presented by Mr. DeCologero's Admissions and deposition testimony are more than sufficient to grant Hartford Life summary judgment.

## V. CONCLUSION

For the foregoing reasons, Hartford's Life's Motion t for Summary Judgment on its Counterclaim should be granted.

WHEREFORE, Hartford Life respectfully requests that this Honorable Court grant its Motion for Summary Judgment as Mr. Decologero has admitted a that he worked during his alleged disability and, therefore, there is no dispute that he must reimburse Hartford Life $31,000.00 in disability payments as he did not meet the Policy's definition of Total Disability on or after September 21, 2000.

Respectfully submitted by,
HARTFORD LIFE INSURANCE
COMPANY,
By Their Attorneys,


   /s/ James J. Ciapciak_____
James J. Ciapciak, BBO #: 552328
CIAPCIAK & ASSOCIATES, P.C.
99 Access Road
Norwood, MA  02062
Tel:  (781) 255-7401
Fax:  (781) 255-7401


## <u>CERTIFICATE OF SERVICE</u>

     I, James J. Ciapciak, hereby certify that this document filed through the ECF system will be sent electronically on this 25th day of February 2008 to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants:

Cheri L. Crow, Esquire
Two Main Street
Suite 300
Stoneham, MA 02180

      /s/ James J. Ciapciak_____
      James J. Ciapciak

F:/JJC/DeCologero/Pleadings/MemSJ-Counterclaim.doc

**EXHIBIT 1**

**HARTFORD LIFE INSURANCE COMPANY**
Hartford, Connecticut
(A stock insurance company, herein called the Company)

Will pay benefits according to the conditions of this Policy.

Signed for the Company

*Lynda Godkin*
Lynda Godkin, *Secretary*

*[signature]*
Lowndes A. Smith, *President*

**Hartford Life**

| | |
|---|---|
| Policy Number: | AGP-5062 |
| Policyholder Name: | Trustees of the Educational Profession of America Group Insurance Trust |
| Policyholder Address: | Bank of Newport<br>P.O. Box 450<br>Newport, RI 02840 |
| Policy Effective Date: | December 1, 1999 |
| Policy Anniversary: | December 1 of each year beginning 2000 |

**TABLE OF CONTENTS**
Schedule
Participating Organizations
Contract Provisions
Definitions
Period of Coverage
Benefits
Exclusions
Claim Provisions
Riders (if any)

Accepted by          Bank of Newport,    Trustee

........*Ann M. Nagle*........ Vice President
Policyholder

Form SRP-1311 A (HL) (5062)
Printed in the U.S.A

00158

## SCHEDULE – ELIGIBILITY

**Eligible Persons** include Prior Covered Persons, Members, Spouses, and Domestic Partners, subject to Evidence of Insurability and all other terms of this Policy.

**Prior Covered Person** means a person who was covered under the Prior Policy on November 30, 1999.

On November 30, 1999, the Prior Covered Person must be:
a) Actively-at-Work, as defined in this Policy; and
b) under the Policy Age Limit.

**Prior Policy** means Group Policy Number 6078 issued by Allianz Life Insurance Company of North America to the Regions Bank, Trustee for the Educational Profession of America Group Insurance Trust.

**Member** means a person in good standing in a Participating Organization of the Policyholder, provided the Member is:
a) Actively-at-Work, as defined, on a Full-time basis;
b) under Age 60; and
c) residing in the United States or Puerto Rico, except for Members who are Prior Covered Persons.

**Spouse** means the Spouse of the Member described above provided that the Spouse:
a) is not legally separated or divorced from the Member;
b) is Actively-at-Work, as defined, on a Full-time basis;
c) is under Age 60; and
d) resides in the United States or Puerto Rico, except for Spouses who are Prior Covered Persons.

Spouse shall also include the Member's Domestic Partner.

With respect to Coverage Division 001, Plans II, III, V, V1, V2, and V3, a Spouse is not an Eligible Person. Spouse coverage is available under Coverage Division 001, Plan I, and Coverage Divisions 002 and 003.

**Domestic Partner** means any individual with whom the Member either:
a) registers as a Domestic Partner, if the state, city, or town in which they reside authorizes registration as Domestic Partners; or
b) executes a Domestic Partner Affidavit acceptable to us, to establish that they are Domestic Partners for purposes of this Policy.

Such person will remain a Domestic Partner as long as he or she continues to meet the requirements described in the Domestic Partner registration or Domestic Partner Affidavit.

## SCHEDULE – ELIGIBILITY (Continued)

**Policy Age Limit:** 65

**Evidence of Insurability:**
We will pay for any evidence of insurability which we request. We reserve the right to decline an Eligible Person's application for coverage under the program. If we decline and an Eligible Person elects to provide us with additional evidence of insurability, the additional evidence will be at his or her own expense.

Simplified Issue:
To be accepted for coverage under this Policy on a Simplified Issue basis, an Eligible Person must submit a completed Application acceptable to us under our Simplified Issue underwriting standards.

Standard Issue:
To be accepted for coverage under this Policy on a Standard Issue basis, an Eligible Person must submit a completed Application acceptable to us under our Standard Issue underwriting standards.

00160

## SCHEDULE – BENEFITS

Prior Covered Persons will be covered under the Plan which most closely resembles the plan under which he or she was covered under Prior Policy, subject to all of the terms and conditions of this Policy and payment of the required premium.

**Open Plans:**
An Eligible Person may apply for coverage under Plan I or Plan III, of Coverage Division 001, as well as Coverage Divisions 002 and 003.

Coverage Division 002 applies only to Non-Sponsored Allied Health Professionals & Occupations. Coverage Division 003 applies only to Sponsored Allied Health Professionals & Occupations.

**Closed Plans:**
Coverage Division 001 and Plans II, V, VI, V2, and V3 are closed, and are provided under this Policy for renewal purposes only.

Plans V, V1, V2, and V3 apply only to Members of the American Massage Therapy Association who were Prior Covered Persons and who became covered under the Plans in accordance with the Transition Provision.

### Accident and Sickness Total Disability Benefit

**Monthly Benefit Amount:**
An Eligible Person may elect a Monthly Benefit Amount subject to the Minimum and Maximum amounts shown in the chart on Page 6 for his or her Plan. Monthly Benefit Amounts must be elected in increments of $100. An Eligible Person may not increase their benefits to an amount greater than the percentage of their Basic Monthly Pay shown in the chart. If Benefits become due for a period of less than one Month, the amount will be pro-rated at 1/30th per diem.

With the exception of Insured Persons under Coverage Division 001, Plan I and Plan V, and Coverage Divisions 002 and 003, the Monthly Benefit Amount payable will be subject to the Offset Provision stated below.

**Offset Provision:**
The benefit amount payable as the result of the Insured Person's Total Disability will be the lesser of:
   a) the Monthly Benefit Amount; or
   b) with respect to
        1) Coverage Division 001, Plans V1, V2, and V3, 60% of the Insured Person's Basic Monthly Pay; or
        2) Coverage Division 001, Plans II and III, 70% of the Insured Person's Basic Monthly Pay;
minus:
        1) any Other Income Benefits, including those for which the Insured Person could collect but did not apply; and
        2) all other income from any employer or for any work.

However, if the Insured Person's Monthly Benefit Amount would reduce to less than $50.00 per month due to Other Income Benefits, then the minimum Monthly Benefit Amount under this benefit will be $50.00 per month.

**Maximum Payment Period:**
For Total Disability that commences
   a) before Age 60, we pay benefits up to the Maximum Benefit Period for the selected Plan;
   b) on or after Age 60, but before Age 64, we pay benefits up to the Maximum Benefit Period for the selected Plan or to Age 65, whichever occurs first; or
   c) on or after Age 64, but before Age 65, we pay benefits for up to 12 months.

We will not pay Total Disability benefits beyond the date the Insured Person ceases to be Totally Disabled.

SCHEDULE – BENEFITS (Continued)

Partial Disability Benefit ("PTD")

Partial Disability Benefits are only "Included" in the Plans Shown.
Monthly Benefit Amount:        50% of the amount selected under the Total Disability Benefit
Maximum Payment Period:        6 months

If Benefits become due for a period of less than one Month, the amount will be pro-rated at 1/30th per diem.

Partial Disability means a disability that:
   a)   immediately follows a period of Total Disability for which benefits are payable under this Policy; and
   b)   prevents the Insured Person from engaging in active employment for more than four hours per day.

PTD Benefits are payable when all of the following conditions have been met:
   a)   The Insured Person is Partially Disabled while his or her insurance under this Policy is effective.
   b)   The Insured Person is not receiving, nor entitled to receive, benefits for Total Disability under this Policy.
   c)   The Maximum Benefit Period for the selected Plan is not exhausted.

   All payments will be made directly to the Insured Person.

   In no event will the Partial Disability Benefit when added to the member's earnings during his Partial Disability exceed the Monthly Benefit Amount.

PTD Benefits will cease on the earliest occurrence of the following events:
   a)   Benefits for Partial Disability have been paid for six full months.
   b)   The Insured Person ceases to be Partially Disabled.
   c)   The Maximum Benefit Period for the selected Plan is exhausted.
   d)   ,This Policy terminates.  (See Insured Persons Period of Coverage)

For purposes of computing the Maximum Benefit Period, a Partial Disability will be considered as a continuation of the preceding Total Disability.

Rehabilitation Benefit
(Applicable to 001-I, 001-II, 001-III, and 003 only)
See Benefit

The Maximum Benefit Period for which Rehabilitation Benefits may be paid is 12 months.  See Rehabilitative Employment Benefit for description.

Waiver of Premium
(Applicable to Standard Issue plans only)
See Waiver of Premium for description.

## SCHEDULE – BENEFITS (Continued)

### Schedule of Benefits Chart

| Coverage Division - Plan | Monthly Benefit Amount | | | Maximum Benefit Period | | Waiting Period Options | PTD Included |
|---|---|---|---|---|---|---|---|
| | Minimum Amount | Maximum, Not to Exceed the % of Basic Monthly Pay Shown | | For Sickness | For Injury | | |
| 001-I | $400 | $3000 | 70% of Basic Monthly Pay | 1 Year | 5 Years | 60 Days | Included |
| 001-II | $400 | $3000 | 70% of Basic Monthly Pay | 2 Years | To Age 65 | 60 Days | Included |
| 001-III | $300 | $3000 | 70% of Basic Monthly Pay | To Age 65 | To Age 65 | 60, 90, or 180 Days | Included |
| 001-V | $200 | $3000 | 60% of Basic Monthly Pay | 1 Year | 1 Year | 60 Days | None |
| 001-V1 | $200 | $3000 | 60% of Basic Monthly Pay | 2 Years | 2 Years | 60, 90, or 180 Days | None |
| 001-V2 | $200 | $3000 | 60% of Basic Monthly Pay | 5 Years | 5 Years | 60, 90, or 180 Days | None |
| 001-V3 | $200 | $3000 | 60% of Basic Monthly Pay | To Age 65* | To Age 65* | 60, 90, or 180 Days | None |
| 002 | $400 | $3000 | 70% of Basic Monthly Pay | 1 Year | 1 Year | 60 Days | None |
| 003 | $400 | $3000 | 70% of Basic Monthly Pay | 1 Year | 5 Year | 60 Days | Included |

*Subject to the Maximum Payment Period provision as described in Schedule – Policy Modifications.

## SCHEDULE - PREMIUMS

**Individual Premiums:** Premiums for each Insured Person are stated in the table on the following page.

Premiums are based on the Insured Person's:
   a) Age on his or her effective date and on each premium due date thereafter; and
   b) Benefit Plan and Waiting Period option selected.

The premiums shown are for semi-annual periods of coverage. If a premium becomes due for a different period, it will be pro-rated. Premiums for Ages 60 and over are Renewal Premiums only.

**Individual Premium Due Dates:** The first premium for each person is due on the date he or she becomes covered under this Policy. Each premium after that is due at the end of the period for which his or her preceding premium was paid.

**Individual Grace Period:** A Grace Period of 31 days from the Individual Premium Due Date is allowed each Insured Person for payment of each premium due after the initial premium. The Insured Person's insurance will be continued during the Grace Period.

The Grace Period will not continue coverage beyond a date stated in the Termination Provision.

**Policy Premium:** The premium for this Policy is the sum of the Individual Premiums for each Insured Person.

**Policy Premium Due Dates:** The Policy Premium is payable on:
   a) the Policy Effective Date; and
   b) the first day of each sixth month thereafter with respect to each Covered Person whose premium becomes due on such date.

Each Policy Premium is due on or in advance of the date it becomes payable. This Policy terminates on the last day of the period for which premium is paid.

**Policy Payment:** The Policy Premiums are to be paid to us by the Policyholder. However, they may be paid to us by any other person according to a mutual agreement among the other person, the Policyholder and us.

**Change of Premiums:** We have the right to change the premium rate after this Policy has been in force for six months and on any Premium Due Date thereafter. This includes the right to change premium rates for a benefit that applies to all individuals of the same class, Age and sex.

We will give the Policyholder notice of any change at least 75 days before the Due Date on which it is to become effective.

SCHEDULE - PREMIUMS (Continued)

Semi-Annual Premiums
Per $100 of Monthly Benefit Amount

COVERAGE DIVISION 001

| Insured Person's Age | Plan I | Plan II | Plan III 60-Day Waiting Period | Plan III 90-Day Waiting Period | Plan III 180-Day Waiting Period |
|---|---|---|---|---|---|
| Under Age 30 | $6.01 | $8.00 | $10.56 | $9.52 | $8.90 |
| 30-34 | 6.60 | 8.83 | 12.28 | 10.97 | 10.14 |
| 35-39 | 7.19 | 9.94 | 14.21 | 12.28 | 11.52 |
| 40-44 | 8.32 | 11.59 | 17.39 | 14.56 | 13.66 |
| 45-49 | 9.77 | 13.80 | 23.46 | 20.01 | 18.62 |
| 50-54 | 12.08 | 16.84 | 32.50 | 27.88 | 25.67 |
| 55-59 | 14.26 | 19.18 | 41.81 | 34.43 | 30.98 |
| 60-64 | 17.89 | 22.63 | 40.02 | 28.01 | 23.87 |
| 65-69 | N/A | N/A | N/A | N/A | N/A |

| Insured Person's Age | Plan V 60-Day Waiting Period | Plan V1 60-Day Waiting Period | Plan V1 60-Day Waiting Period | Plan V1 90-Day Waiting Period | Plan V1 180-Day Waiting Period |
|---|---|---|---|---|---|
| Under Age 30 | N/A | $8.00 | $6.64 | $5.70 | $3.94 |
| 30-34 | N/A | 9.52 | 8.03 | 6.99 | 5.05 |
| Under Age 35 | $10.56 | N/A | N/A | N/A | N/A |
| 35-39 | 11.88 | 10.63 | 8.98 | 7.81 | 5.64 |
| 40-44 | 14.52 | 16.07 | 13.90 | 12.41 | 9.57 |
| 45-49 | 17.16 | 17.47 | 15.11 | 13.48 | 10.40 |
| 50-54 | 21.12 | 28.01 | 24.49 | 22.09 | 17.62 |
| 55-59 | 29.04 | 29.08 | 25.43 | 22.94 | 18.30 |
| 60-64 | 39.60 | 73.07 | 65.68 | 60.56 | 50.39 |
| 65-69 | N/A | 66.57 | 58.64 | 53.30 | 43.42 |

| Insured Person's Age | Plan V2 60-Day Waiting Period | Plan V2 60-Day Waiting Period | Plan V2 90-Day Waiting Period | Plan V2 180-Day Waiting Period |
|---|---|---|---|---|
| Under Age 30 | $9.00 | $7.59 | $6.61 | $4.76 |
| 30-34 | 10.95 | 9.68 | 8.80 | 7.04 |
| 35-39 | 12.23 | 10.82 | 9.83 | 7.87 |
| 40-44 | 22.21 | 19.78 | 18.08 | 14.75 |
| 45-49 | 24.13 | 21.51 | 19.66 | 16.03 |
| 50-54 | 41.64 | 37.57 | 34.75 | 29.23 |
| 55-59 | 43.24 | 39.01 | 36.09 | 30.35 |
| 60-64 | 89.01 | 79.74 | 72.93 | 58.21 |
| 65-69 | 66.57 | 58.64 | 53.30 | 43.42 |

00165

SCHEDULE - PREMIUMS (Continued)

Semi-Annual Premiums
Per $100 of Monthly Benefit Amount

COVERAGE DIVISION 001 (Continued)

| Insured Person's Age | Plan V3 60-Day Waiting Period | Plan V3 60-Day Waiting Period | Plan V3 90-Day Waiting Period | Plan V3 180-Day Waiting Period |
|---|---|---|---|---|
| Under Age 30 | $11.11 | $9.57 | $8.50 | $6.42 |
| 30-34 | 15.85 | 14.35 | 13.28 | 11.07 |
| 35-39 | 17.71 | 16.04 | 14.85 | 12.39 |
| 40-44 | 33.14 | 30.19 | 28.08 | 23.76 |
| 45-49 | 36.02 | 32.81 | 30.52 | 25.82 |
| 50-54 | 57.05 | 52.08 | 48.60 | 41.34 |
| 55-59 | 59.25 | 54.08 | 50.47 | 42.93 |
| 60-64 | 93.06 | 83.36 | 76.25 | 60.86 |
| 65-69 | 69.60 | 61.31 | 55.72 | 45.39 |

COVERAGE DIVISION 002

| Insured Person's Age | 60 Day Waiting Period |
|---|---|
| Under Age 30 | $7.21 |
| 30-34 | 7.92 |
| 35-39 | 8.62 |
| 40-44 | 9.98 |
| 45-49 | 11.72 |
| 50-54 | 14.49 |
| 55-59 | 17.13 |
| 60-64 | 21.46 |

COVERAGE DIVISION 003

| Insured Person's Age | 60 Day Waiting Period |
|---|---|
| Under Age 30 | $6.01 |
| 30-34 | 6.60 |
| 35-39 | 7.19 |
| 40-44 | 8.32 |
| 45-49 | 9.77 |
| 50-54 | 12.08 |
| 55-59 | 14.26 |
| 60-64 | 17.89 |

00166

# PARTICIPATING ORGANIZATIONS

The Policyholder means the Trustees of the Educational Profession of America Group Insurance Trust.

Participating Organization means any organization that has become a member of Educational Profession of America Group Insurance Trust.

We or the Policyholder (by written request), may add to or delete from the list of Participating Organizations in this Policy at any time.

Any change, subject to our written approval, will become effective on a date which is mutually agreeable to the Policyholder and us.

The Policyholder will act for and on behalf of each Participating Organization in all matters concerning this Policy.

Every:
    a)   act of the Policyholder;
    b)   agreement made between the Policyholder and us;
    c)   notice given by us to, or to us by, the Policyholder;
is binding on each Participating Organization.

Each reference in this Policy to a relationship between the Policyholder and its Eligible Persons includes the same relationship between each Participating Organization and its Eligible Persons, except where this Policy describes specific differences.

**Individual Effective Date:** A person associated with a Participating Organization will not:
    a)   become an Eligible Person before the Organization qualifies; or
    b)   continue as an Eligible Person after the Organization ceases to qualify;
as a Participating Organization.

**Premiums:** A Participating Organization's premiums will be calculated based on:
    a)   the coverage requested; and
    b)   the data given to us by the Organization.

**Data Furnished by Participating Organization:** With our approval, the Participating Organization may keep the important insurance records on all Insured Persons. The Participating Organization or its designee must give us information, when and in the manner we ask, to administer the insurance provided by this Policy.

The Participating Organization will, upon our request, give us:
    a)   the names of all persons initially eligible for coverage;
    b)   the names of all additional persons who become eligible for coverage;
    c)   the names of all persons whose amount of insurance is to be changed;
    d)   the names of all persons whose eligibility or insurance is terminated; and
    e)   any data necessary to administer the insurance provided by this Policy.

00107

## PARTICIPATING ORGANIZATIONS (Continued)

The Participating Organization's failure to report a person's termination of eligibility or insurance does not continue the coverage beyond the date of termination.

The Policyholder's and/or Participating Organization's insurance records will be open for our inspection at any reasonable time.

Upon termination of coverage, any unearned premium will be determined on a pro-rata basis. We will promptly return any unearned premium paid upon the request of the Insured Person.

**Participating Organization Termination Date:** A Participating Organization will cease to be covered on the first to occur of:

a) the date the Participating Organization ceases to be a member of the Policyholder;
b) the date requested by the Participating Organization but not prior to our receipt of the request; or
c) the termination date of this Policy.

| Name of Participating Organization | Effective Date |
|---|---|
| Academy of Model Aeronautics | December 1, 1999 |
| Accounts Group Insurance | December 1, 1999 |
| Adult Education Association | December 1, 1999 |
| Allied Health Occupations/Allied Health Professionals | December 1, 1999 |
| American Academy of Dermatology | December 1, 1999 |
| American Academy of Religion | December 1, 1999 |
| American Association for Medical Transcription | December 1, 1999 |
| American Association for Respiratory Care | December 1, 1999 |
| American Association of Critical-Care Nurses | December 1, 1999 |
| American Association of Physicians and Surgeons | December 1, 1999 |
| American Association of Physics Teachers | December 1, 1999 |
| American Association of Sex Educators, Counselors & Therapists | December 1, 1999 |
| American Association of Teachers of French | December 1, 1999 |
| American Association of Teachers of German | December 1, 1999 |
| American Association of Teachers of Spanish & Portuguese | December 1, 1999 |
| American Business and Insurance Attorneys | December 1, 1999 |
| American Business Women's Association | December 1, 1999 |
| American College of Chest Physicians | December 1, 1999 |
| American College of Health Care Administrators | December 1, 1999 |
| American College of Musicians/National Guild of Piano Teachers | December 1, 1999 |
| American College of Sports Medicine | December 1, 1999 |
| American Council of the Teachers of Foreign Languages | December 1, 1999 |
| American Cytogenetic Technologists | December 1, 1999 |
| American Dental Hygienists' Association | December 1, 1999 |
| American Dietetic Association | December 1, 1999 |
| American Dietitians | December 1, 1999 |
| American Federation of Musicians | December 1, 1999 |
| American Federation of School Administrators | December 1, 1999 |
| American Federation of Teachers | December 1, 1999 |
| American Foreign Service Association | December 1, 1999 |
| American Guild of Organists | December 1, 1999 |
| American Historical Association | December 1, 1999 |
| American Massage Therapy Association | December 1, 1999 |
| American Medical Technologists | December 1, 1999 |
| American Medical Women's Association | December 1, 1999 |

## PARTICIPATING ORGANIZATIONS (Continued)

| Name of Participating Organization | Effective Date |
|---|---|
| American Mensa Limited | December 1, 1999 |
| American Numismatic Association | December 1, 1999 |
| American Nurses Association | December 1, 1999 |
| American Philosophical Association | December 1, 1999 |
| American Political Science Association | December 1, 1999 |
| American Society for Clinical Laboratory Science | December 1, 1999 |
| (formerly American Society for Medical Technology) | |
| American Swimming Coaches Association | December 1, 1999 |
| American Teachers of Spanish and Portuguese | December 1, 1999 |
| American Thoracic Society | December 1, 1999 |
| Archeological Institute of America | December 1, 1999 |
| Association for Asian Studies | December 1, 1999 |
| Association for Humanistic Psychology | December 1, 1999 |
| Association of Energy Engineers | December 1, 1999 |
| Association of Government Accountants | December 1, 1999 |
| Case Management Association of America | December 1, 1999 |
| Chicago Federation of Musicians | December 1, 1999 |
| Chicago Teachers Union | December 1, 1999 |
| Clemson University | December 1, 1999 |
| College Art Association of America | December 1, 1999 |
| Daughters of America | December 1, 1999 |
| Decision Sciences Institute | December 1, 1999 |
| ERA Realtors | December 1, 1999 |
| Federation of American Societies for Experimental Biology | December 1, 1999 |
| Federation of Nurses and Health Professionals | December 1, 1999 |
| Health Physics Society/Society & Association Services Corp. | December 1, 1999 |
| Illinois CPA Society | December 1, 1999 |
| Interamerican College of Surgeons | December 1, 1999 |
| International Association of Printing House Craftsmen | December 1, 1999 |
| International Furnishing and Design Association | December 1, 1999 |
| International Society of Clinical Lab Technologists | December 1, 1999 |
| International Transactional Analysis Association | December 1, 1999 |
| Investment Management Plan | December 1, 1999 |
| Modern Language Association of America | December 1, 1999 |
| Moulding Centers | December 1, 1999 |
| Music Teachers National Association | December 1, 1999 |
| NALS...the association for legal professionals | December 1, 1999 |
| Nashville Songwriters Association International | December 1, 1999 |
| National Association of Criminal Defense Lawyers | December 1, 1999 |
| National Association of Enrolled Agents | December 1, 1999 |
| National Association of Neonatal Nurses | December 1, 1999 |
| National Association of Pediatric Nurses | December 1, 1999 |
| National Communication Association | December 1, 1999 |
| (formerly Speech Communication Association) | |
| National Contract Management Association | December 1, 1999 |
| National Council of Teachers of English | December 1, 1999 |
| National Council of Teachers of Mathematics | December 1, 1999 |
| National Court Reporters Association        (frozen) | December 1, 1999 |
| National Federation of Paralegal Associations, Inc. | December 1, 1999 |
| National Fire Protection Association | December 1, 1999 |
| National Notary Association | December 1, 1999 |
| National Power Engineers | December 1, 1999 |

00169

## PARTICIPATING ORGANIZATIONS (Continued)

| | |
|---|---|
| National Press Club | |
| National Restaurant Association | December 1, 1999 |
| National Science Teachers Association | December 1, 1999 |
| National Speakers Association | December 1, 1999 |
| New York Civil Service Retired Employees Association | December 1, 1999 |
| New York State United Teachers | December 1, 1999 |
| Oncology Nursing Society | December 1, 1999 |
| Professional Bowlers Association | December 1, 1999 |
| Professional Gymnastics Coaches Association | December 1, 1999 |
| Professional Photographers of America | December 1, 1999 |
| Public Relations Society of America | December 1, 1999 |
| Refrigeration Service Engineers Society | December 1, 1999 |
| Registry of Interpreters for the Deaf, Inc. | December 1, 1999 |
| REMAX Realtors, Inc. | December 1, 1999 |
| Society for the Preservation & Encouragement of Barber Shop | December 1, 2000 |
| Quartet Singing in America Inc. | December 1, 1999 |
| Society of Nuclear Medicine | |
| Society of Professional Journalists | December 1, 1999 |
| Southern Illinois Credit Union | December 1, 1999 |
| Teachers of English to Speakers of Other Languages | December 1, 1999 |
| The Endocrine Society | December 1, 1999 |
| United Federation of Teachers | December 1, 1999 |
| United States Professional Tennis Association | December 1, 1999 |
| United States Professional Tennis Registry | December 1, 1999 |
| University of Illinois Alumni Association | December 1, 1999 |
| Veterans of Foreign Wars | December 1, 1999 |
| Wisconsin Alumni Association | December 1, 1999 |
| Women's Caucus for the Arts | December 1, 1999 |
| Women's Council of Realtors | December 1, 1999 |
| American Health Information Management Association | December 1, 1999 |
| | December 1, 1999 |

00170

## CONTRACT PROVISIONS

**Entire Contract:** The entire contract between the Policyholder and us consists of:
a) this Policy, and any forms made a part of this Policy at issue; and
b) any individual applications submitted by Eligible Persons and accepted by us in connection with this Policy.
All statements made by the Policyholder or the Insured Person will be deemed representations and not warranties. No statement made to effect this insurance will:
a) void the insurance; or
b) reduce benefits;
unless it is in writing and signed by the Policyholder or the Insured Person.

**Changes:** We reserve the right to make changes in this Policy. We will give the Policyholder 75 days advance written notice of any change. No agent has authority to change or waive any part of this Policy. To be valid, any change or waiver must be in writing, approved by one of our officers and made a part of this Policy.

**Time Periods:** All periods begin and end at 12:01 A.M., Standard Time at the place where this Policy is delivered.

**Certificates:** We will give individual certificates to:
a) the Policyholder; or
b) any other person according to a mutual agreement among the other person, the Policyholder, and us;
for delivery to Insured Persons. The certificates will describe the features of this Policy which are important to Insured Persons.

**30-Day Right to Examine Certificate:** The Insured Person has a 30-day right to examine his or her Certificate. If the Insured Person is not satisfied, he or she may return it to us within 30 days of his or her effective date. In that event, we will consider it void from the certificate effective date and any premium paid will be refunded. Any claims paid under this Policy during the initial 30-day period will be deducted from the refund.

**Clerical Error:** Clerical error (whether by the Policyholder, the Plan Administrator, or us) in keeping the records having to do with this Policy, or delays in making entries on the records, will not void the insurance of any person if that insurance would otherwise have been in effect. A clerical error will not extend the insurance of any person if that insurance would otherwise have ended or been reduced as provided by this Policy. When a clerical error is found, premiums and benefits will be adjusted based on the true facts and this Policy.

**Misstated Age:** If the Age of the Insured Person has been incorrectly stated, the premium rates will be adjusted to the correct Age of the person. If the change in Age affects the Insured Person's benefits, the benefits will be corrected accordingly and the premium adjustment will take this correction into account.

**Cancellation:** This Policy may be cancelled at any time by 60 days advance written notice mailed or delivered by us to the Policyholder, or by the Policyholder to us. If we cancel, we will mail or deliver the notice to the Policyholder at its last address shown in our records. If we cancel, it becomes effective on the later of:
a) the date stated in the notice; or
b) the 61st day after we mail or deliver the notice.

If the Policyholder cancels, it becomes effective on the later of:
a) the date we receive the notice; or
b) the date stated in the notice.

In either event:
a) we will promptly return to the Policyholder any unearned premium; or
b) the Policyholder will promptly pay any earned premium which has not been paid.
Any earned or unearned premium will be determined on a pro rata basis. Cancellation will be without prejudice to any claim which commenced prior to the effective date of the cancellation.

**Not in Lieu of Worker's Compensation:** This Policy does not satisfy any requirement for worker's compensation insurance.

**Conformity with Law:** If any provision of this Policy is contrary to the law of the jurisdiction in which it is delivered, such provision is hereby amended to conform to that law.

## DEFINITIONS

**Actively-at-Work** means the Insured Person is performing all the regular duties of an occupation for wage or profit on a Full-time basis at:

    a)  his or her customary place of employment; or

    b)  at a location to which that employment requires him to travel.

A person will not be considered Actively-at-Work for any holiday or vacation period in excess of three consecutive weeks.

**Age** means an Insured Person's attained age on any Premium Due Date.

**Basic Monthly Pay** means:

    1)  with respect to the American Dental Hygienists Association:

        a)  for self-employed Insured Persons, net income after the deduction of business expenses for the Calendar Year immediately preceding the Total Disability, or

        b)  for all other Insured Persons, the average monthly salary or rate of pay (not counting dividends or overtime payment) for the 12 months immediately preceding the Total Disability; and

    2)  with respect to all others:

        a)  for self-employed Insured Persons, his or her net income after the deduction of business expenses for the Calendar Year immediately preceding the Total Disability, or

        b)  for all other Insured Persons, his or her average monthly salary or rate of pay (not counting commissions, bonuses, overtime pay or any other fringe benefit or extra compensation) for the 12 months immediately preceding the Total Disability.

**Complication of Pregnancy** means a condition, requiring hospital confinement (when the pregnancy is not terminated), whose diagnosis is distinct from pregnancy but adversely affected or caused by pregnancy, such as:

    a)  acute nephritis or nephrosis;

    b)  cardiac decompensation;

    c)  missed abortion; and

    d)  similar medical and surgical conditions of comparable severity.

Complication of Pregnancy will also include:

    a)  non-elective Cesarean section;

    b)  termination of ectopic pregnancy; and

    c)  spontaneous termination of pregnancy, occurring during a period of gestation in which a viable birth is not possible.

However, Complication of Pregnancy will <u>not</u> include:

    a)  false labor, occasional spotting, or morning sickness;

    b)  physician prescribed rest;

    c)  hyperemesis gravidarum;

    d)  pre-eclampsia;

or any similar condition associated with the management of a difficult pregnancy not consisting of a nosologically distinct Complication of Pregnancy.

**Disabled** means Totally Disabled as defined under Accident and Sickness Total Disability Benefit; or if covered by the Partial Disability Benefit, Partially Disabled as defined in the Benefits Schedule.

## DEFINITIONS (Continued)

**Full-time** means that a person is working:
- a) at their customary occupation for 20 hours per week with respect to the:
  - 1) American Dietetic Association,
  - 2) American Massage Therapy Association, and
  - 3) American Dental Hygienists Association;
- b) 20 hours per week with respect to the American Federation of Musicians provided the person can verify the number of hours he or she was:
  - 1) performing (one hour of practice time will be credited for every 3 hours of verifiable performance time),
  - 2) giving lessons, or
  - 3) working at another occupation for wage or profit; or
- c) at their customary occupation for 30 hours per week for the past 90 consecutive days with respect to all other persons.

**Injury** means bodily injury which:
- a) resulted directly and independently of all other causes from an accident; and
- b) resulted in a Period of Total Disability that commenced while the Insured Person was covered under this Policy and within 90 days of the date of the accident.

**Injury** *does not* mean any Period of Disability resulting from:
- a) Sickness, illness, or disease, except a pus-forming infection which occurs through an accidental wound;
- b) medical or surgical treatment of a Sickness, illness, or disease; or
- c) hernia of any type.

Such disability will be considered as the result of Sickness.

**Insured Person** means an Eligible Member or Spouse while he or she *is covered* under this Policy.

**One Injury** means all injuries to an Insured Person which result from any one accident.

00475

### DEFINITIONS (Continued)

**Other Income Benefits** means the amount of any benefit for loss of income, provided to the Insured Person, as a result of the period of Disability for which the Insured Person is claiming benefits under this plan. This includes any such benefits for which the Insured Person is eligible or that are paid to the Insured Person or to a third party on the Insured Person's behalf, pursuant to any:

a) temporary or permanent disability benefits under a Workers' Compensation Law, occupational disease law, or similar law;

b) governmental law or program that provides disability or unemployment benefits as a result of the Insured Person's job with the Employer;

c) plan or arrangement of coverage, whether insured or not, as a result of employment by or association with the Employer or as a result of membership in or association with any group, association, union or other organization;

d) individual insurance policy where the premium is wholly or partially paid by the Employer;

e) "no-fault" automobile insurance plan;

f) disability benefits under the United States Social Security Act, the Canada Pension Plan, the Quebec Pension Plan, or similar plan or act that the Insured Person is entitled to receive because of the Insured Person's disability.

**Other Income Benefits** also means any such payments that are made to the Insured Person or to a third party on his or her behalf, pursuant to any:

a) disability benefit under any employer's Retirement Plan; or

b) portion of a settlement or judgment, minus associated costs, of a lawsuit that represents or compensates for the Insured Person's loss of earnings;

c) retirement benefits from a Retirement Plan that is wholly or partially funded by employer contributions, unless:

   1) the Insured Person was receiving it prior to becoming Disabled; or

   2) the Insured Person immediately transferred the payment to another plan qualified by the United States Internal Revenue Service for the funding of a future retirement.

   Other Income Benefits will not include the portion, if any, of such retirement benefits that were funded by the Insured Person's after-tax contributions;

d) retirement benefits under the United States Social Security Act, the Canada Pension Plan, the Quebec Pension Plan, or similar plan or act that the Insured Person receives because of his or her retirement, unless the Insured Person was receiving them prior to becoming Disabled.

If the Insured Person is paid Other Income Benefits in a lump sum, we will pro-rate the lump sum:

a) over the period of time it would have been paid if not paid in a lump sum; or

b) if such period of time cannot be determined, over a period of 60 months.

We may make a retroactive allocation of any retroactive Other Income Benefit payments.

00174

## DEFINITIONS (Continued)

**Other Income Benefits (Continued):**

The amount of any increase in benefits paid under any federal or state law will not be included as Other Income Benefits if such increase:

    a) takes effect after the date benefits become payable under this plan; and

    b) is a general increase which:

        1) is required by law; and

        2) applies to all persons who are entitled to such benefits.

**Physician** means a legally qualified physician or surgeon. "Physician" will not include the Insured Person, nor any person related to the Insured Person by blood or marriage.

**Rehabilitative Employment** means employment or service which:

    a) prepares a Totally Disabled or Partially Disabled person to resume gainful work; and

    b) is approved, in writing, by us.

The term Rehabilitative Employment will include, when appropriate, any necessary and feasible:

    a) vocational testing;

    b) vocational training;

    c) work-place modification;

    d) prosthesis; and

    e) job placement.

**Sickness** means an Insured Person's sickness, disease or Complication of Pregnancy, as defined, which results in a Period of Total Disability that commenced while the Insured Person was covered under this Policy.

**Waiting Period** means the number of consecutive days at the beginning of a period of Total Disability which must elapse during which no benefits are payable.

The Waiting Period:

    a) begins on the first day of the Insured Person's Total Disability; and

    b) is satisfied when the Insured Person has been continuously Totally Disabled for the number of days shown in the Schedule.

**We, our, or us** means the company named on the face page of this Policy.

**Written Request** means any form provided by us for the particular request.

## INSURED PERSONS PERIOD OF COVERAGE

**Effective Date:** Each Eligible Person becomes an Insured Person on the later of:
 a)  the Policy Effective Date; or
 b)  the first day of the month on or next following the date we have:
  1)  received his or her Written Application, and
  2)  determined that he or she is insurable;
subject to payment of the required premium and the Deferred Effective Date Provision.

The insurability requirement is stated in the Schedule - Eligibility.

**Deferred Effective Date:**  If an Eligible Person is to become:
 a)  covered under this Policy; or
 b)  covered for increased benefits under this Policy;
and is not Actively-at-Work on that date, he or she will not be so covered until the date that he or she is once again Actively-at-Work.

**Request for Change in Coverage:**  If an Insured Person gives us a Written Application for a change in coverage for which he or she is eligible and pays the required premium, the change will become effective on the first day of the month on or next following the later of:
 a)  the date we receive the request; or
 b)  the date we determine that he or she is insurable.

If the Request increases coverage, the amount of the increase will be subject to the Deferred Effective Date provision.

**Termination:**  Coverage of an Insured Person terminates on the earliest to occur of:
 a)  the date this Policy is cancelled;
 b)  the Premium Due Date he or she fails to pay any required premium contribution, subject to the Grace Period;
 c)  the Premium Due Date on or next following the date he or she:
  1)  attains the Policy Age Limit shown in the Schedule as applicable to the Plan in which he or she is covered; or
  2)  ceases to be Actively-at-Work as defined, except due to disability covered by this Policy; or
 d)  the date that he or she enters full-time active duty in the armed forces of any country or international organization.

Termination will be without prejudice to any claim which began prior to the effective date of termination.

## ACCIDENT AND SICKNESS TOTAL DISABILITY BENEFIT

If an Insured Person becomes Totally Disabled as the result of an Injury or Sickness while covered under this Policy, we will pay the Monthly Benefit Amount due for the period of Total Disability.  The period of Total Disability must require the regular care of a physician.

We will not pay benefits for any part of a period of Total Disability that:
   a) is applied to the Waiting Period; or
   b) exceeds the Maximum Payment Period.

The Waiting Period and Maximum Payment Period apply separately to each period of Total Disability.

The Monthly Benefit Amount, Waiting Period, and Maximum Payment Period are shown in the Schedule.

**Total Disability:**
With respect to Plans with a Maximum Benefit Period of one year, Total Disability means disability which wholly and continuously prevents an Insured Person from performing the substantial and material duties of his or her usual occupation.

With respect to Plans with a Maximum Benefit Period of two or more years, Total Disability means disability which:
   a) during the Waiting Period and the first 24 months during which Total Disability Benefits are payable, wholly and continuously prevents an Insured Person from performing the substantial and material duties of his or her usual occupation; and
   b) thereafter wholly and continuously prevents an Insured Person from engaging in any and every occupation or employment for which he or she is reasonably suited by training, education or experience.

00177

## REHABILITATIVE EMPLOYMENT BENEFIT
### (Applicable to Plans 001-I, 001-II, 001-III, and 003)

If, while an Insured Person is Totally Disabled or Partially Disabled, he or she accepts Rehabilitative Employment, we will continue to pay a Monthly Benefit Amount.

The Monthly Benefit Amount we will pay will be equal to the Insured Person's Accident and Sickness Total Disability Monthly Benefit Amount:

    a)  less 50% of any income received from the Rehabilitative Employment with respect to Insured Persons covered under Coverage Division 003; or

    b)  less 80% of any income received from the Rehabilitative Employment with respect to Insured Persons covered under all other Coverage Divisions and Plans.

The sum of the Monthly Benefit Amount and total income received from a program of Rehabilitative Employment may not exceed 100% of the Insured Person's Basic Monthly Pay. If this sum exceeds the Basic Monthly Pay, the Monthly Benefit Amount paid by us will be reduced accordingly.

We reserve the right to review, at the end of every 6-month period, any Rehabilitative Employment an Insured Person participates in while benefits are being paid under this Policy.

If an Insured Person remains Totally Disabled after a period of Rehabilitative Employment, he or she may continue to receive benefits under the Accident and Sickness Total Disability Benefit or the Partial Disability Benefit, subject to the Maximum Payment Period for such benefit.

## WAIVER OF PREMIUM
### (Applicable to Standard Issue plans only)

We will waive the premium which becomes due for an Insured Person's coverage while he or she is Totally Disabled during the period that:

a)   begins after the Insured Person has been Totally Disabled for a period of six consecutive months; and

b)   ends when the Accident and Sickness Total Disability Benefit is no longer payable.

When the Waiver of Premium ceases, the Insured Person may continue his or her coverage under this Policy provided that:

a)   he or she resumes paying his or her premium; and

b)   his or her coverage has not terminated in accordance with the Termination Provision.

## EXCLUSIONS AND LIMITATIONS

**Exclusions:**  This Policy does not cover:
  1) intentionally self-inflicted Injury, suicide or attempted suicide, while sane or insane;
  2) pregnancy or childbirth, except Complications of Pregnancy;
  3) war or act of war, whether declared or not;
  4) any Injury sustained while riding on, boarding or alighting from, any aircraft:
      a) as a pilot, crew member or student pilot;
      b) operated by any military authority (land, sea or air), unless it is a Military Transport Aircraft used for transport and operated by the United States Military Air Mobility Command (AMC) or an AMC type service of a national government recognized by the United States; or
      c) being used for tests, experimental purposes, stunt flying, racing or endurance tests;
  5) the commission or attempted commission of a felony by the Insured Person;
  6) injury sustained as a consequence of the Insured Person's voluntary use of drugs which federal law prohibits dispensing without a prescription, including sedatives, narcotics, barbiturates, amphetamines or hallucinogens, unless the drug is taken as prescribed or administered by a licensed physician;
  7) Sickness contracted or Injury sustained while on full-time active duty as a member of the Armed Forces (land, water, air) of any country or international authority.

We will refund the pro rata portion of any premium paid for the Insured Person while he or she is in the Armed Forces on full-time active duty for a period of two months or more. Written notice must be given to us within 12 months of the date the Insured Person enters the Armed Forces.

**Successive Periods of Disability Limitation:**  Periods of Disability:
  a) due to the same or related medical causes; and
  b) separated by less than 6 months during which the Insured Person is Actively-at-Work;
will be considered one Period of Disability.

Periods of Disability separated by at least 6 months during which the Insured Person is Actively-at-Work will be considered separate Periods of Disability.

**Concurrent Disabilities:**  Benefits during any Period of Disability as the result of:
  a) more than one Sickness; or
  b) more than one Injury; or
  c) both Sickness and Injury;
will be considered the same as if the Disability resulted from only one cause.

**Period of Disability** means a continuous length of time during which the Insured Person is Disabled under this Policy.

## PRE-EXISTING CONDITION LIMITATION

**Pre-Existing Condition,** as used in this limitation, means any Injury or Sickness, diagnosed or undiagnosed, for which Medical Care is received by an Insured Person:

- a) within the 12 month period prior to the Insured Person's effective date of insurance; or
- b) with respect to the limitation for increase in coverage, within the 12-month period prior to the effective date of the Insured Person's increase in coverage.

For the purposes of this limitation, we will consider:

- a) Medical Care received when:
  1) a Physician is consulted or medical advice is given; or
  2) Treatment is recommended or prescribed by, or received from a Physician.
- b) Treatment to include, but not be limited to, any:
  1) medical examination, test, attendance, or observation;
  2) medical services, supplies, or equipment, including their prescription or use; or
  3) prescribed drugs or medicines, including their prescription or use.

All manifestations, symptoms, or findings which result:

- a) from the same or related accident or Sickness; or
- b) from any aggravations of accident or Sickness;

are considered to be the same accident or Sickness for the purpose of determining a Pre-Existing Condition.

**Conditions Prior to Effective Date:** Any loss or period of Total Disability which:

- a) begins during the first 12 months of an Insured Person's insurance; and
- b) is a result of a Pre-Existing Condition;

will not be covered. This will not apply to the Insured Person's period of Total Disability beginning after being free of Medical Care for the condition for a one-year period (ending any time on or after his or her effective date).

**Conditions Prior to Effective Date of Increase in Coverage:** Any loss or period of Total Disability which:

- a) begins during the first 12 months following the date an Insured Person makes a change in coverage that increases his or her benefits; and
- b) is a result of a Pre-Existing Condition;

will not be covered. This will not apply to the Insured Person's period of Total Disability beginning after being free of Medical Care for the condition for a one-year period (ending any time on or after his or her effective date of increase).

**Health Waiver and Application Modification Form:** If an Insured Person's Pre-Existing Condition was excluded or limited by name or specific description on a Health Waiver and Application Modification form attached to his or her certificate, then such Pre-Existing Condition will not be covered under this Policy at any time, unless the Insured Person completes an Application Requesting Removal of Waiver, and we agree in writing to remove the limitation on that condition.

# EXHIBIT 2

09/22/2005 10:17 FAX 860 843 5417          LIFE LAW DEPT                                    ☑005/008

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MASSACHUSETTS





CIVIL ACTION
No.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

WILLIAM DECOLOGERO,
Plaintiff

v.

HARTFORD LIFE INSURANCE COMPANY
Defendant

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This case is brought pursuant to the Employee Retirement Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et. seq.,* and involves a claim to recover benefits due under an employee benefit plan and to enforce rights under the terms of the plan. 29 U.S..C. § 1132(e)(1).

## COMPLAINT

1.    The plaintiff, William Decologero, is a citizen of the Commonwealth of Massachusetts residing at 26 Chapin Avenue, North Andover, Massachusetts.

2.    The defendant Hartford Life Insurance Co. (hereinafter "The Hartford") is a corporation doing business in Massachusetts with a principal place of business in Hartford, Connecticut.

3.    This Court has jurisdiction under 29 U.S.C. § 1132(e)(1).

4.    The Hartford is the underwriter for a disability insurance policy held by Trustees of the Educational Profession of America Group Insurance Trust, policy number AGP 5062 issued effective December 1, 1999 (hereinafter "the Policy").

5.    The Policy is an employee benefit plan governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461(hereinafter "ERISA").

6.    The Hartford is the Plan Administrator for the Policy.

7.    Tony D Italian Steak House was a policyholder as a member of the Trustees of the Educational Profession of America Group Insurance Trust.

8.    Mr. Decologero was employed by Tony D Italian Steak House and as such was an an Eligible Person as defined by the Policy.

9.    Mr. Decologero became injured on May 17, 2000.

10.   Mr. Decologero applied for disability benefits in a timely fashion.

11.   The Policy provides that:

With respect to Plans with a Maximum Benefit Period of two or more years, Total Disability means disability which:

a.    During the Waiting Period and the first 24 months during which Total Disability Benefits are payable, wholly and continuously prevents an Insured Person from performing the substantial and material duties of his or her usual occupation; and

b.    Thereafter wholly and continuously prevents an Insured person from engaging in any an every occupation or employment for which he or she is reasonably suited by training, education or experience.

The policy also states that the period of Total Disability must require regular care of a physician.

12.   The purpose of the Disability Policy is to provide income replacement when an employee is disabled.

13.   The Hartford was responsible for determining whether Mr. Decologero was eligible for disability benefits based on a review of all pertinent information.

14.   On August 16, 2000, The Hartford notified Plaintiff that his claim for disability benefits was approved.

15.   On August 20, 2001, The Hartford notified Plaintiff that his claim for disability benefits was terminated effective September 21, 2000.

16.   On October 15, 2001, Mr. Decologero pursued his administrative remedies by appealing The Hartford's decision to deny him past paid and further benefits .

17.   On November 28, 2001, The Hartford denied the Plaintiff's appeal.

09/22/2005 10:17 FAX 860 843 5417          LIFE LAW DEPT                                    ☒007/008

18.  The Hartford unreasonably relied upon its "investigation" without interviewing Mr. Decologero or verifying its "facts".

19.  The Hartford never requested an independent medical examination of plaintiff.

20.  Mr. Decologero exhausted his administrative remedies.

21.  Due to his medical condition, Mr. Decologero cannot work.

22.  Mr. Decologero has been unable to work at his regular job since May 17, 2000.

23.  Mr. Decologero has been and continues to be unable to perform the essential functions of his job.

24.  The Policy's monthly disability benefit equaled the lesser of: 70% of the pre-disability monthly income or a flat benefit of $3,000.00 per month.

25.  Mr. Decologero has been unable to perform any job since May 17, 2000.

## COUNT I.  ERISA VIOLATION

26.  Plaintiff incorporates by reference his allegations in paragraphs 1 through 25 above.

27.  The Hartford abused its discretion in terminating Mr. Decolgero's disability benefits.

28.  The Hartford's decision to terminate Mr. Decologero's disability benefits was arbitrary and capricious in light of the information known and/or available to The Hartford at the time it made its decision.

29.  The Hartford violated ERISA by terminating Mr. Decologero's disability benefits.

30.  Mr. Decologero has suffered and continues to suffer damages including lost benefits due to The Hartford's ERISA violations.

## COUNT II.  ERISA VIOLATION

31.  Plaintiff incorporates by reference his allegations in paragraphs 1 through 25 above.

32.  The Hartford did not conduct a full and fair review of Mr. Decologero's claim and/or appeal.

33.  The Hartford violated ERISA by denying Mr. Decologero's appeal.

34. Mr. Decologero has suffered and continues to suffer damages including lost benefits due to The Hartford's ERISA violations.

WHEREFORE, the Plaintiff demands:

1. Judgment against the Defendant The Hartford for compensatory damages and special damages;

2. Specific performance by The Hartford of the Long Term Disability insurance policy applicable in this matter;

3. A determination that the monies owed as set forth above are due together with interest;

4. Attorney's fees;

5. Costs;

6. Interest; and

7. Any and all other relief available and deemed meet and just by the Court.

William Decologero
By his Attorney,

Cheri L. Crow, Esq.  BBO #106830
23 Walkers Brook Drive
Reading, MA  01867
(781) 944-8470

A TRUE COPY
ATTEST:
RICHARD E. OSTOP
CT STATE MARSHAL

4

JS 44
(Rev 07/99)

# CIVIL COVER SHEET



The JS44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I (a) PLAINTIFFS

William Decologero

## DEFENDANTS

Hartford Life Insurance Co.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Essex
(EXCEPT IN U.S PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME ADDRESS, AND TELEPHONE NUMBER)

Cheri L. Crow, Esq
23 Walkers Brook Drive
Reading, MA  01867

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U S Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
(For Diversity Cases Only)   FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Claim to recover benefits due under an employee benefit plan and to enforce rights under the terms of the plan pursuant to 29 U.S.C. § 1132 (e) (1).

## V. NATURE OF SUIT (PLACE AN x IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE /PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury— Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | ☐ 640 R.R & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U S Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☒ 791 Empl Ret Inc Security Act | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |

## VI. ORIGIN (PLACE AN x IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A CLASS ACTION
☐ UNDER FR C P 23

DEMAND $
144,000.00

Check YES only if demanded in complaint.
JURY DEMAND: ☐ YES ☒ NO

## VIII. RELATED CASE(S) IF ANY (See instructions)

None

JUDGE _____   DOCKET NUMBER _____

DATE
August 1, 2005

SIGNATURE OF ATTORNEY OF RECORD

A TRUE COPY ATTEST
RICHARD B OSTOP
US STATE MARSHAL

UNITED STATES DISTRICT COURT

**EXHIBIT 3**

**CLAIM FOR TOTAL DISABILITY BENEFITS**
Statement of Insured

NOTE: This statement must be made by the insured. Every question must be fully and clearly answered. The Company reserves the right to ask for additional statements if deemed necessary for proper disposition of the claim.

Allianz Life Insurance Company
of North America
Minneapolis, MN 55403

1. a. Your Full Name:
   *William DeCologero*

   Date of Birth: *4/26/57*

   All Allianz Life Policy Numbers: *6098-001*

   b. Your Present Address:
   *26 Chapin Rd*
   *North Andover MA 01845*

   Social Security Number: *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*

   Phone No.: *978 689-2393*

2. Employer's Name and Address:
   *Tony D Italian Stk/Hse*
   *2 Essex St Haverhill MA*

   Phone No.: *978 521-2960*

3. Position and Specific Duties:
   *General/Mang    To oversee/Run*
   *All Duties of the Establishment*

   Hours Worked per Week: *85-90*

   Earnings: $ *1200* per *Week*

   Length of Time with Employer: *1yr*

   Length of Time in Position: *1yr*

4. Date of injury or beginning of illness leading up to disability: *5/17/00*

   Date you last worked: *5/17/00*

   If returned to work, give date:

   If you have not returned, approximate return to work date: *unknown*

   Describe fully your present disability and its cause, with a complete history to date:
   *Fell off Dumpster Injuring my Left knee, Left Shoulder*
   *Left Back Still presently Disable*

   Is the condition work related? ☒ Yes ☐ No

   List All Physicians Consulted or Hospital Confinements in the Last Five Years.

   | Name of Doctor/Hospital | Address | Date of Treatment |
   |---|---|---|
   | *Hale Hospital* | *Haverhill MA.* | *5/19/00* |
   | *Dr Weinstein* | *522 Chickering Rd   N. Andover MA* | *5/22 - 6/1* |

5. Describe other income you are receiving:

   | Yes | No | Type | Amount | Date Began | Date Terminated |
   |---|---|---|---|---|---|
   | ☐ | ☐ | Auto Insurance | $ | | |
   | ☐ | ☐ | Credit, Mortgage, or Loan Repayment | $ | | |
   | ☐ | ☐ | Social Security (disability or retirement) | $ | | |
   | ☐ | ☐ | State Disability | $ | | |
   | ☐ | ☐ | Retirement (normal, early, or disability) | $ | | |
   | ☑ | ☐ | Worker's Compensation *yes* | $ *unknown* | | |
   | ☐ | ☐ | Group Disability Benefits | $ | | |
   | ☐ | ☐ | Other (describe): | $ | | |

**AUTHORIZATION**

To all physicians, hospitals, medical service providers, druggists, employers, consumer reporting agencies, law enforcement agencies and any other agencies or organizations (including other insurance companies, Blue Cross-Blue Shield, self insured and prepaid health plans) and specifically

JUN 0 9 2000

— Hospital(s), and Dr.(s) —

You are authorized to permit the Allianz Life Insurance Company of North America and its authorized representatives to view and obtain a copy of ALL RECORDS* including employment, law enforcement, tax, financial, insurance claim records and medical records as to examination, history, diagnosis, treatment and prognosis with respect to any physical or mental condition including psychiatric, drug or alcohol treatment and disease of

I understand the information obtained will be used only by Allianz Life to determine eligibility for insurance and benefits claimed under the insured's policy. I consent to rediscloure of such information to reinsuring companies, the Medical Information Bureau and such other persons or organizations performing business or legal services in connection with my claim, or as may be otherwise lawfully required. Such information will not be given, sold, transferred or relayed to any other person not specified in this form without my written consent.

*William DeCologero*
Print Name of Insured

I understand this authorization may be revoked by written notice to Allianz Life, but this will not apply to information already released. If not revoked, this authorization will be valid while the claim is pending but not to exceed a maximum of two years from the date below.

I know I may request to receive a copy of this authorization. I also agree a photographic copy of this authorization shall be as valid as the original.

* Limitations, if any:

   Date: *5/30/00*    Signed: [signature]    If child insured, give relationship:

Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim containing any materially false information

**EXHIBIT 4**

# LONG TERM DISABILITY CLAIM
**ATTENDING PHYSICIAN'S STATEMENT OF DISABILITY**

Allianz Life Insurance Company
North America
Minneapolis, MN 55403

Any person who knowingly and with intent to defraud any insurance company or other person files a statement containing any materially false information, or conceals for purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

| Name of Patient | | | Date of Birth |
|---|---|---|---|
| William DECoLogero | | | 4/14/57 |

Present Address: 26 Chapin Rd

| Employer's Name | | Group Policy No. |
|---|---|---|
| Tony D' Italian Stk Hse | | |

The patient is responsible for the completion of this form. We must have comprehensive medical information in order to evaluate the insured's claim for Long Term Disability Benefits.

## 1. HISTORY

(a) When did symptoms first appear or accident happen? Mo. 5  Day 0  Yr. 5

(b) Date disability commenced  Mo. 5  Day 17  Yr. 00

(c) Has patient ever had same or similar condition? ☐ Yes  ☒ No

If "Yes", state when and describe

(d) Is condition due to injury or sickness arising out of patient's employment? ☒ Yes  ☐ No  ☐ Unknown

## 2. DIAGNOSIS
(including any complications)

(a) Date of last examination  Mo.  Day  Yr.

(b) Diagnosis (including any complications)  C7T1 Strain
(R) Shoulder / Knee pain

(c) Subjective symptoms

(d) Objective findings (including current X-rays, EKGs, Laboratory Data and any clinical findings)
↓ ROM  C-YS Spine  Pain & ROM  (R) Shoulder tender

## 3. DATES OF TREATMENT

(a) Date of first visit  Mo. 5  Day 12  Yr. 00

(b) Date of last visit  Mo.  Day  Yr. 00

(c) Frequency  ☐ Weekly  ☒ Monthly  ☐ Other (Specify)

## 4. NATURE OF TREATMENT

(Including Surgery and medications prescribed, if any)
NSAID  PT

Will treatment substantially improve function and employability? ☐ Yes  ☒ No  unknown

If "Yes", specify

## 5. PROGRESS

(a) Has patient  ☐ Recovered?  ☒ Improved?  ☐ Unchanged?  ☐ Retrogressed?

(b) Is patient  ☐ Bed confined?  ☐ Hospital confined?  ☒ Ambulatory?  ☐ House confined

(c) Has patient been hospital confined?  ☐ Yes  ☒ No

If "Yes", give Name and Address of Hospital  Confined from  through

## 6. CARDIAC
(If Applicable)

N/A

(a) Functional capacity (American Heart Ass'n.)  ☐ Class 1 (No limitation)  ☐ Class 2 (Slight limitation)  ☐ Class 3 (Marked limitation)  ☐ Class 4 (Complete limitation)

(b) Blood Pressure (last visit)  Systolic  Diastolic

*(handwritten at top)* shoulder & knee movement limited

| 7. LIMITATION (If there is a limitation, check and describe) | Standing | ☐ing | Bending | ☐hands | ☐ Sitting |
| --- | --- | --- | --- | --- | --- |
| | Walking | Stooping | Lifting | Psychological | Other (state which) |

**8. PHYSICAL IMPAIRMENT** ("as defined in Federal Dictionary of Occupational Titles)

☐ Class 1 - No limitation of functional capacity; capable of heavy work * No restrictions (0-10%)
☐ Class 2 - Medium manual activity* (15-30%)
☐ Class 3 - Slight limitation of functional capacity; capable of light work* (35-55%)
☑ Class 4 - Moderate limitation of functional capacity; capable of clerical/administrative (sedentary*) activity (60-70%)
☐ Class 5 - Severe limitation of functional capacity; incapable of minimal (sedentary*) activity (75-100%)

Remarks: _____

**9. MENTAL/ NERVOUS IMPAIRMENT** (if applicable)

Please define "stress" as it applies to this claimant.

☐ Class 1 - Patient is able to function under stress and engage in interpersonal relations (no limitations)
☐ Class 2 - Patient is able to function in most stress situations and engage in most interpersonal relations (slight limitations)
☐ Class 3 - Patient is able to engage in only limited stress situations and engage in only limited interpersonal relations (moderate limitations)
☐ Class 4 - Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitations)
☐ Class 5 - Patient has significant loss of psychological, physiological, personal and social adjustment (severe limitations)

Remarks: _____

Do you believe the patient is competent to endorse checks and direct the use of the proceeds thereof?   ☐ Yes   ☐ No

| 10. EXTENT OF DISABILITY | | From Any Occupation | | | From Patient's Regular Occupation | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | (a) Is patient now totally disabled? | ☑ Yes | ☐ No | | ☑ Yes | ☐ No | |
| | (b) If no, when was patient able to go to work? | Mo. | Day | Yr. | Mo. | Day | Yr. |
| | (c) If yes, when do you think patient will be able to resume any work?  Approximate Date | Mo. | Day | Yr. | Mo. | Day | Yr. |
| | | Indefinite ☐ | | | ☐ | | |
| | | Never ☐ | | | ☐ | | |

| 11. REHABILI- TATION | | | |
| --- | --- | --- | --- |
| | (a) Is patient a suitable candidate for further rehabilitation services? | ☐ Yes | ☑ No |
| | (b) Can present job be modified to allow for handling with impairment? | ☐ Yes | ☐ No |

| | | Patient's Job | | | Any Other Work | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | (c) When could trial employment commence? | Mo. | Day | Yr. | Mo. | Day | Yr. |
| | | ☐ Full-time | ☐ Part-time | | ☐ Full-time | ☐ Part-time | |

(d) Would vocational counseling and/or retraining be recommended?   ☐ Yes >   ☐ No

**12. REMARKS** _____
_____
_____
_____
_____
_____

| Date 6/26/00 | Signature (attending Physician) | Degree M.D. | Telephone 794 3000 |
| --- | --- | --- | --- |
| Address (Street, City or Town, State or Province, Zip Code) 522 Chickering Rd   North Andover, MA  01845 | | | |

**EXHIBIT 5**

August 20, 2001

William Decologero
26 Chapin Road
North Andover, MA  01845

Policyholder:  Trustees Of The Educational Profession Of America Group Ins
Policy No.:    83AGP005062
Insured:       William Decologero
SSN:           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

Dear Mr. Decologero:

We are writing to you regarding your claim for Disability benefits under the association insurance policy number 83AGP005062.  This policy funds Trustees of The Educational Profession Of America Group Ins Disability Employee Benefits Plan.

Upon completion of a comprehensive review of the information contained in your claim file, viewed in its entirety, it has been determined that the evidence in your file in support of your claim does not establish that you met the Policy's definition of Total Disability on or after 09/21/00.  Accordingly, benefits are no longer payable to you under the terms of the Policy and your claim has been terminated as of 09/21/00. Because benefits were paid after 09/21/00, an overpayment has occurred in the amount of $31,000.00.  An explanation of how this overpayment occurred will follow in this letter.

Please refer to page 20 of your policy where it defines Total Disability:

" **Total Disability:**

With respect to Plans with a Maximum Benefit Period of one year, Total Disability means disability which wholly and continuously prevents an Insured Person from performing the substantial and material duties of his or her usual occupation.

With respect to Plans with a Maximum Benefit Period of two or more years, Total Disability means disability which:

a)  during the Waiting Period and the first 24 months during which Total Disability Benefits are payable, wholly and continuously prevents an Insured Person from performing the substantial and material duties of his or her usual occupation; and
b)  thereafter wholly and continuously prevents an Insured Person from engaging in any and every occupation or employment for which he or she is reasonably suited by training, education or experience."

We based our decision to terminate benefits upon Policy language and all documents contained in your file, viewed as a whole, including the following specific information:

1)   Initial Claim for Total Disability Benefits completed by you and signed on  05/30/00.
2)   Verification of coverage by Seabury and Smith (formerly Albert H. Wohler & Co.) dated 06/20/00.
3)   Attending Physician Statement completed by Dr. Paul Weinstein on 06/26/00.
4)   Medical records from Dr. Paul Weinstein dating from 05/22/00 through 01/23/01.
5)   Copy of medical records from Dr. Onaly Kapasi dating from 01/31/01 through 05/02/01.
6)   Copy of Independent Medical Examination (IME) report done 10/27/00 and received from Atlantic Charter Insurance Company on 07/17/01.
7)   Copy of a job description for a Restaurant Manager from the Dictionary of Occupational Titles.
8)   Claimant questionnaire and Other Income Questionnaire completed and signed by you on 04/13/01.
9)   A copy of your Detailed Earnings Report from Social Security Administration.
10)  Employment verification and payroll information from J.L. Marshall & Sons, Inc dated 06/07/01.
11)  Corporate Documents for Two Essex Street Inc. signed by you on 10/27/99 and listing you as Treasurer0.21 and Director of the corporation.
12)  Interview with Hartford Life Insurance's Investigator William Moryto conducted 08/10/01 and a statement signed by you.
13)  Surveillance report and video from our representative surveillance vendor Factfinder Investigations on 06/29/01 and 06/30/01.

Your claim file reflects that you stopped working as a Restaurant Manager of Tony D's Italian Restaurant on 05/17/00 as a result of a disability caused by a left knee and left shoulder strain. Accordingly, pursuant to the Policy's definition of Total Disability, you became entitled to Total Disability benefits as you were prevented from performing the substantial and material duties of your usual occupation.

Dr. Paul Weinstein first treated you on 05/22/00 at which time his impression was that you sustained a cervical strain, thoracic strain, lumbar strain, strain/contusion left shoulder and a strain/contusion left knee. You were treated with Anaprox and Vicodin for the pain. On 8/15/00, you continued to complain of pain in your left shoulder and left knee. In view of the fact that you  had continued pain, an MRI of your left shoulder was ordered to rule out any internal derangements.

The MRI of your left shoulder done 10/12/00 demonstrated: "no joint effusion or fluid within the subacromial/subdeltoid bursa. There is ill-defined increased signal in the midportion of the supraspinatus tendon on both the T1, protein density and T2 images.  No frank tear of the supraspinatous tendon is demonstrated.  The glenohumeral joint and labral anatomy appear intact. Marrow signal about the shoulder appears intact. Impression: Findings most consistent  with a partial tear of the supraspinatus tendon without demonstration of a complete tear."  Based on this report, you were referred to Dr. Kopasi for an orthopedic consult on 11/20/00.

Dr. Onaly Kapasi recommended that you have arthroscopic shoulder evaluation and Neer Achromioplasty with repair of the Rotator Cuff. He further advised that this was considered elective surgery and would required pre-approval by your insurance company. To date, you have not had any surgery done on your left shoulder or on your left knee.

We received a copy of an Independent Medical Examination done on 10/27/00 by Mordecai Berkowitz (Orthopedic Surgeon) from your worker's compensation carrier Atlantic Charter.  Dr. Berkowitz noted that he also evaluated you on 06/27/00.

When Dr. Berkowitz first examined you on 6/27/00, he felt you were capable of working full time in a modified capacity with lifting up to 5 pounds frequently and 10-15 pounds on occasion. He further estimated that you could return to your regular work without restriction within two weeks from that examination.

After examining you again on 10/27/00, Dr. Berkowitz presented the following assessment: "The findings of the incomplete tear of the rotator cuff do not correspond to the claimant's symptoms and it is extremely common finding, even in active individuals. This certainly would not explain pain 24 hours a day, which has persisted without relief since May 2000. In addition, he had an inconsistent range of motion of his shoulder and an inconsistent range of motion in his knee. I am unable to appreciate any clinical objective findings in relation to the May 17, 2000 incident." His final diagnosis was: "Contusion, left shoulder (Pre-existing partial tear, rotator cuff) and a Contusion, left knee." Dr. Berkowitz felt that you had sufficient time to recover and should be capable of carrying out your regular work without restriction.

We obtained a copy of a job description for a Restaurant Manger as it is performed in the national economy. This description comes from the Dictionary of Occupational Titles provided by the U.S.Department of Labor. This is considered a light occupation involving the planning, directing and coordinating activities of an organization or department that serves food and beverages. A light occupation is defined by the U.S. Department of Labor as "the ability to lift 20 pounds maximum with frequent lifting and/or carrying of objects weighing up to 10lbs. Even though the weight lifted may be only negligible amount, a job is in this category when it involves sitting most of the time with a degree of pushing and pulling of arm and or leg controls, or when it requires walking and standing to a significant degree.

When asked on your Claimant Questionnaire, if you have engaged in any work activity (including self-employment) since the onset of your Disability you answered "No". On the Other Income Questionnaire, when asked to complete information pertaining to any of the following income benefits that you have received, are currently receiving or expect to receive, including wages from employment, you left the section concerning wages blank.

We obtained a copy of your Detailed Earnings Inquiry (DEQY) report from the Social Security Administration. The wage information contained in this record is part of the Federal Income Tax records that you and or employers filed with the Internal Revenue Service. According to your earnings record, you had the following earnings listed for 2000:

Two Essex Street Inc..............................$19200.00
J.L Marshall & Sons Inc............................ $1850.70

In order to determine your dates of employment and job description, we contacted J.L. Marshall & Sons Inc. who provided written confirmation on 06/07/01. We learned that you were employed as a laborer for the period of 09/21/00 through 10/06/00. You work for a total of 93 hours and earned a gross amount of $1850.70. It was further noted that you were laid off due to lack of work.

This employment information is inconsistent with your repeated representation to Hartford life that you had never resumed work in any capacity since your leave from work. It is also important to note that the position of a laborer is considered a heavy occupation requiring frequent lifting of up to 50 lbs.

During our investigation, we performed a background check including public records. We discovered that you incorporated a business on 09/27/99 known as Two Essex Street, Inc.

The corporate documents are signed by you and list you as the Treasurer and Director of Two Essex Street, Inc. This business also operates the restaurant known as Tony D's Italian Steakhouse.

On 08/10/01, you met with and provided a signed statement to Investigator Frank Barre from Hartford Life Insurance Company. During this interview, you were positively identified as the person depicted in the video surveillance discussed later in this letter.

In your statement, here quoted in part, you relayed the following information:

"I have been asked to describe my disability as it exists at this present time and if it has changed in the past six months. In the past three months my condition has gotten worse. It is my left shoulder and the left knee. At this time, is causing me pain constantly. The pain is with me all of the time. I can't lift with my left arm. My knee swells up and it collapses on me. It give out. In the past six months my left knee has collapsed twice. "

"I am presently under the care of:

Dr. Paul Weinstein, of Essex St. Lawrence, MA. Last seen July 17th, will see again this week. He is my primary doctor and prescribes my pain medication.
Dr. Onaly Kapasi, orthopedic surgeon, of the Pentucket Medical Center in Haverhill, MA. Last seen June 1st or, 6th, 2001.

I am taking the following prescription medications: My prescriptions are filled at the CVS in North Andover.
I take Percocet, prescribed at 40 tablets per month for pain. I would take one at night for a month, then go off them for a month.

I have been asked if I am receiving any prescribed treatments or therapies. None"

"I have been asked if I use any devices to aid in my ambulating and if any devices have been added to my home or car to aid in my ambulating
I have been asked to describe my limitations and abilities as to: I wear a knee brace all day, and take it off at night. It is a fabric Velcro brace.

Walking: I can walk for about the house, to and from my car. I can walk 10 to 15 minutes at a time. I can't mow the lawn. I can walk to go shopping for little things at the local stores.

Hand and Arm Dexterity: My left shoulder is in pain. I have torn ligaments and possibly tendon damage. My right arm and hand is okay. I am limited to what I can do with my left arm. I can lift my left arm up at the shoulder, but it is limited and causes pain. I try not to use the left arm.
Stand: I can stand for about 10 minutes at a time. It is the pressure on my left knee that prevents me from standing for long periods. If I stand or walk for too long, my left knee will most likely swell up.
Sit: My sitting is okay. I am comfortable when sitting.
Lift and Carry: I don't do any lifting with the left arm. I can carry and lift with the right hand and arm such as grocery bags, and cookware.
Reaching forward, side to side, and over my head: Reaching with my left arm is very minimal. My right arm is okay.

Pushing and pulling: I don't even attempt to use my left arm to push or pull anything such as a grocery cart. I use my right arm to push.

Climbing stairs: I can climb a flight of stairs. I live in a two-story home. I may go up and down the stairs once a day. My bedroom is on the first floor.

Enter/Exit an automobile: I drive a van. I can get in and out of it without too much of a problem.

Driving an automobile: I can drive an automobile when I have to. I drive a van with automatic transmission. I use my right arm for the driving. I drive about four times a week. I drive in town. I drive to the grocery store. I will drive my kids to where they may have to go."

"I have been asked to describe my pain and my levels of pain on a scale of (1) to (10), with the understanding a pain level 10 would require me to seek urgent medical treatment or hospitalization. I have in the left shoulder and left knee. The pain in both is about a six to seven all of the time. At night it gets a little worse, if I roll over during sleep."

"I have been asked what prevents me from returning to work at my job. It is my capability of doing the work. It is my physical ability. I was in general management of a restaurant. I had to do everything, cooking, cleaning, stocking, Management is only 5 percent. The rest of the work, is physical. I was on the floor all of the time. Restaurant work is a seventy-hour workweek.

I have been asked if I have worked, including volunteer work or self-employment activities at any time since I reported becoming disabled. I have not worked at all since becoming disabled.

I have been asked about my income.

I receive the long-term disability benefits from The Hartford Life Company.

Social Security Disability: I receive about $220 per month including the amount for my children. I have been receiving this based on an injury in 1993. My left hand was severely injured at my restaurant. I don't remember when I started receiving the Social Security. I believe it was about two years ago.

Other Disability Income: None

Pension Income: None

Any earned income: None

Any other incomes: I was in real estate until last year. I sold my last property in 1999. The properties were in my name. I bought and sold rental properties. They were multifamily homes. I owned as many as eight properties five or six years ago, including a diner in Lawrence. It was Perrault's Diner. I sold it a few years ago. At the time I sold the last of my properties, I began working at Tony D's. I was the general manager. I have been asked about my affiliation. I would put down 'Treasurer" when I signed checks. I was authorized to sign checks. I am not an officer with 2 Essex Street Inc. 2 Essex is the corporation under which, Tony D's operated. Two Essex, Inc. is still active. Tony D's closed in June 2000. My brother Joseph was the manager. Ray Doane was the owner and president. To the best of my knowledge, 2 Essex is not operating any other businesses at this time. I am not receiving any other income.

I have been asked if I have any form of income, any interest, or any investment, in any type or form of business. None

I have been asked if I have any professional licenses. My real estate license lapsed about ten years ago. I never used my license to work for a real estate firm. I only used it for the knowledge of investing into properties".

On 06/29/01 and 06/30/01 you were observed and videotaped by our representative surveillance vendor Factfinders Investigations. During the surveillance, you were observed driving your vehicles to several locations. You demonstrated the ability to enter and exit your vehicle using your left hand and arm to open and close both the van and truck door. This movement was done in a very fluid manner without any apparent signs of pain or discomfort. While driving, you backed your vehicle up and used your left arm to turn the wheel while you turned your upper body and neck in both directions. You were further observed walking back and forth to your pickup truck without any knee brace or displaying any sign of a limp. At one point, you lifted some chairs using both hands and arms above your shoulders into the back of the pickup truck with no apparent signs of discomfort or difficulty. On two occasions, you bent your knees as you bent down to look at the rear of the your vehicle. It should also be noted that you had very good muscle tone in both your upper and lower extremities with no apparent atrophy of the muscles in either your left arm or left leg.

In the investigation, we have established that you returned to work for another employer performing a job as a general laborer. During this same time, you claimed to be Totally Disabled and were receiving disability benefits. Based upon all of this information, it appears that you had and continue to have the functional ability to perform the material and substantial duties of your usual occupation.

Therefore, it is our determination that as of 09/21/00, you no longer met the Policy definition of Totally Disabled. Consequently, all benefits paid beyond 09/21/00 are overpaid. An explanation of your overpayment is as follows:

$3000.00.........................................................Net Monthly LTD Benefit

| DATE OF BENEFIT | | BENEFIT PAID |
|---|---|---|
| 09/21/00 - 09/30/00 | ($3000.00/30 days X 10 days) | $ 1000.00 |
| 10/01/00 – 07/31/01 | ($3000.00 X 10 months) | $30,000.00 |
| TOTAL Disability Benefit PAID | (09/21/00 - 07/31/01) | $31,000.00 |
| TOTAL SHOULD HAVE PAID | (09/21/00 – 07/31/01) | 0.00 |
| TOTAL OVERPAID | (09/21/00 – 07/31/01) | $31,000.00 |

Please submit your check or money order for $31,000.00 made payable to Hartford Life Insurance Company for full reimbursement of the overpayment.

In order to ensure that your payment is properly credited, please include your Social Security number on the check or money order, and mail your payment to:

> The Hartford Life Companies
> SRH Disability Claims
> P.O. Box 2993
> Hartford, CT 06104-2999

You will receive written confirmation when your reimbursement payment is processed.

If you have any additional information, not previously submitted, which you believe will assist us in evaluating your claim for LTD benefits, please forward that information to us within sixty (60) days from the date of your receipt of this letter. In particular, copies of any and all business records for the business known as Two Essex Street Inc. including, but not limited to, job duties, earnings and wage records including hours worked for tax years 1999, 2000 and 2001; other financial information, including but not limited to bank records, business transactions of any kind or description, including billing, invoices or payment records of any kind, and a signed 4506 tax form for the business known as Two Essex Street, Inc. for tax years 1999 and 2000, a signed 4506 tax form for personal taxes for tax years 1997 and 1998, a signed business authorization allowing us to contact any people associated with Two Essex Street, Inc. as well as any additional medical information may assist us in further evaluating your claim for benefits. The Hartford will review any additional information you submit, along with previously submitted information, and will notify you of the results of our review.

If you do not agree with the reason why your claim was terminated, in whole or in part, and you wish to appeal our decision, you must write to us within sixty (60) days of the date of this letter. Your letter, which must be signed and dated by you or your legal representative, should clearly outline your position and any issues or comments you have in connection with your claim and our decision to terminate your request for benefits under the Policy.

Once we receive your appeal, your claim will be reviewed based upon your statements and the documents and notes contained in your claim file. Upon completion of our review, we will advise you of our further determination.

We reserve all rights and defenses available to us in making our decision.

If you have any questions, please feel free to contact our office at Toll Free (888) 232-5340. Our office hours are 8:00 AM to 4:00 PM EST, Monday through Friday. Information may be faxed to 1-860-843-4716.

Sincerely,


Kim Gabrielsen, Senior Investigative Analyst
Special Investigations Unit – Group Benefits Division
Hartford Life Insurance Company

# EXHIBIT 6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WILLIAM DECOLOGERO,      ) | |
|     ) | |
|     Plaintiff/Defendant-in-Counterclaim,   ) | |
|     ) | |
| v.     ) | CIVIL ACTION NO: 11613 REK |
|     ) | |
| HARTFORD LIFE INSURANCE     ) | |
| COMPANY,     ) | |
|     ) | |
|     Defendant/Plaintiff-in-Counterclaim.   ) | |

### HARTFORD LIFE INSURANCE COMPANY'S FIRST SET OF REQUESTS FOR ADMISSIONS TO WILLIAM DECOLOGERO

Pursuant to F.R.C.P. 36, Defendant/Plaintiff-in-Counterclaim, Hartford Life Insurance Company ("Hartford"), propounds the following Request for Admissions ("Requests") upon Plaintiff/Defendant-in-Counterclaim, William Decologero ("Decologero") to be answered under oath. These Requests are of a continuing nature. If additional information within the scope of any Request becomes available to Plaintiff after he serves his Answers upon Defendant, Plaintiff shall furnish such additional information by way of a Supplemental Response as required by F.R.C.P. 26(e).

### INSTRUCTIONS

Decologero is required to serve upon Hartford's counsel a written statement signed under the pains and penalties of perjury: 1) confirming or denying the truth of each statement; 2) setting forth in detail why you cannot confirm or deny the truth of the matter; or 3) setting forth objections and stating the reasons for the objections. Service of your written

1

responses shall be made to the undersigned counsel at the law offices of Ciapciak & Associates, P.C., 99 Access Road, Norwood, Massachusetts 02062 within thirty (30) days of receipt or they will be deemed admitted.

## DEFINITIONS

1.      The terms "Decologero", "you", "your", and "yours" mean Plaintiff/Defendant-in-Counterclaim and his agents, servants, attorneys and employees.

2.      The term "Policy" shall mean the group disability insurance policy number 83AGP005062, issued by the Hartford to the Trustees of the Educational Profession of America Group Insurance Trust.

3.      The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

4.      The term "document" is defined to include any writings, drawings, graphs, charts, photographs, video or audio recordings and other data-compilations. A draft or non-identical copy is a separate document within the meaning of this term.

5.      Identify (with respect to Persons). When referring to a person, "to identify" means to give, to the extent known, the person's full name, present or last known address, and, when referring to a natural person, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

6.      Identify (with respect to Documents). When referring to documents, "to identify," means to give, to the extent known, the:

         a.   type of document;

- 2 -

    b.  general subject matter;

    c.  date of the document; and

    d.  author(s), addressee(s), and recipient(s).

7.     No answer is to be left blank.  If the answer to any request or subparagraph of a request is "none" or "unknown," such statement must be written in the answer.  If the question is inapplicable, "N/A" must be written in the answer.  If an answer is omitted because of the claim of privilege, state so in the answer and include the basis of the privilege.

## REQUESTS FOR ADMISSIONS

1.    Admit that page 20 the Policy contains the following definition of Total Disability:

**Total Disability**:

With respect to Plans with a Maximum Benefit Period of one year, Total Disability means disability which wholly and continuously prevents an Insured Person from performing the substantial and material duties of his or her usual occupation.

With respect to Plans with a Maximum Benefit Period of two or more years, Total Disability means disability which:

    a)    during the Waiting Period and the first 24 months during which Total Disability Benefits are payable, wholly and continuously prevents an Insured Person from performing the substantial and material duties of his or her usual occupation; and

    b)    thereafter wholly and continuously prevents an Insured Person from engaging in any and every occupation or employment for which he or she is reasonably suited by training, education or experience.

2.    Admit that you have read and understand the definition of Total Disability as set forth in Request 1.

3.    Admit that on or about May 17, 2000, at the time that you allegedly became disabled you were working as a Restaurant Manager of Tony D's Italian Restaurant.

4.    Admit that from September 21, 2000 until October 6, 2000 you were employed by J.L. Marshall & Sons Inc. as a laborer.

5.    Admit that on October 6, 2000 you were laid-off by J.L. Marshall & Sons Inc. due to lack of work.

6.    Admit that you did not notify but rather concealed your employment by J.L. Marshall & Sons Inc. from the Hartford.

7.    Admit that you received disability insurance benefits from the Hartford for the time period of September 21, 2000 until July 31, 2001 in the amount of $31,000.00.

8.    Admit that despite the Hartford's written demand, you refused and continue to refuse to reimburse the Hartford the $31,000.00, (plus applicable interest) which you received for the time period of September 21, 2000 until July 31, 2001.

Defendant,
Hartford Life Insurance Company,
By its Attorneys,


_____
James J. Ciapciak, BBO # 552328
CIAPCIAK & ASSOCIATES, P.C.
99 Access Road
Norwood, MA  02062
Tel: (781) 255-7401
Fax: (781) 255-7401

## CERTIFICATE OF SERVICE

I, James J. Ciapciak, hereby certify that on the 5th day of April, 2007, I have served the foregoing by causing a copy of same to be served upon all counsel of record by mail.


_____
James J. Ciapciak

- 4 -

# EXHIBIT 7

**Page 1**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MASSACHUSETTS

C A No. 11613-REK

WILLIAM DeCOLOGERO,
      Plaintiff/Defendant-in-Counterclaim,

vs

HARTFORD LIFE INSURANCE COMPANY,
      Defendant/Plaintiff-in-Counterclaim

\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF WILLIAM DeCOLOGERO, a witness called on behalf of the Defendant, taken pursuant to the applicable provisions of the Massachusetts Rules of Civil Procedure at the offices of Ciapciak & Associates, 99 Access Road, Norwood, Massachusetts on June 5, 2007, commencing at 1:05 p.m.

\*\*\*\*\*\*\*\*

Reporter: Joyce E. Romanow
Professional Court Reporter and Notary Public
Copley Court Reporting, Inc.
58 Batterymarch St, Suite 317, Boston, MA 02110
(617) 423-5841
www.copleycourt.com

**Page 2**

APPEARANCES

CHERI L. CROW, ESQ.
      Law Office of Cheri L. Crow
      Two Main Street
      Suite 300
      Stoneham, Massachusetts 02180
      (781)438-6400
      For Plaintiff

JAMES J. CIAPCIAK, ESQ.
      Ciapciak & Associates, P.C.
      99 Access Road
      Norwood, Massachusetts 02062
      (781)255-7401
      For Defendant

**Page 3**

I N D E X

DEPOSITION OF      WILLIAM DeCOLOGERO

EXAMINATION BY MR. CIAPCIAK . . . . . . . 4

E X H I B I T S

| No. | Description | Page |
|-----|-------------|------|
| 1 | Notice | 71 |
| 2 | Letter Dated 8-20-01 | 71 |
| 3 | DVD | 113 |
| 4 | Letter Dated 10-15-01 | 125 |
| 5 | Letter Dated 10-15-01 | 125 |
| 6 | Claim for Disability Benefits Form | 125 |
| 7 | Long-Term Disability Claim Form | 136 |
| 8 | Initial Injury Reports | 140 |
| 9 | Occupational Description | 165 |
| 10 | Claimant Questionnaire | 170 |
| 11 | Letter Dated 6-7-01 | 170 |
| 12 | Articles of Incorporation | 181 |

**Page 4**

PROCEEDINGS

(Begins 1:05 p.m.)

(WILLIAM DeCOLOGERO, sworn.)

EXAMINATION BY MR. CIAPCIAK:

Q.     Good afternoon. My name is Jim Ciapciak. I represent the Hartford Life Insurance Company. And we're here to take your deposition today with respect to a claim for long-term disability benefits.

       Could you please state your full name and address for the record.

A.     My name is William DeCologero, 26 Chapin Road, North Andover.

Q.     And your date of birth?

A.     4-26-57.

Q.     Have you been deposed or given trial testimony today or both?

       MS. CROW: Before today?

       MR. CIAPCIAK: Yes. Before today.

       MS. CROW: You forgot the "before."

Q.     Before today.

       MR. CIAPCIAK: Have you ever been, I thought I said.

A.     No.

157

1  around the house." Would you agree with that?
2      A.    I would agree, yes.
3      Q.    It says, "He says he has no experience
4  doing laundry or vacuuming."
5      A.    In my life. Don't even know how to do
6  clothes.
7      Q.    "And was unable to do the dishes."
8      A.    A house full of tailors, my grandmother, my
9  mother, my wife, they did everything.
10     Q.    "And was unable to do dishes."
11     A.    Even that.
12     Q.    It says, "He spends most of his time
13 reading or watching television."
14     A.    Correct.
15     Q.    Is that about right?
16     A.    Yeah.
17     Q.    It says, "He states he drives a car with
18 automatic transmission. Under direct questioning he
19 states that he was absolutely not working in any
20 capacity." Do you agree with those, too?
21     A.    Regarding not working -- regarding the jobs
22 we talked about. This one -- I haven't worked at all,
23 no, except for the 13 days of that union.
24     Q.    Okay. This was dated October 27, 2000.

158

1  You had worked the month before though, right?
2      A.    Right. 13 days, yeah.
3      Q.    But it says here in the direct questioning,
4  it states, he was absolutely not working in any
5  capacity. Do you recall telling them you hadn't
6  worked?
7              MS. CROW: It says absolutely not
8  working in any capacity.
9      A.    At the time I wasn't working at all.
10     Q.    Okay.
11     A.    I stopped on the union October 15th.
12     Q.    Okay. It says here that you went to the
13 Hale Hospital, next page, "He went to the Hale
14 Hospital a few days later." You testified this
15 morning that you went the same day.
16     A.    I believe it was the same day.
17     Q.    Which one was it, do you know?
18     A.    I believe I went the same day.
19     Q.    Now you're not so sure?
20     A.    No. I'm just -- I went to the hospital as
21 soon as I got worse. I believe it was the same day.
22     Q.    Okay. As you sit here today knowing your
23 testimony earlier today and --
24     A.    Oh, I went the same day.

159

1      Q.    You've got to let me finish the question.
2  As you sit here today, knowing your testimony
3  earlier that it was the same day and seeing this
4  report now that indicates that it might have been a
5  few days later, do you know one way or the other?
6      A.    No. It was the same day.
7      Q.    You're sure?
8      A.    Sure.
9      Q.    Okay. Here it says, "He states his only
10 income now is from the property which you own with
11 your brother who cares for the property." So in 2000,
12 you still owned property?
13     A.    I probably had some left.
14     Q.    Some of those apartments?
15     A.    I was in a 16-unit apartment building with
16 my brother David.
17     Q.    Okay. David or Joe?
18     A.    Joseph, I had an 8 unit with him. By -- in
19 in 2000 we already sold that one, the 8 unit. I had
20 one with David and one with Joseph, too.
21     Q.    All right. The ones that you had left in
22 2000 were with David or Joseph?
23     A.    I believe it was just myself in Haverhill.
24 I had a three-family in North Andover and --

160

1      Q.    How did you -- who took care of those?
2      A.    I had people work, people taking care of
3  them. My brothers or my tenants that I -- I had one
4  tenant that would live on the property and take care
5  of it. I would adjust the rent factor with him and
6  say, take out the trash, redo some painting or some --
7  I always had somebody.
8      Q.    Okay.
9      A.    Everybody knew, I don't lift a board.
10     Q.    Okay. Again, back in October of 2000, had
11 your knee gotten better or was it about the same?
12     A.    It was the same at that point. My knee was
13 the same that first year.
14     Q.    It says in here that they measured the
15 thickness of your muscles in both legs and they were
16 about the same, indicating that you had been walking
17 and there was no atrophy. How would you explain that?
18     A.    If I'd been walking?
19     Q.    It doesn't look like you had any -- that
20 you weren't --
21     A.    I don't recall the report, I just don't.
22     Q.    I'm just, were you up and around at this
23 point or?
24     A.    Up around the house, you mean, sit around?

85

1  numbered, let's just say what's at the first --
2         MR. CIAPCIAK: It starts off, "We
3  obtained."
4         MS. CROW: No. The top of the page
5  starts, "He further advised."
6         Q.   Yes. And the first part of the paragraph
7  -- you starred, so I'm assuming you can go right down
8  to it. It's the next thing you've starred, right?
9         A.   Right.
10        Q.   So the first thing after Page 1 where it
11 says "You aren't entitled to benefits," the next thing
12 you've starred is a paragraph starting, "We obtained a
13 copy." Tell me what you disagree with there.
14        A.   (Looks.) A description of a restaurant
15 manager. That's what I'm starring right now. That's
16 inappropriate right here.
17        Q.   It's what?
18        A.   For what they say the job duties of a
19 restaurant manager, that's why I starred it.
20        Q.   So you disagree with the job description of
21 a restaurant manager?
22        A.   Totally.
23        Q.   From the dictionary of occupational titles
24 provided by the U.S. Department of Labor?

86

1         A.   Yes.
2         Q.   Okay. The next thing you've starred is on
3  the next page. That starts, "You work for a total of
4  93 hours and earned a gross amount of $1850.70. It
5  was further noted that you were laid off due to lack
6  of work." What do you disagree with there?
7         A.   There was plenty of work. It was a five-
8  year project. I was laid off because of my ability to
9  work.
10        Q.   Okay. J.L. Marshall & Sons as a laborer,
11 that's what you're referring to, the prior page?
12        A.   I have it right here.
13        Q.   The prior page, last paragraph. "In order
14 to determine"?
15        A.   That's the company I worked for.
16        Q.   J.L. Marshall & Sons confirmed that you
17 worked for them as a laborer from September through
18 October and made $1,850?
19        A.   Correct.
20        Q.   So that part you agree with?
21        A.   I agree to the amount, yes.
22        Q.   And you agree that you worked for them from
23 September to October of 2000?
24        A.   I don't recall what they said. September

87

1  -- 13 days? Yeah. September, October, yeah.
2         Q.   Okay. The part you don't agree with is
3  that you were laid off due to lack of work?
4         A.   Due to lack -- my ability to work, yeah.
5         Q.   If they indicated that you were laid off
6  due to lack of work, you would disagree with their
7  representation?
8         A.   Of course I would.
9         Q.   So did they lay you off?
10        A.   They told me not to come back.
11        Q.   They what?
12        A.   That's the layoff I got. They told me I
13 was done after I explained my disability, my job
14 description that I was hired for.
15        Q.   What was the job description you were hired
16 for?
17        A.   It was for light driving. Driving in the
18 yard on job site, job sites, driving the truck so they
19 could load the materials off. That's it. Delivery
20 driver.
21        Q.   What?
22        A.   Delivery driver for yard. The job site was
23 so big that they'd give you a cart, a motor cart,
24 truck. And you'd drive to certain sections of all the

88

1  jobs inside that fenced-in area. And we have loads
2  up, unloads. I just drove. I did it for one day and
3  then the second day and then they just asked me to do
4  some heavy lifting and I couldn't do it.
5         Q.   But you were there more than two days
6  though, right?
7         A.   Yes. I just kept on saying I couldn't do
8  whatever they asked me. So they laid me off or told
9  me to leave. I don't recall getting a letter.
10        Q.   They didn't say -- did they tell you this
11 is because of your disability we're laying you off or
12 did they say it was because of lack of work?
13        A.   They said because I was unable to do the
14 positions inside the job.
15        Q.   Okay. The next thing you starred the next
16 sentence, is employment information. Do you see that?
17        A.   Yes.
18        Q.   Not that page, the next page. This
19 employment information. Right here.
20        A.   Yeah.
21        Q.   Second paragraph starts, "This employment
22 information is inconsistent with your repeated
23 representation to Hartford Life that you had never
24 resumed work in any capacity since your leave from

189

1 stay, I said we would only stay --
2      MR. CIAPCIAK: It's on the record.
3      MS. CROW: -- 20 minutes and now I'm
4 saying we'll stay as long as it takes.
5      MR. CIAPCIAK: You changed your mind.
6      MS. CROW: Absolutely, because we're not
7 coming back.
8      MR. CIAPCIAK: Okay.
9      MS. CROW: I told you to hurry up
10 because we wouldn't stay. But we're going to stay,
11 unless you're not.
12      MR. CIAPCIAK: You told me 20 minutes.
13 I went and called and said -- made an appointment
14 because you said, We are not staying past 20 minutes.
15 So I took you at your word. We'll take it up with the
16 judge. That's all.
17      MS. CROW: We will take it up with the
18 judge.
19      MR. CIAPCIAK: No worries.
20      (Suspended 5:45 p.m.)
21
22
23
24

190

1      COMMONWEALTH OF MASSACHUSETTS
2      COUNTY OF MIDDLESEX
3
4      I, Joyce E. Romanow, a Professional
5 Shorthand Reporter and Notary Public in and for the
6 Commonwealth of Massachusetts, do hereby certify that
7 William DeCologero, the witness whose deposition is
8 herein set forth, was identified and duly sworn by me
9 and that such deposition is a true record of the
10 testimony given by the witness on June 5, 2007 to the
11 best of my skill and ability.
12
13      I further certify that I am neither
14 related to nor employed by any of the parties in or
15 counsel to this action, nor am I financially
16 interested in the outcome of this action.
17
18      In witness whereof, I have hereunto set
19 my hand and seal this 25th day of June, 2007.
20
21
22          _____
23      Joyce E. Romanow, Notary Public
24      My Commission Expires: July 6, 2012

191

1      C E R T I F I C A T E
2      I, William DeCologero, do hereby certify that
3 I have read the foregoing transcript of my testimony
4 given on June 5, 2007, and I further certify that said
5 transcript is a true and accurate record of said
6 testimony (with the exception of the following
7 corrections listed below):
8 PAGE  LINE  CORRECTION  REASON
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18      SIGNED UNDER THE PAINS AND PENALTIES OF
19 PERJURY, and executed this _____ day of _____, 2007.
20
21
22          _____
23      WILLIAM DeCOLOGERO
24